UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| ECOLAB Inc., and NALCO COMPANY LLC d/b/a Nalco Water, an Ecolab Company and/or Nalco Water,<br><br>        Plaintiffs,<br><br>v.<br><br>JESSICA GRAILER,<br><br>        Defendant. | Case No.: 3:23-cv-00102-wmc |

## SECOND DECLARATION OF JESSICA GRAILER

I, Jessica Grailer, declare under penalty of perjury that the following is true and correct:

1. I reviewed the materials filed publicly by Plaintiffs Ecolab Inc. and Nalco Company LLC, and I make this declaration based on my personal knowledge.

2. This is the second declaration I am making in this case. Here, I will address some general issues relating to my former job at Nalco, some issues relating to my discussions and text messages with Josh Galliart in January 2023, and some of the accusations that Laurence Lieb makes against me.

### General Issues Relating to My Nalco Job

3. I saw from the plaintiffs' materials that Nalco is calling me a "high-level" or "key" employee. I am not sure exactly what Nalco means by "high-level" or "key" employee, but I do not think those labels are accurate.

4. Nalco hired me in 2012 after I completed my bachelor's degree in Chemical Engineering. The position was what I understood to be an entry-level position for people with my educational background. Beyond my educational knowledge, the position did not require prior work experience.

1

5. No other employees reported to me during my time at Nalco. I was never anyone else's supervisor or manager.

6. I was a customer-facing employee responsible for developing and maintaining business relating to water and process chemical treatment. My title changed more than once as I accumulated time as a Nalco employee, and my geographic area also increased, but my basic job responsibilities mostly stayed the same. At no point did other employees start reporting to me as a result of a change in my job title.

7. I do not know how many other Nalco employees had jobs similar to mine. My understanding, though, was that many did. Even limited to the team that reported to my manager Josh Galliart, I understood that several other people had roles and responsibilities similar to mine.

8. I do not believe that I ever had an office or cubicle during my time at Nalco. I saw from the plaintiffs' materials that Nalco says I was "based" in Verona, Wisconsin. Verona is the city where I rent an apartment to live. To the best of my memory, I never visited any Nalco facilities in Verona or the larger Madison area. When I did work for Nalco in Verona, I worked from my apartment.

9. When I met with my manager Josh Galliart or the other members of his team, we typically would meet at a customer location or a meeting room in a hotel. Sometimes I also met Galliart at Hy-Vee grocery stores, Starbucks, or restaurants.

10. I saw that in his declaration, Galliart said that I managed and serviced accounts in Wisconsin, Illinois, and Minnesota. That is not a complete list of the states I worked in. I additionally managed and serviced accounts in Iowa. Galliart also was based in Iowa, and I sometimes met him at or around customer locations in Iowa.

11. My work primarily focused on responsibilities related to customer relationships. Because I did not go into a Nalco office, I did not physically see other employees in an office setting and was not regularly exposed to the work of others beyond my own area. I was not part of strategic planning sessions to set company budgets, goals, or long-terms plans. My job duties focused on interactions with customers outside of Nalco.

12. I have reviewed the description of my job responsibilities in paragraph 7 of Galliart's declaration. I would not say that I managed and troubleshot "chemical formulations and reformulations." That makes it sound like I was involved in chemical research or development. In reality, although I would apply chemicals that Nalco made and quantify improvements, I was not involved in formulating the chemistries.

13. I have attached, as Exhibit A, a copy of what I believe I used as my resume when looking for a new job last year. That will show how I was describing my own job responsibilities and experience last year.

14. I reviewed the Employee Sales, Service, Marketing & Inventions Agreement that the plaintiffs filed, and I see it has an e-signature with my name on it, as well as a date/time stamp for May 16, 2021.

15. Based just on my memory, I cannot say whether or not I did sign that Employee Sales, Service, Marketing & Inventions Agreement in May 2021. I recall using an e-signature to sign documents while at Nalco, but I do not recall if I did that for this specific document.

16. In the fall of last year, I searched for a copy of what Nalco would be treating as my contract in what I called my "Workday" account at Nalco. All I was able to find is the document that I have attached here as Exhibit B. Although it looks to be mostly identical to the

document the plaintiffs just filed, it did not appear to have my name or e-signature on it when I found it. (See Exhibit B.)

### My January Discussions and Text Messages with Josh Galliart

17. In my first declaration (Dkt 28), I discussed a call that Josh Galliart made to me the afternoon of Sunday, January 8.

18. I agree that during that call, I told Josh Galliart that I was leaving Nalco for ChemTreat.

19. I do not agree that Galliart told me to "cease working immediately" during that call. I did understand (and I think that he and I talked about) how mostly I would no longer be performing my job responsibilities. However, as I discussed in paragraph 36 of my first declaration, he agreed to an offer I made to send him an email about customer action items that would need to be completed (an email I wrote and sent the evening of January 8), and he also agreed to my offer to forward him emails from my Nalco e-mail address that I received from customers with other action items that would need to be completed. In light of that, I think it would be misleading to say I was instructed to "cease working immediately" as of the time I spoke to Galliart on January 8.

20. Another reason that I believe that Galliart did not want me to "cease working immediately" was because he continued to follow up with me after January 8th about work matters.

21. Exhibit B to my first declaration (Dkt. 28-2) includes text messages that Galliart and I exchanged on January 9 and 10. He appears in my phone as Josh and those texts were about work matters.

4

22.     In his January 9 texts, Galliart said he had told "Tyler" that "matt wolf" had not been providing data needed for reports that Tyler was asking for. I understood that what he was talking about in those texts was related to my work with Nalco. "Tyler" is the plant manager for a Nalco customer I had been servicing. Matt Wolf is the production manager for the same customer. I believe the issue with that customer's reports was one of the customer action items in the January 8 email that I wrote to Galliart and discussed in paragraph 36 of my first declaration.

23.     In his January 9 texts, Galliart also said he would "have Patrick discuss" a suggestion that I had made about the same issue with reports. I also understood what Galliart meant by that comment. Two people on Galliart's team were named Patrick, and I understood Galliart was telling me that one of them would be handling the issue with the reports.

24.     On January 10, Galliart and I texted about "marquis." "Marquis" refers to a Nalco customer I had been servicing.

25.     I also do not agree that Galliart instructed me not to "steal" information during our January 8 call. It would not have been necessary for him to give me that instruction, but I do not agree that he said that.

## Laurence Lieb's Declaration

26.     I have reviewed Laurence Lieb's declaration.

27.     For two reasons, I am not able on my own to give a full response to Lieb's accusations.

28.     First, I cannot tell exactly what Lieb is accusing me of doing. I can see that he accuses me of "exfiltrating" different files and photographs. However, I do not think he ever says how he believes that I did that. I have reviewed Lieb's declaration many times, and I do not think

he ever defines his word "exfiltration" or explains where he is accusing me of "exfiltrating" things to.

29. Second, while I generally remember sending and accessing work e-mails as I was closing out my Nalco job duties, I no longer have access to those e-mails, and I would need them to refresh my memory on exact details of what took place. Further, I am not sophisticated with respect to computer forensics and computer-generated reports. For these reasons, I will generally need to defer to technical experts such as Bruce Pixley to respond directly to much of what Lieb says in his declaration.

30. I will try here to address some of the accusations Lieb makes against me, without attempting to be exhaustive or to delve into technical issues that I do not understand.

*Paragraph 17 and Table A of Lieb's Declaration*

31. In paragraph 17 and Table A of his declaration, Lieb accuses me of "accessing" my "Ecolab OneDrive account" at 1:01 p.m. on January 15 and then exfiltrating a list of files.

32. By January 15, I already had returned the Nalco laptop that I used to access what I knew as "OneDrive." However, I still had access to my Nalco email account on January 15, through my personal cell phone. I addressed these matters in paragraphs 5–8, 24, and 37–38 of my first declaration.

33. Based on information that I attached to my first declaration, I can see that I must have been using my Nalco email account (through my personal cell phone) at almost exactly the time that Lieb identifies in paragraph 17 of his declaration. Exhibit D to my first declaration contains screenshots of emails from Adidas and American Eagle that I forwarded from my Nalco email to my personal Gmail on January 15. Those email forwards are time stamped 1:04 p.m., 1:05 p.m., and 1:06 p.m. (See Exhibit D to my first declaration at Dkt. 28-4.)

34. As for the files listed in Lieb's Table A, I recognize some of the file names, but I do not believe that I searched for or tried to do anything with any of those files at the date and time that Lieb gives. I do not know if there is some "computer" sense in which those files or other files could have been "accessed" by software or an application when I was looking for the Adidas and American Eagle emails on my phone, but I can say that I was not trying to find the files that Lieb lists.

*Paragraph 19 of Lieb's Declaration*

35. In paragraph 19 of his declaration, Lieb says that I plugged in my old USB drive to my Nalco laptop at 9:39 p.m. CST on January 8, 2023. He does not appear to accuse me of doing anything improper with the USB after he says I plugged it in, but he still makes that statement about the day and time he says I plugged it in.

36. I do not recall using my USB drive on January 8. The last time I can remember having and using the USB is December 20, when I used it to print a document at a FedEx print shop. I cannot rule out the possibility that I still had the USB on January 8, but I do not remember having it then or doing anything with the USB that late.

*Paragraph 23 of Lieb's Declaration*

37. In paragraph 23 of his declaration, Lieb accuses me of trying to prevent Nalco from accessing "iCloud stored backups" of my old Nalco-issued cell phone. He accuses me of doing that by changing the email address that I use for my Apple ID, from my old @ecolab.com email address to my personal Gmail address.

38. I addressed my iCloud storage in paragraphs 42–45 of my first declaration. As I said there, I started paying for iCloud storage on my personal phone sometime after purchasing a personal phone for myself. I continue to pay for that storage now. As I also said in my first

declaration, when I left Nalco, I used my personal cell phone to change the email address for my Apple ID from my old Nalco email address (which I was no longer going to have) to my personal Gmail address.

39. I intentionally enabled iCloud storage on my personal cell phone. That is the reason I was paying for the iCloud storage.

40. I did not intentionally enable iCloud storage on the cell phone that Nalco issued to me. I do not know for sure whether iCloud storage was ever enabled for that phone, but I did not intend to enable it. As I said in paragraph 14 of my first declaration, to the best of my knowledge, all the Nalco-related information on the phone, aside from text messages and call records, also was available on my Nalco laptop or in my Nalco email. Also, I do not remember anyone at Nalco ever telling me that I should be enabling iCloud storage (or offering to pay for iCloud storage) to back up information on my Nalco cell phone.

41. I see that in paragraph 23 of his declaration, Lieb also claims that I currently have access to "iCloud stored Ecolab property" through my Apple ID.

42. As I said in paragraph 45 of my first declaration, I do not know exactly what information is or is not in the iCloud storage I have been paying for. I have turned over my Apple ID password to Bruce Pixley, and I understand that he is looking to see what is there.

***Paragraphs 24–25 and Exhibit D of Lieb's Declaration***

43. In paragraphs 24–25 and Exhibit D of his declaration, Lieb accuses me of exfiltrating five photos on January 8. (Lieb says in paragraph 25 that three photos are listed in his Exhibit D, but his Exhibit D actually lists four photos in addition to the photo he mentions in paragraph 25, bringing the total to five.)

44.     I could not help but notice that all five photos that Lieb mentions in paragraph 25 or Exhibit D are also listed in Exhibit H to Lieb's declaration. I believe that Lieb is making his accusations about those five photos two different times, first in paragraphs 24–25 and Exhibit D of his declaration, and then again in paragraph 33 and Exhibit H.

45.     Because Lieb's accusations in paragraphs 24–25 and Exhibit D only repeat part of his accusations in paragraph 33 and Exhibit H, I will address those accusations below, when I get to paragraph 33 and Exhibit H of Lieb's declaration.

***Paragraph 26 of Lieb's Declaration***

46.     In paragraph 26 of his declaration, Lieb says that I plugged in my old USB drive to my Nalco laptop at 6:26 a.m. on December 20, 2022. He also says that I unplugged the USB from my laptop at 4:55 p.m. that same day. Lieb does not appear to accuse me of doing anything improper on December 20, but he still makes those statements about when I plugged in and unplugged the USB. He does not give a time zone in this paragraph of his declaration, but I assume he means Central Standard Time, since that is what he uses elsewhere in his declaration and his exhibits.

47.     I have located a paper record that I believe is relevant to this particular statement of Lieb's.

48.     Attached here as Exhibit C is a redacted copy of a Custody Control Form that I received on December 20, when I provided a fluid sample for a drug screening that I needed to do in order to qualify for my new job. (I have redacted my social security number and my date of birth.)

49.     The Custody Control Form says that I turned over custody of my fluid sample to the collector at 4:50 p.m. on December 20. (See Exhibit C.)

50. Based on the Custody Control Form, I do not believe I could have unplugged my USB drive from my laptop at 4:55 p.m. on December 20, as Lieb says I did. I remember using the USB drive to print, at a FedEx print shop, a specific document that I needed to bring with me to the drug screening. I printed that document the afternoon of December 20, shortly before going to the drug screening. Remembering that, and seeing that my Custody Control Form says I gave the collector my sample at 4:50 p.m., I do not believe I could have unplugged my USB from my laptop at 4:55 p.m. The USB needed to be unplugged from my laptop no later than when I visited the print shop, before I went to the drug screening. I needed to connect the USB to the printer at the print shop, and I could not have done that if the USB had been plugged into my laptop.

***Paragraph 30 and Exhibit E of Lieb's Declaration***

51. In paragraph 30 and Exhibit E of his declaration, Lieb accuses me of exfiltrating a number of files on January 8.

52. Lieb says in his paragraph 30 that he counted a total of "161 exfiltrated files." If, however, you look at his Exhibit E, almost every file appears to be listed twice. Based on my experience during my time at Nalco, I as well as other employees at Nalco gave unique files unique file names. I was not in the habit of using the same file name for different documents and I do not believe anyone else at Nalco that I worked with used the same file name for different documents. Based on my experience with Nalco's file naming conventions, by my count, around 80 unique files actually are listed on Lieb's Exhibit E, not 161.

53. I recognize some of the file names in Lieb's Exhibit E and believe it is possible that I used a few of them for work purposes on January 8. But otherwise, I believe that I did not search for or try to do anything with the files listed in Lieb's Exhibit E on January 8.

54. I also do not understand what use many of the files listed in Lieb's Exhibit E would have to anyone at this point. For example, to the best of knowledge and memory, the "Payslip 7.1.20" and "Payslip 7.16.20" files should be copies of my pay slips from July 2020; the "Westin hotel," "adkins lunch," and "Wendys Cogen" files should be copies of hotel and food receipts; the "steel toes.jpeg" file should be a photo of a receipt for steel toed boots; the "BSE golf," "Badger golf," "Badger Golf," and "Badger State Golf" files all should relate to past golf outings; and the "Aspen Hill application" file should be a copy of the application I filled out to rent my apartment in Verona.

### Paragraph 31 and Exhibit F of Lieb's Declaration

55. In paragraph 31 and Exhibit F of his declaration, Lieb accuses me of exfiltrating one PDF file on January 8.

56. I believe I understand from the file name what the file Lieb refers to probably is. I do not, however, believe that I searched for or tried to do anything with that file on January 8.

### Paragraph 32 and Exhibit G of Lieb's Declaration

57. In paragraph 32 and Exhibit G of his declaration, Lieb accuses me of exfiltrating a number of spreadsheets on January 8.

58. I recognize many of the file names listed in Lieb's Exhibit G, and I believe that I used some of those files on or shortly before January 8. For example, I believe that I used the "NALCO Evap 1-4-23," "NALCO Gateway 5G 1-6-23," "PO#493751," and "WW trial calcs" files when writing the January 8 email to Josh Galliart that I mentioned in paragraph 36 of my first declaration.

59. I did not, however, try to "exfiltrate" any of those files on January 8 (although I note again that I do not understand exactly what Lieb means when he accuses me of "exfiltrating" things).

60. For other files listed in Lieb's Exhibit G, I do not believe that I searched for or tried to do anything with them, and I also do not understand what use many of those files would be to anyone at this point. For example, to the best of my knowledge and memory, the "Government Indices 4-2018" file should be outdated public information from 2018; the "Grailer 2017 Vacation," "Grailer 2018 Vacation," and "Vacation Tracker 2019 Grailer" files should be my old vacation trackers from 2017 to 2019; the "Jacket Size Form – Grailer" file should be a document about the size of the jacket I wear; and the "Jaime School Table" and "justin school and monthly expenses" files should be old spreadsheets that I used to help my siblings.

### *Paragraph 33 and Exhibit H of Lieb's Declaration*

61. In paragraph 33 and Exhibit H of his declaration, Lieb accuses me of exfiltrating 43 pictures on January 8. As I mentioned above, the photos listed in Lieb's Exhibit H include the five photos that Lieb also lists in his paragraph 25 and Exhibit D.

62. Based on the file names, I believe I understand what the photos listed in Exhibit H generally should be. To the best of my knowledge and memory, they should be photos that I took in September 2019 when inspecting equipment belonging to a particular Nalco customer that I serviced, inside that customer's plant. As I mentioned in paragraph 14 of my first declaration, I sometimes would take pictures on a phone and then upload them to my Nalco laptop for purposes of documenting and reporting on work I completed when at a customer site.

12

63. I do not believe that I searched for or tried to do anything with the photos that Lieb lists on January 8. I also do not understand how the photos could be useful to anyone at this point. Again, I believe they are photos that I took at a customer's plant in 2019.

### *Paragraph 39 and Exhibit K of Lieb's Declaration*

64. In paragraph 39 and Exhibit K of his declaration, Lieb says that I "downloaded" a number of email attachments on January 8.

65. Later in paragraph 39, Lieb calls those email attachments "the exfiltrated Email Attachments," but I cannot tell if he really is accusing me of "exfiltrating" them or not. Also, to the extent Lieb is saying only that I "downloaded" the attachments, I do not understand where he is saying that I downloaded them to.

66. Lieb says in his paragraph 39 that he counted a total of "66 email attachments." If, however, you look at his Exhibit E, nearly all the file names seem to appear more than once. I think that Lieb may be double counting the files again, as in paragraph 30 and Exhibit E of his declaration.

67. Although generally I will need to defer to Bruce Pixley about what the available data shows or does not show, this is another instance where I think I have some relevant information.

68. I believe that all or nearly all the files listed in Lieb's Exhibit K probably were attachments to emails that I received or sent on January 8. For example, I believe I recognize the "3571-Illinois River" attachments as copies of reports I received weekly by email. I also believe that the files with names like "image001.png" or "image002.png," etc., should be graphics files for graphics or pictures embedded in emails. I further believe that I recognize the "ADM Clinton Cogen" file as a report that I wrote on January 8 and distributed by email, using an online

platform. And I believe I recognize the "NALCO Evap 1-4-23," "NALCO Gateway 5G 1-6-23," "PO#493751," and "WW trial calcs" files as files that I attached to the January 8 email to Josh Galliart that I mentioned in paragraph 36 of my first declaration.

Executed this 15 day of March, 2023.

                                                                                          _Jessica Grailer_
                                                                                           Jessica Grailer