Laurence D. Lieb
January 23, 2024

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN


ECOLAB, INC., and NALCO          )
COMPANY, LLC, d/b/a NALCO        )
WATER, an ECOLAB COMPANY         )
and/or NALCO WATER,              )
                                 )
            Plaintiffs,          )
                                 )
     -vs-                        )   No. 3-cv-102-wmc
                                 )
JESSICA GRAILER,                 )
                                 )
        Defendant.               )


        The deposition of LAURENCE D. LIEB,

called by the Defendant for examination, pursuant

to notice and pursuant to the Federal Rules of

Civil Procedure for the United States District

Courts pertaining to the taking of depositions,

taken before Noreen E. Resendez, Registered

Professional Reporter and Notary Public within and

for the County of DuPage and State of Illinois, at

300 North LaSalle Street, Suite 4000, Chicago,

Illinois, commencing at the hour of 9:11 a.m. on

Tuesday, January 23, 2024.

Laurence D. Lieb
January 23, 2024

Page 2

```
 1  A P P E A R A N C E S:
 2     FAEGRE DRINKER BIDDLE & REATH, By
        MR. DAVID YOSHIMURA
 3     801 Grand Avenue, 33rd Floor
        Des Moines, Iowa  50309
 4     515.248.9000
        david.yoshimura@faegredrinker.com
 5
            On behalf of the Plaintiff;
 6
 7     QUARLES & BRADY, LLP, By
        MR. MATTHEW SPLITEK
 8     33 East Main Street, Suite 900
        Madison, Wisconsin  53703
 9     608.251.5000
        matthew.splitek@quarles.com
10
            and
11
       QUARLES & BRADY, LLP, By
12     MS. LAUREN BOLCAR
        2020 K Street NW, Suite 400
13     Washington, DC 20006
        202.372.9600
14     lauren.bolcar@quarles.com
15          On behalf of the Defendant.
16
17
18  ALSO PRESENT:
19  Christopher Messer - Videographer
20
21
22
23
24
```

Page 3

```
 1                I N D E X
 2  WITNESS                       EXAMINATION
 3  LAURENCE D. LIEB
 4     BY MR. SPLITEK                 5
 5
 6            E X H I B I T S
 7     LAURENCE D. LIEB
 8  DEPOSITION EXHIBIT          MARKED FOR ID
 9     No. 1        Invoice              19
       No. 2        Report               20
       No. 3        Report Exhibits      20
10     No. 4        Digitally reviewed   40
       No. 5        Digital Guardian Report  41
11     Nos. 6 and 7  Report              53
       No. 36       Exhibit F            75
12     No. 8        Declaration          88
       No. 9        Screenshots          102
13     No. 10       Audit Log            105
       No. 11       Screenshots          131
14     No. 12       Audit log            161
       No. 13       Microsoft            181
15     No. 14       Microsoft            182
       No. 15       Microsoft            183
16     No. 16       Elastic Doc          184
       No. 17       Elastic Doc          185
17     No. 18       Microsoft            194
       No. 19       Exhibit G            196
18     Nos. 20, 21   Axiom Screenshot    222
       No. 22       Axiom Screenshot     230
19     Nos. 23, 24   Axiom Screenshot    239
       Nos. 25, 26   Axiom Screenshot    247
20     No. 27       Hyperlink            261
       No. 28       Hyperlink            261
21     No. 29       Axiom Screenshot     266
       No. 30       Axiom Screenshot     266
22     No. 31       OSForensics          268
       No. 32       OSForensics          273
23     No. 33       OSForensics          277
       No. 35       Exhibit E            298
24     No. 38       Special Master Report  311
```

Page 4

```
 1          THE VIDEOGRAPHER:  We are now on the
 2  record.  Today's date is January 23rd, 2024.
 3  The time is approximately 9:11 a.m.  This is
 4  the video recorded deposition of Laurence
 5  Lieb in the matter of Ecolab, et al., versus
 6  Jessica Grailer heard before the United
 7  States District Court, Western District of
 8  Wisconsin, Case Number 3.23 CV 00102.
 9          My name is Christopher Messer.  I
10  am the videographer.
11          At this time, Counsel, you may now
12  state your appearances for the record and
13  then our court reporter will swear in the
14  witness.
15      MR. YOSHIMURA:  David Yoshimura on
16  behalf of plaintiffs with Faegre Drinker
17  Biddle & Reath.
18          MR. SPLITEK:  Matt Splitek of Quarles &
19  Brady for the defendant.  And with me I also
20  have Lauren Bolcar, Quarles & Brady.
21          (Witness duly sworn remotely.)
22  WHEREUPON:
23          LAURENCE D. LIEB,
24  called as a witness herein, having been first duly
```

Page 5

```
 1  sworn, was examined and testified as follows:
 2                   EXAMINATION
 3  BY MR. SPLITEK:
 4      Q.   Good morning.
 5      A.   Good morning.
 6      Q.   How many times have you been deposed
 7  before?
 8      A.   I believe it's at least eight.
 9      Q.   You've done this before then but I'll
10  go over some of the ground rules.  You're under
11  oath testifying just like you were in court.
12          Do you understand?
13      A.   I do.
14      Q.   The court reporter will need verbal
15  answers and words so that the record is clear.
16          You understand that?
17      A.   I do.
18      Q.   If you don't understand a question,
19  will you tell me?
20      A.   I will.
21      Q.   If you need a question repeated, can
22  you tell me or the court reporter?
23      A.   I will.
24      Q.   All right.  Also if you want a break,
```

Laurence D. Lieb
January 23, 2024

Page 6

1  tell me that, too, please.
2       A.    Absolutely.
3       Q.    Who engaged you for this matter?
4       A.    I was engaged by Ecolab Corporation
5  through their original outside counsel, Fisher and
6  Phillips.
7       Q.    And when were you engaged?
8       A.    I was engaged -- my recollection is
9  early 2023.
10      Q.    Do you remember when you were first
11  contacted about anything relating to Jessica
12  Grailer?
13      A.    I don't recall the specific date.
14      Q.    Was it right around the time you were
15  engaged?
16      A.    I'm not sure I understand the question.
17      Q.    Were you -- did a lot of time elapse
18  between when you were first contacted about
19  anything related to Jessica Grailer and when you
20  were engaged?  Was there a gap?
21      A.    I don't believe so.
22      Q.    Okay.  Do you remember when you first
23  performed any work relating to Jessica Grailer?
24      A.    My recollection is February or March of

Page 7

1  2023.
2       Q.    All right.  Other than this case, how
3  many times has Ecolab or Nalco Company engaged you
4  or your company, Tyger Forensics?
5            MR. YOSHIMURA:  Objection to scope.
6  BY THE WITNESS:
7       A.    I'm currently engaged on, including the
8  Grailer matter, four matters.
9       Q.    Those are current?
10      A.    Current.
11      Q.    Other than the four current Ecolab lab
12  matters, have you ever been engaged on any other
13  Ecolab or Nalco matters?
14      A.    No.
15            MR. YOSHIMURA:  Objection to scope.
16  BY MR. SPLITEK:
17      Q.    Let's go through the four engagements.
18  So one of them is this one, the Jessica Grailer
19  engagement?
20      A.    Yes.
21      Q.    Do the other three also involve former
22  Ecolab employees?
23            MR. YOSHIMURA:  Objection; scope.
24

Page 8

1  BY THE WITNESS:
2       A.    Two do and one I believe involves --
3  well, all three do and current employees as well.
4       Q.    Okay.  What was the first matter where
5  you were engaged by Ecolab?
6            MR. YOSHIMURA:  Objection.
7  BY THE WITNESS:
8       A.    I believe it was Ecolab Nalco versus
9  Anthony Ridley and Chem Tree.
10      Q.    Okay.  And where is that case pending?
11            MR. YOSHIMURA:  Objection.
12  BY THE WITNESS:
13      A.    I believe it's pending in federal court
14  in Tennessee.
15      Q.    Okay.
16      A.    I could be wrong.
17      Q.    All right.  And that case involves an
18  employee or former employee named Anthony Ridley,
19  right?
20            MR. YOSHIMURA:  Objection.
21  BY THE WITNESS:
22      A.    That is correct.
23      Q.    When was the second case for which
24  Ecolab engaged you?

Page 9

1            MR. YOSHIMURA:  Objection.
2  BY THE WITNESS:
3       A.    I believe it is a case involving a
4  former employee of Ecolab named Simon Walker.
5       Q.    Where is that case pending?
6            MR. YOSHIMURA:  Objection.
7  BY THE WITNESS:
8       A.    I don't recall.
9       Q.    And what was the third case for which
10  Ecolab engaged you?
11            MR. YOSHIMURA:  Objection.
12  BY THE WITNESS:
13      A.    I believe it is the Jessica Grailer
14  matter.
15      Q.    And what was the fourth case for which
16  Ecolab engaged you?
17            MR. YOSHIMURA:  Objection.
18  BY THE WITNESS:
19      A.    It's -- I believe the case caption is
20  Ecolab versus Washing Systems, Inc.
21      Q.    Okay.  And Ecolab versus Washing
22  Systems, Inc., does that involve any Ecolab
23  employees or former employees?
24            MR. YOSHIMURA:  Objection.

Laurence D. Lieb
January 23, 2024

Page 10

```
 1   BY THE WITNESS:
 2        A.   It does.
 3        Q.   How many employees or former employees?
 4             MR. YOSHIMURA:  Objection.
 5   BY THE WITNESS:
 6        A.   One former employee.
 7        Q.   And what's that former employee's name?
 8             MR. YOSHIMURA:  Objection.
 9   BY THE WITNESS:
10        A.   I believe his last name is Shanklin.
11        Q.   Can you spell that for the record?
12        A.   I can.  S-H-A-N-K-L-I-N.
13        Q.   All right.  And is Chem Tree involved
14   at all in that Washing Systems, Inc., matter?
15        A.   I don't believe so.
16             MR. YOSHIMURA:  Objection.
17   BY MR. SPLITEK:
18        Q.   Does the Washing Systems, Inc. matter
19   involve any question as to whether anyone
20   exfiltrated materials from Ecolab or Nalco?
21             MR. YOSHIMURA:  Objection.  And at this
22             point, I think now that we're getting into
23             the substance of these cases, Counsel, and we
24             may be approaching questions of matters that
```

Page 11

```
 1             are attorney-client privilege, I'm going to
 2             instruct the witness to the extent that any
 3             of his answers may be privileged, that he not
 4             answer this question.
 5   BY THE WITNESS:
 6        A.   I'm not attorney but my understanding
 7   of the question you're asking would ask me to
 8   reveal potentially privileged information.
 9        Q.   Okay.  And that's fine.  I just want to
10   make sure the record is clear.
11             You are on -- well, for both of you --
12   your attorney's instruction you won't -- you can't
13   tell me whether in the Washing Systems, Inc. case,
14   you performed any analysis of whether somebody
15   exfiltrated materials from Ecolab or Nalco?
16        A.   My understanding of the question is
17   you're asking me to reveal or disclose privileged
18   communication I had with Ecolab's counsel.
19        Q.   All right.  How did you first get
20   connected with Ecolab?
21        A.   I was engaged by their outside counsel,
22   Fisher and Phillips.
23        Q.   Did you know anyone at Ecolab or Nalco
24   before you were first engaged by Ecolab?
```

Page 12

```
 1        A.   I did not.
 2        Q.   All right.  All together, about how
 3   much have you been paid or has your company Tyger
 4   Forensics been paid for Ecolab engagements?
 5             MR. YOSHIMURA:  Objection.
 6   BY THE WITNESS:
 7        A.   I would -- my recollection is roughly
 8   $100,000, in that neighborhood.
 9        Q.   How many times has the Fisher Phillips
10   law firm engaged you or your company Tyger
11   Forensics?
12             MR. YOSHIMURA:  Objection.  I'm not
13             sure answering that question would disclose
14             any sort of privilege.  I may have been
15             engaged by them on matters that were internal
16             investigations of that sort.  So I don't know
17             -- I don't want to breach any sort of
18             confidentiality.
19   BY MR. SPLITEK:
20        Q.   I'm just asking for a number.  How many
21   times?
22        A.   I don't recall.
23        Q.   Can you estimate it?
24        A.   No.
```

Page 13

```
 1        Q.   Is it more than 20?
 2        A.   I don't recall.
 3        Q.   Is it more than 50?
 4        A.   No.
 5        Q.   Is it possibly between 20 and 50 times?
 6        A.   No.
 7        Q.   Is it under 20?
 8             MR. YOSHIMURA:  Objection; asked and
 9             answered.
10   BY THE WITNESS:
11        A.   I don't want to disclose any sort of --
12   or breach any sort of confidentiality agreements.
13        Q.   All right.  And just so the record is
14   clear, you're not going to tell me how many times
15   the Fisher Phillips law firm has engaged you?
16             MR. YOSHIMURA:  Objection.
17   BY THE WITNESS:
18        A.   No.
19        Q.   How did you first get connected with
20   Fisher Phillips?
21        A.   I was brought in by another electronic
22   discovery provider to -- because I'm a licensed
23   Michigan private investigator, which is required
24   to perform computer forensics in the State of
```

Laurence D. Lieb
January 23, 2024

Page 14

1  Michigan, and this other E-discovery provider did
2  not have a licensed Michigan PI on staff, and that
3  case involved Fisher Phillips.
4      Q.   And when was that?
5      A.   Two years ago.
6      Q.   Did you know anyone at the Fisher
7  Phillips firm before you were first engaged by
8  Fisher Phillips?
9      A.   I had never heard of them before that.
10     Q.   What were you asked to do when you were
11 initially engaged for this matter?
12         MR. YOSHIMURA:  Objection to the extent
13     that question calls for privileged
14     communications with counsel, instructing the
15     witness not to answer.
16 BY THE WITNESS:
17     A.   Can you be more specific, please?
18     Q.   First I want to get an answer at least
19 to the question I asked.
20         So when you were first engaged for this
21 matter, what were you initially asked to do?
22         MR. YOSHIMURA:  So to the extent that
23     your answer would call for a privileged
24     communication between you and Fisher

Page 15

1      Phillips, don't answer that.  If you can
2      answer the question without revealing
3      privileged communication, answer it.
4  BY THE WITNESS:
5      A.   Well, I can state for the record that I
6  created a forensic image of Jessica Grailer's
7  former work laptop.  I then built forensic
8  databases of that laptop using Magnet Forensics
9  Axiom and Passmark's OSForensics software tools.
10 Performed forensic analysis, wrote my declaration,
11 which you obviously have a copy of.
12     Q.   And I'm just going to ask it again,
13 though.
14         When you were initially engaged for the
15 matter, what were you asked to do?
16         MR. YOSHIMURA:  Same objection.  Also
17     asked and answered.
18 BY THE WITNESS:
19     A.   I really don't understand ur question.
20     Q.   And just to clarify, I'm not asking
21 what you did.  I'm asking what you were asked to
22 do.
23         MR. YOSHIMURA:  Same objections and
24     same instructions.

Page 16

1  BY THE WITNESS:
2      A.   Yeah, I honestly don't understand your
3  question.  I honestly don't.  Can you please be
4  more specific what you're ...
5      Q.   Did you talk to a person when you were
6  engaged for the matter?
7      A.   Yes.
8      Q.   And who was the person?
9      A.   That was Michael Honeycutt at Fisher
10 and Phillips.
11     Q.   And did Michael Honeycutt and you talk
12 about what you were being asked to do in the
13 engagement for which you were being engaged?
14         MR. YOSHIMURA:  Objection.  To the
15     extent that question can be understood to
16     call for privileged communications, I'll
17     instruct Mr. Lieb not to answer.
18         To the extent you can answer
19     without revealing privileged communication,
20     you may.
21 BY THE WITNESS:
22     A.   Yeah, I don't understand what you're --
23 can you please be more specific in what you're
24 asking me.  I really don't understand your

Page 17

1  question.
2         MR. SPLITEK:  Can you read the question
3     back again, please?
4             (Whereupon, the record
5             was read as requested.)
6  BY THE WITNESS:
7      A.   It sounds -- I'm interpreting your
8  question that you are asking me to reveal
9  potentially privileged communication.
10     Q.   To make sure the record is clear then,
11 you're not going to answer the question, right?
12         MR. YOSHIMURA:  Objection.
13 BY THE WITNESS:
14     A.   Are you asking me to reveal privileged
15 communication?
16     Q.   No.  Right now I'm asking just for you
17 to confirm that you're not going to answer the
18 question.
19         MR. YOSHIMURA:  Objection.
20 BY THE WITNESS:
21     A.   So please be more specific in your
22 question so that I'm not being asked to reveal
23 privileged communication with Fisher Phillips
24 counsel.

Laurence D. Lieb
January 23, 2024

Page 18

```
 1      Q.    So my current question is just whether
 2  or not you are going to answer the last question.
 3  That's all.  It's nothing about Fisher Phillips
 4  right now.
 5            MR. YOSHIMURA:  Objection.
 6  BY THE WITNESS:
 7      A.    Well, my current understanding is
 8  you're asking me to directly reveal privileged
 9  communication or potentially privileged
10  communication with Ecolab counsel.
11      Q.    And so for that reason you're not going
12  to answer the question, right?
13            MR. YOSHIMURA:  Objection; asked and
14      answered.
15  BY THE WITNESS:
16      A.    Yes, I'm not going to reveal
17  potentially privileged communication.
18      Q.    Thank you.  I just want to make sure
19  the record is clear as we're moving through here.
20            And if you're not going to answer this
21  question, just tell me.  But what were you told
22  this case was about when you were first engaged?
23            MR. YOSHIMURA:  Objection.  To the
24      extent this calls for privileged
```

Page 19

```
 1  communication, I would instruct Mr. Lieb not
 2      to answer.
 3  BY THE WITNESS:
 4      A.    I don't recall being told the case --
 5  you're asking me what the case was about.  I don't
 6  recall any conversation about what the case was
 7  about.
 8      Q.    Have you invoiced your client for the
 9  work you've performed in this matter?
10      A.    I have.
11      Q.    And have your invoices provided
12  itemized time entries for your work?
13      A.    They have.
14            MR. SPLITEK:  I'm going to hand you
15      Exhibit 1.
16            (Deposition Exhibit No. 1 was
17            introduced to the witness.)
18  BY MR. SPLITEK:
19      Q.    Is Exhibit 1 a copy of your first
20  invoice in connection with this matter?
21      A.    I believe so.
22            MR. SPLITEK:  I'm going to hand you
23      Exhibit 2.
24
```

Page 20

```
 1            (Deposition Exhibit No. 2 was
 2            introduced to the witness.)
 3  BY MR. SPLITEK:
 4      Q.    Is Exhibit 2 a copy of your report in
 5  this matter?
 6      A.    Let me read it.  It is.
 7            MR. SPLITEK:  I'm going to hand you
 8      Exhibit 3.
 9            (Deposition Exhibit No. 3 was
10            introduced to the witness.)
11  BY MR. SPLITEK:
12      Q.    Does Exhibit 3 contain the exhibits to
13  your report in this matter?
14            MR. YOSHIMURA:  While he's reviewing
15      this matter, I would just move the final
16      exhibit in the packet that you've just handed
17      me appears to have been cropped in the
18      margins of the pages so it may not reflect
19      the complete exhibit.
20  BY THE WITNESS:
21      A.    Yeah, that's right.  If we're going to
22  refer to the exhibits, particularly the ones from
23  OSForensics, which are in full color --
24            MR. SPLITEK:  Can we go off the record
```

Page 21

```
 1  one moment?
 2            THE VIDEOGRAPHER:  The time is
 3  9:30 a.m.  We are going off the record.
 4            (Whereupon, a discussion
 5            was had off the record.)
 6            THE VIDEOGRAPHER:  The time is 9:32
 7  a.m.  We are back on the record.
 8  BY MR. SPLITEK:
 9      Q.    Mr. Lieb, I am handing you a new and
10  better copy of Exhibit 3.
11      A.    Okay.
12      Q.    Does Exhibit 3 contain the exhibits to
13  your report in this matter?
14      A.    It does.
15      Q.    So does Exhibit 2, which is your
16  report, contain a complete statement of all of the
17  opinions you will express in this matter?
18            MR. YOSHIMURA:  Objection.
19  BY THE WITNESS:
20      A.    I don't really understand that
21  question.
22      Q.    All right.  Well, I'll ask it again.
23  It's just yes or no.
24            Does Exhibit 2, which is your report,
```

Laurence D. Lieb
January 23, 2024

Page 22

1  contain a complete statement of all of the
2  opinions you will express in this matter?
3              MR. YOSHIMURA:  Objection.
4  BY THE WITNESS:
5      A.   I guess it depends on what questions
6  you ask me.  So if you ask me about the report,
7  then I'll answer regarding my opinions expressed
8  in the report.  But if you're asking me a question
9  about an opinion or information unrelated to what
10 is in this report, then I'm going to answer you
11 directly.
12             Did I misinterpret your question?
13     Q.   Let's try again.
14             Does Exhibit 2 contain a complete
15 statement of all of the opinions you currently
16 intend to express in this matter?
17             MR. YOSHIMURA:  Objection.
18 BY THE WITNESS:
19     A.   I don't want to answer a question that
20 I think you're asking me because occasionally that
21 gets people angry with me.  So do you want me to
22 answer what I think you're asking me or should I
23 give you a chance to ask more specifics or ...
24     Q.   Why don't we start with you answering

Page 23

1  the question that I asked.
2      A.   Okay.
3      Q.   So what's that?
4      A.   Please repeat it.
5              MR. SPLITEK:  Can you repeat the
6      question for the witness?
7                  (Whereupon, the record
8                   was read as requested.)
9  BY THE WITNESS:
10     A.   I'm not really understanding that
11 question.  But I will answer that the -- I stand
12 by, and no information, no evidence has come to my
13 attention or knowledge that has changed any of the
14 conclusions or opinions I reached or expressed in
15 my declaration.  And if you ask me a question that
16 was not covered in this subject, I'm going to
17 answer you directly as well.
18     Q.   Does Exhibit 2, which again, is your
19 report, contain a complete statement of the basis
20 and reasons for the opinions that you intend to
21 express in this matter?
22             MR. YOSHIMURA:  Objection.
23 BY THE WITNESS:
24     A.   I honestly don't understand that

Page 24

1  question.  So I will respond that -- no
2  information has come to my attention that changes
3  any of the opinions expressed in my Exhibit 2
4  report.  But if you ask me a question that -- on a
5  subject that was not covered in here, my
6  understanding is I'm required to -- you are an
7  officer of the court, I'm required to and I will
8  answer you directly.
9      Q.   So taken together, do Exhibits 2 and 3
10 identify all of the facts and data that you
11 considered in forming your opinions in this
12 matter?
13             MR. YOSHIMURA:  Objection.
14 BY THE WITNESS:
15     A.   Yes.
16     Q.   And taken together, do Exhibits 2 and 3
17 identify all of your relevant qualifications?
18     A.   Yes.  I'm not trying to be difficult.
19 I'm honestly not understanding the question.
20     Q.   You considered a Digital Guardian
21 report in your analysis, right?
22     A.   I did.
23     Q.   And Digital Guardian is software that
24 Ecolab had installed on Grailer's work laptop,

Page 25

1  right?
2      A.   Yes.  To be specific, Digital Guardian
3  is a software that is running on a server
4  controlled by Ecolab and there's an agent, what is
5  known as an agent, running on all Ecolab
6  employee's work stations, the Digital Guardian.
7              So there is both.  There's the overall
8  software running on a server and then there's an
9  agent that's running on all the Ecolab employees'
10 laptops.
11     Q.   And the Digital Guardian agent was
12 running on Grailer's laptop, right?
13     A.   Yes.
14     Q.   Okay.  And Digital Guardian is designed
15 to record the exfiltration of files, right?
16     A.   That's my understanding.  According to
17 Digital Guardian's website it categorizes itself
18 as a data loss prevention software.
19     Q.   For example, Digital Guardian is
20 designed to make a record if files are copied to
21 an external storage device like a USB thumb drive,
22 right?
23     A.   That is correct.
24     Q.   Okay.  And in your report, you opine

Laurence D. Lieb
January 23, 2024

Page 26

1 that Grailer copied files to a USB thumb drive,
2 right?
3        A.   I do.
4        Q.   Okay.  Does the Digital Guardian report
5 that you considered record Grailer copying those
6 files to her USB thumb drive?
7        A.   No, because it cuts off at a time
8 before those acts occurred.
9        Q.   What time does it cut off?
10       A.   I don't have the report in front of me
11 so I don't recall specifically.
12       Q.   Did you do any analysis to determine
13 that the Digital Guardian report cut off at a
14 certain time?
15       A.   If you're asking me if I analyzed the
16 Digital Guardian report that was provided to me by
17 Ecolab, I did analyze that report.
18       Q.   And that was a bad question.  So let me
19 ask a better one.
20            How did you determine -- well, let me
21 back up one more time.
22            You said the Digital Guardian report
23 cut off at a certain time, right?
24       A.   Yes.

Page 27

1        Q.   What do you mean by it cut off?
2        A.   The -- I don't have the Digital
3 Guardian report in front of me, but it's -- the
4 last entry is a specific time and that's what
5 I'm -- that time is what I'm describing is the end
6 of that report on January 8th.
7        Q.   Okay.  Do you know whether the Digital
8 Guardian agent was still running on Grailer's
9 laptop after the last entry in the Digital
10 Guardian report?
11       A.   I don't know.
12       Q.   Did you do any analysis to figure out
13 whether it was continuing to run after the last
14 entry in the Digital Guardian report?
15       A.   I did not.
16       Q.   But you could do that, right?
17       A.   I could do it if I was asked to, yes.
18       Q.   But you didn't do it?
19       A.   I didn't do it.
20            MR. YOSHIMURA:  Objection.
21 BY MR. SPLITEK:
22       Q.   And I take it no one did ask you to
23 analyze whether the Digital Guardian agent was
24 continuing to run in Grailer's laptop after the

Page 28

1 last entry that you saw in the Digital Guardian
2 report?
3            MR. YOSHIMURA:  Objection to the extent
4       that you may call for privileged information.  I
5       would instruct Mr. Lieb not to reveal any
6       privileged communications.
7 BY THE WITNESS:
8       A.   Yeah, I received no direction
9 whatsoever from Ecolab's counsel as to what type
10 of analysis to perform.  I performed -- since
11 theft of trade secrets is -- one of our practice
12 is my specialties.  I have a standard set of
13 analysis steps that I undertake in each of these
14 cases.  So I performed those steps in this case as
15 well.
16 BY MR. SPLITEK:
17       Q.   But sitting here today, you don't know
18 whether or not the Digital Guardian agent was
19 still running on Grailer's laptop after the last
20 entry that you saw in the Digital Guardian report?
21            MR. YOSHIMURA:  Objection; asked and
22       answered.
23 BY THE WITNESS:
24       A.   I did not perform any analysis to see

Page 29

1 if the Digital Guardian agent running was still
2 running after the Digital Guardian report that was
3 provided to me that Ecolab had ended.
4       Q.   And if you didn't perform any analysis
5 to see if it was running, then you don't know
6 whether it was running, right?
7            MR. YOSHIMURA:  Objection; asked and
8       answered.
9 BY THE WITNESS:
10      A.   Yeah, I didn't analyze it because I
11 didn't need to.
12      Q.   What do you mean you didn't need to?
13      A.   Well, in my Exhibit 2 declaration all
14 of the -- so first let me state for the record
15 that I'm an independent expert, meaning no matter
16 who asks me a question, my answer is going to be
17 exactly the same, period, end of story.
18            Literally 100 percent of my work is
19 based upon science and can be replicated by a
20 qualified peer.  And I've been taught and mentored
21 that to the extent that -- to assume that judge,
22 jury, officers of the court are all brilliant in
23 their own field, to the extent they don't
24 understand my answer, it's a failure on my part to

Laurence D. Lieb
January 23, 2024

Page 30

1  explain my opinion in plain English.
2          So the items I'm expressing in Exhibit
3  2, I quote and reference, you'll notice there is
4  footnotes where I found the evidence that I'm
5  referencing in my declaration and you'll see that
6  I reference a specific location on her laptop
7  computer, for example, so that any qualified peer
8  can go look at a forensic image of her laptop, the
9  same exact location that I found, and they would
10  find that same exact evidence.
11      Q.    So right now I want to keep talking
12  about the Digital Guardian report.
13      A.    Okay.
14      Q.    So the Digital Guardian report was --
15  Digital Guardian was designed to record the type
16  of exfiltration that you're accusing Grailer of
17  engaging in on January 8th, right?
18          MR. YOSHIMURA:  Objection;
19      argumentative.
20  BY THE WITNESS:
21      A.    My understanding working with Ecolab
22  and their Digital Guardian reports on multiple
23  cases is that Ecolab has -- and with any company
24  using Digital Guardian, will set up rules such

Page 31

1  that if a rule is violated, it's -- a flag is
2  triggered.  But that's kept at the -- on the,
3  we'll call it the server side.
4          So the local agent running on the
5  machine is just a local agent that's reporting
6  back or sending information to the Digital
7  Guardian server.
8      Q.    Do you know whether or not the Digital
9  Guardian report records any instances of Grailer
10  copying files to the USB thumb drive that you
11  mention in your report?
12      A.    I did not -- my analysis of the Digital
13  Guardian report provided to me by Ecolab did not
14  find any evidence of, what I would describe as
15  exfiltration of files to an external USB media or
16  I would have referenced that in my report.
17      Q.    But don't you want to know why the
18  alleged exfiltration was not recorded in the
19  Digital Guardian report?
20          MR. YOSHIMURA:  Objection.
21  BY THE WITNESS:
22      A.    Well, the exfiltration that I found was
23  performed after the Digital Guardian report cuts
24  off time-wise.  So that is the explanation.

Page 32

1      Q.    But you already told me that you don't
2  know whether the agent was still running.
3      A.    You're not understanding -- so there is
4  an agent.
5          MR. YOSHIMURA:  He has to ask you a
6      question then you can answer the question.
7      There is no question pending right now.  That
8      was a statement from counsel.
9          THE WITNESS:  Sorry.
10  BY MR. SPLITEK:
11      Q.    My next question is what were you about
12  to tell me?
13          MR. YOSHIMURA:  Objection.
14  BY THE WITNESS:
15      A.    Can you repeat your statement because
16  you were --
17      Q.    Yes.
18          My statement was you told me earlier
19  that you don't know whether the Digital Guardian
20  agent was still running on her laptop after the
21  last entry that you saw on the report, right?
22      A.    Right.
23      Q.    And then you said you don't understand,
24  right?

Page 33

1      A.    I don't understand what?
2          MR. YOSHIMURA:  Objection.
3  BY THE WITNESS:
4      A.    I understand --
5      Q.    I think you told me that I didn't
6  understand.
7      A.    Well, you were mischaracterizing.  So
8      the --
9          MR. YOSHIMURA:  Larry, he did not ask
10      you a question.
11          THE WITNESS:  Okay, sorry.
12  BY MR. SPLITEK:
13      Q.    My question is what were you going to
14  tell me that I didn't understand?
15          MR. YOSHIMURA:  Objection.
16  BY THE WITNESS:
17      A.    The Digital Guardian agent running on
18  the Ecolab employee machines sends information to
19  the Digital Guardian server and then that is what
20  -- from what the reports are run, including the
21  one that I analyzed.
22      Q.    How would Grailer have exfiltrated the
23  files that you say she exfiltrated without that
24  being recorded by Digital Guardian?

Laurence D. Lieb
January 23, 2024

Page 34

1    A.    I see that as she may not have been
2  connected to the Internet.  That's my explanation
3  because she -- again, the agent running on the
4  machine has to report -- on her laptop has to
5  report back to the Digital Guardian mother ship.
6          So if it is -- if it is not connected
7  or she shuts off that agent, it is not going to
8  report back.  So the Digital Guardian mother ship
9  is only reporting and providing -- collecting
10  information that the laptops are sending to it.
11    Q.    Okay.  And did you do any analysis to
12  determine whether Grailer could have exfiltrated
13  files from the laptop to a thumb drive without the
14  Digital Guardian reporting it, just by not being
15  connected to the Internet?
16          MR. YOSHIMURA:  Objection.
17  BY THE WITNESS:
18    A.    Did you ask me if I tested that?  I
19  didn't understand the question.
20    Q.    Let me first ask a preliminary
21  question.
22          Are you saying that you believe Grailer
23  exfiltrated files from her laptop to a thumb drive
24  when she was not connected to the Internet?

Page 35

1    A.    What I'm saying is I found -- and any
2  independent forensic specialist analyzing the same
3  laptop will find the same information that I
4  reference in my declaration that Grailer
5  exfiltrated a significant number of files to an
6  external USB drive.
7    Q.    That's not my question.
8          My question is:  Are you saying that
9  Grailer exfiltrated files from her laptop to her
10  thumb drive when she was -- when the laptop was
11  not connected to the Internet?
12          MR. YOSHIMURA:  Objection.
13  BY THE WITNESS:
14    A.    What I'm saying is that the Digital
15  Guardian report that I was provided with cuts off
16  at a specific time.  I don't have it in front of
17  me.  I analyzed that report, obviously, to see if
18  there was any evidence of exfiltration to USB
19  drive.  I did not find any in the Digital Guardian
20  report, otherwise, I would have reported that in
21  my declaration.
22          I did find evidence of exfiltration
23  that any other independent qualified forensic
24  expert can find as well and confirm by analyzing

Page 36

1  the laptop just as I did.
2    Q.    But it still -- it still just isn't
3  really answering my question.  I'm going to try
4  again.  It's really at this point just a yes-or-no
5  question.
6          Are you or are you not -- are you or
7  are you not saying that Grailer was not connected
8  to the Internet when you say that she exfiltrated
9  files from her laptop to her thumb drive?
10          MR. YOSHIMURA:  Objection.
11  BY THE WITNESS:
12    A.    I don't recall.
13    Q.    I'm just asking if you are saying that.
14          MR. YOSHIMURA:  Objection.
15  BY THE WITNESS:
16    A.    I don't recall.  I'd have to have the
17  Axiom -- Magnet Axiom forensic database in front
18  of me to answer that specific question.  I know
19  that Axiom database was provided to your side so
20  that you actually have the ability to answer that
21  question yourself.
22    Q.    Sitting here today, do you know whether
23  or not Grailer's laptop was connected to the
24  Internet during the time that you are claiming she

Page 37

1  exfiltrated files to her thumb drive?
2    A.    I don't recall.
3    Q.    But I'm just asking do you know.
4    A.    Do I know?  I don't recall -- I don't
5  recall performing that analysis specifically.  I
6  do recall performing the analysis that's detailed
7  in my report.
8    Q.    I get that.
9          But you don't remember doing any
10  analysis to determine whether or not Grailer's
11  laptop was connected to the Internet during the
12  time that you say she was exfiltrating files to
13  her thumb drive?
14          MR. YOSHIMURA:  Objection.
15  BY THE WITNESS:
16    A.    I don't recall.
17    Q.    Okay.  But tell me, what is your
18  explanation for the fact that the Digital Guardian
19  report does not record any of the exfiltration
20  that you're alleging she engaged in?
21          MR. YOSHIMURA:  Objection.  Asked and
22          answered.
23  BY THE WITNESS:
24    A.    Well, it sounds like you're asking me

Laurence D. Lieb
January 23, 2024

Page 38

1    to speculate.  But I will state, the Digital
2    Guardian report that I was provided with cuts off
3    at a specific time on January 8th.  The
4    information that -- the evidence of activities of
5    exfiltration chronologically is after that last
6    time entry in the Digital Guardian report.
7            So you're asking me to speculate why
8    that information was not transferred from the
9    agent running on the laptop to the Digital
10   Guardian mother ship.  I don't know.
11       Q.   Okay.  You didn't perform any analysis
12   to try to determine how the Digital Guardian
13   report could have failed to record the copying
14   that you allege, right?
15           MR. YOSHIMURA:  Objection.
16   BY THE WITNESS:
17       A.   Well, it is not my opinion that the
18   Digital Guardian system failed.
19       Q.   Okay.  Well, I'll rephrase the
20   question.
21           You didn't perform any analysis to try
22   to determine why the Digital Guardian report did
23   not record any of the copying that you allege,
24   correct?

Page 39

1        A.   That's correct.  Because I didn't need
2    to.
3        Q.   Okay.  And so you can't explain why the
4    Digital Guardian report does not record any of the
5    copying that you allege; is that correct?
6            MR. YOSHIMURA:  Objection.
7    BY THE WITNESS:
8        A.   I don't recall.  I may have performed
9    that analysis.  I don't recall.  I'll also state
10   it is irrelevant, in my opinion, because the
11   evidence of the exfiltration is on the laptop and
12   can be verified by any qualified peer.
13       Q.   I know you want to talk about that.
14           But, again, my question is:  You can't
15   explain why the Digital Guardian report does not
16   record any of the exfiltration that you allege; is
17   that right?
18           MR. YOSHIMURA:  Objection; asked and
19       answered.
20   BY THE WITNESS:
21       A.   No.  I could explain it if I performed
22   the forensic analysis.  In my opinion, I didn't
23   need to because I found evidence of exfiltration
24   on the laptop.

Page 40

1        Q.   You didn't perform the analysis so you
2    can't explain it now; is that correct?
3            MR. YOSHIMURA:  Objection.
4    BY THE WITNESS:
5        A.   As we sit here, without the benefit of
6    the Axiom database of the laptop, yes.  If I had
7    it in front of me and up and running, I could
8    answer your question specifically.
9        Q.   Do you know whether there would be
10   Digital Guardian agent information on Grailer's
11   laptop that was not reported to the Digital
12   Guardian server that you could have reviewed?
13       A.   There could be, but I don't recall
14   looking for that.
15       Q.   All right.  I'm going to share my
16   screen here and bring up --
17       A.   Which one am I looking at?
18       Q.   It will be the one that is currently
19   dark.  Before we tinker at all with this,
20   Exhibit 4 is displayed on the screen.
21           Do you recognize Exhibit 4 as a copy of
22   the Digital Guardian report you received?
23       A.   I believe so.
24       Q.   I'm going to stop sharing the screen

Page 41

1    for a moment.  We're moving away from Exhibit 4.
2            MR. YOSHIMURA:  Just for identification
3        purposes, that's obviously a very large
4        document.  Larry has only seen a very small
5        sample of it.  Is he going to be able to read
6        that document to confirm that what he
7        believes to be the Digital Guardian report
8        is, in fact, the complete report?
9            MR. SPLITEK:  Yes.  And I can -- do you
10       want me to send you a copy of it too?
11           MR. YOSHIMURA:  Sure.
12           MR. SPLITEK:  I'll send it to you at
13       our next break.  Obviously, you'll get a copy
14       of the digital exhibit in any event.
15           All right.  I'm handing you
16       Exhibit 5.
17           (Deposition Exhibit No. 5 was
18               introduced to the witness.)
19   BY THE WITNESS:
20       A.   Okay.
21       Q.   I will tell you that Exhibit 5 depicts
22   information about two entries in the Digital
23   Guardian report marked as Exhibit 4.
24       A.   Okay.

Laurence D. Lieb
January 23, 2024

Page 42

1    Q.    Do you have any recollection of seeing
2    the information here in Exhibit 5 before?
3    A.    I don't recall seeing -- seeing these
4    specific entries.
5    Q.    Okay.  If you turn to page 2 of
6    Exhibit 5 --
7    A.    Yes.
8    Q.    -- do you see the columns "Destination
9    Device Product Name" and "Destination Device
10   Serial Number"?
11   A.    I do.
12   Q.    Do you recognize that serial number as
13   telling you that this is Grailer's USB thumb
14   drive, the same thumb drive you refer to in your
15   report?
16   A.    It could be.  I'd have to cross
17   reference the serial numbers.  I don't have it
18   memorized.
19   Q.    Yeah.  If you go to paragraph 17 of
20   Exhibit 2, you can do that cross reference.
21   A.    Yes.
22   Q.    So in column FJ on page 2 of Exhibit 5,
23   the destination device serial number, we are
24   seeing the same serial number for the USB thumb

Page 43

1    drive that you mention in your report.
2    A.    Is that a question?
3    Q.    Right?
4    A.    Yes.
5    Q.    And the two events recorded in Exhibit
6    5, the timestamp is December 20th, 2022, right?
7    A.    Yes.
8    Q.    And there's, in column CC, it's a
9    destination file path?
10   A.    I do see that.
11        MR. YOSHIMURA:  Matt, I'm going to have
12        to raise an objection here.  Because we don't
13        have the actual Digital Guardian report up
14        and we're just working off this printout, I
15        pulled up the Digital Guardian report you
16        have referenced.  The columns and rows don't
17        seem to match.
18             So I think it would be helpful if
19        you would allow the witness to confirm what's
20        in the report rather than confirm what you've
21        put on a piece of paper for him to read.
22        MR. SPLITEK:  All right.  I think that
23        will slow things down but if that is what you
24        guys would like to do.  I'll share the screen

Page 44

1    again.
2    BY MR. SPLITEK:
3    Q.    All right.  Mr. Lieb, at your
4    attorney's request we are going to go into the
5    file.
6    A.    Okay.
7    Q.    I'm going to click "enable editing"
8    here on Exhibit 4.
9    A.    Okay.
10   Q.    And then I'm going to go to "data" and
11   I'm going to unfilter and now I'm going to go to
12   column FJ --
13   A.    Okay.
14   Q.    -- for destination device serial
15   number.  Are you with me so far?
16   A.    I am.
17   Q.    I'm going to go back to "data" and I'm
18   going to allow filtering.
19   A.    Okay.
20   Q.    So when we -- and you understand you
21   can filter each of these columns to bring up the
22   events that show up, the fields, the values that
23   show up in that column?
24   A.    I do.

Page 45

1    Q.    Okay.  So I'm going to only select the
2    number alphanumeric code beginning 070B4.
3    A.    Yes.
4    Q.    And we confirmed that's the serial
5    number for Grailer's USB thumb drive?
6    A.    Yes.
7    Q.    I'm going to hit okay.
8         And in Exhibit 5, so there were many,
9    many columns, of course, and if we -- you know, we
10   can scroll through here.  There is a lot more
11   columns than we want to put on a piece of paper.
12        But if we -- so Exhibit 5 takes some of
13   those columns, but if we scroll through in column
14   A, the Digital Guardian report in Exhibit 4
15   matches what's in column A of Exhibit 5, right?
16   A.    Yes.
17        MR. YOSHIMURA:  I'm sorry.  I didn't
18        need to make a record of this, Matt.
19             But the rows that you are showing
20        on the screen right now do not match the row
21        numbers on the piece of paper that you
22        provided.  And I cannot confirm that the
23        event time codes, for example, are the same.
24        They don't appear to be contiguous.

Laurence D. Lieb
January 23, 2024

Page 46

1    THE WITNESS:  That's odd.
2        MR. SPLITEK:  Okay.  In column U, the
3    event codes, what is -- Mr. Yoshimura, what
4    is not matching about the event codes?
5        MR. YOSHIMURA:  So what I see is rows
6    number 5330 and 5331.
7        MR. SPLITEK:  I understand the problem.
8    Here's what your confusion is, I think.
9    Let's unfilter it again and then we will
10   filter and we will go to column U, "event
11   time."
12       I'm going to sort it oldest to
13   newest and so now the rows will change and I
14   think that is what was confusing,
15   Mr. Yoshimura.
16       MR. YOSHIMURA:  Certainly.  Just to
17   make the record clear, Matt, I think what
18   you're explaining to me now is that the paper
19   copy that you provided us is after you
20   resorted all of the data chronologically by
21   which field?
22       MR. SPLITEK:  By -- actually, you can
23   see it right in Exhibit 5.  Do you see that
24   in column U next to "event time" there is an

Page 47

1    arrow pointing upwards?
2        MR. YOSHIMURA:  So you've resorted the
3    entire database by column U in chronological
4    order.
5        MR. SPLITEK:  That is correct.
6        MR. YOSHIMURA:  And once sorted that
7    way, rows 5330 and 5331 are the entries
8    you're referring to.
9        MR. SPLITEK:  Let's confirm to make
10   sure because then we'll sort it.  And you can
11   also see this in Exhibit 5, in column FJ
12   there is also another marker there that
13   indicates it is filtered for the field that's
14   appeared in column FJ.
15       All right.  And then let's, in
16   column FJ, do that again.  We will select for
17   the serial number and now --
18       MR. YOSHIMURA:  5330.
19       MR. SPLITEK:  -- 5330, 5331.
20       MR. YOSHIMURA:  Thank you for helping
21   us clarify the record on the reasons for the
22   discrepancies between the database and the
23   paper copy.
24       MR. SPLITEK:  You're welcome.  And I

Page 48

1    will say for the record, the rows on the side
2    are Excel.  I don't think that the rows are
3    part of the Digital Guardian report's
4    content.  You can reorganize things and the
5    rows will change.
6        But we see in column A, the user
7    matches, J. Grailer; column U, event time
8    12/20/22, 6:27 a.m.; column CZ, destination
9    file path, that matches as well.
10   BY MR. SPLITEK:
11       Q.   And the destination file path, that is
12   to a D drive which is the thumb drive, right?
13   BY THE WITNESS:
14       A.   Yes.
15       Q.   So that's the file path where the file
16   was copied to?
17       A.   That is my understanding.
18       Q.   Okay.  And then the source file path is
19   where the file was copied from; is that correct?
20       A.   Yes.
21       Q.   Okay.  All right.  And DU, which is
22   detection severity, it is blank in both Exhibit 5
23   and in Exhibit 4.  DZ, event has rule violation.
24   It is blank in Exhibit 5 and Exhibit 4, right?  Is

Page 49

1    that correct?
2        A.   Yes.
3        Q.   Column EH, operation type, file copy is
4    the field in both Exhibit 4 and Exhibit 5, right?
5        A.   You're referring to Exhibit 4?
6        Q.   Well, both of them.  Exhibit 4 is on
7    the screen.
8        A.   Oh, sorry.
9        Q.   Exhibit 5 is the paper.
10       A.   Can you repeat the question, please?
11       Q.   Yeah.
12       It says "file copy" in the operation
13   type column of both Exhibits --
14       A.   I see that.
15       Q.   -- 4 and 5?
16       A.   Yes.
17       Q.   If we go to column ET, was rule
18   violated.  The field says no in both Exhibit 5 and
19   Exhibit 4, correct?
20       A.   Correct.
21       Q.   Column FF is destination device.  Drive
22   type removable in both Exhibit 4 and Exhibit 5; is
23   that correct?
24       A.   Yes.

Laurence D. Lieb
January 23, 2024

Page 50

1    Q.    And that -- actually FI, destination
2  device.  Product name is USB disc 2.0 in both
3  Exhibit 4 and Exhibit 5, correct?
4    A.    Correct.
5    Q.    And column FJ, in both exhibits it is
6  the serial number?
7    A.    Correct.
8    Q.    So if we go back to column FF, the
9  destination drive, it is telling you that's
10  something that Grailer can remove from the
11  computer?
12    A.    Yes.
13    Q.    And then if we go to source device
14  drive type in column GG -- I apologize -- column
15  GD, source device drive type is fixed.  The source
16  device is where-- that's the drive where it is
17  coming from, correct?
18    A.    Yes.
19    Q.    And then column GE -- column GG, source
20  device product name in both Exhibit 4 and Exhibit
21  5 it's a Samsung.  Is that the hard drive for
22  Grailer's laptop?
23    A.    I believe so.
24    Q.    And then you also see in Exhibit 4 and

Page 51

1  5 column GH match, right?
2    A.    They do.
3    Q.    Okay.  And then column IR, source was
4  classified.  That matches as well, right?
5    A.    Column IR has the value "no" in both
6  rows for sources classified.
7    Q.    Yep.  In both Exhibit 4 and Exhibit 5,
8  right?
9    A.    Yes.
10    Q.    Okay.  So when I -- I won't want to do
11  this for every exhibit here, but we've been able
12  to go through Exhibit 4 and Exhibit 5 to
13  understand how the Exhibit 5 information was
14  extracted from Exhibit 4, right?
15        MR. YOSHIMURA:  Yes.  And just for the
16      record, to the extent a similar exercise may
17      be needed in the future, we're agreeable to
18      not go through this every time, but we need
19      to make a record clear of how the paper copy
20      is derived from the data in the database.
21        MR. SPLITEK:  Understood.  And also
22      having been through this exercise, even after
23      the deposition too, you feel like, Mr. Lieb,
24      you'd be able to verify using the Excel

Page 52

1  spreadsheet whether anything in any of these
2  paper exhibits is going to be incorrect,
3  right.
4        THE WITNESS:  I would be able to, yes.
5  BY MR. SPLITEK:
6    Q.    Okay.  As long as we have Exhibit 4 up,
7  I'm going to stay in Exhibit 4, I'm going to
8  unfilter again.
9    A.    Okay.
10    Q.    I'm going to go back to event time.
11    A.    Okay.
12    Q.    I'm going to filter, or I'm going to
13  try to.  Yes, now I've done it.
14        And now I'm going to sort newest to
15  oldest in event time.
16    A.    Okay.
17    Q.    And do you agree that should bring up
18  at the top the latest event in the Digital
19  Guardian report, right?
20    A.    Yes.
21    Q.    Let's try again.  We're going to sort
22  newest to oldest.  So the latest event that we're
23  seeing in the Digital Guardian report is 9:28 p.m.
24  on January 8th, 2023; is that correct?

Page 53

1    A.    That is correct.
2    Q.    Okay.
3        MR. SPLITEK:  I'm going to pull down
4      Exhibit 4 now.  I'm going to hand you
5      Exhibits 6 and 7.
6        THE WITNESS:  Okay.
7          (Deposition Exhibit Nos. 6 and 7
8            were introduced to the
9            witness.)
10  BY MR. SPLITEK:
11    Q.    If you look at -- if you look at both
12  Exhibit 6 and Exhibit 7, do you see, again, that
13  up-facing arrow next to the event column, event
14  time in column U?
15    A.    I do.
16    Q.    Okay.  So I'm telling you that that is
17  because I sorted before making these paper
18  exhibits the information in chronological order,
19  not reverse chronological, but chronological.
20        And in Exhibit 6 and 7, if you see the
21  top row in Exhibit 6 is a January 7th, 2023,
22  entry, right?
23    A.    I do see that.
24    Q.    Okay.  And if you look at the bottom

Laurence D. Lieb
January 23, 2024

Page 54

1  row in Exhibit 7, the last row --
2      A.    Bottom row in Exhibit 7.
3      Q.    -- is the same time that we just saw,
4  am I right?  9:28 p.m. on January 8th, 2023?
5      A.    On Exhibit 7 are you referring to Excel
6  row 8345?
7      Q.    That's correct?
8      A.    Okay.
9      Q.    Do you see there's that same 9:28 p.m.
10  timestamp on January 8th, 2023?
11      A.    On Exhibit 7, Excel row 8345, column U
12  it says January 8th, 2023, 9:28.
13      Q.    Okay.  And I don't want to go through
14  recreating this again live on the screen, but I'm
15  telling you that Exhibit 7 -- back up.
16          I'm telling you that Exhibit 6 shows
17  some of the columns on all of the events that the
18  Digital Guardian reported on the first part of
19  January 8th, 2023.
20          Do you understand?
21      A.    Say that again.
22      Q.    Exhibit 6.
23      A.    6.
24      Q.    I'm telling you that this is showing

Page 55

1  data on all of the events that Digital Guardian
2  recorded --
3      A.    Okay.
4      Q.    -- during the first part of January
5  8th, 2023.
6          Do you understand?
7      A.    I do.
8      Q.    And then in Exhibit 7, what's depicted
9  is all of the rest of the events that Digital
10  Guardian reported on January 8th, 2023 in
11  chronologic order.
12          Do you understand?
13      A.    I do.  Although -- I don't have access
14  to all of the rows and columns.  I just have the
15  ones that are visible in your exhibits.
16      Q.    Well, you have access to all of the
17  rows but not -- I see what you mean.  You don't
18  have access to all of the rows of the Digital
19  Guardian report?
20      A.    Correct.
21      Q.    Yeah, that's right.  Exhibits 6 and 7
22  show only some of the rows and only some of the
23  columns.
24      A.    Yes.

Page 56

1      Q.    Because as we just saw in Exhibit 4, it
2  is quite unwieldy, isn't it?
3      A.    Well, I see, for example, on Exhibit 7
4  it is column EH, the second row down, it says
5  "file copy" but I don't see any other columns
6  about what was -- where that was copied to.
7      Q.    I'm sorry.  What are we looking at
8  right now?
9      A.    Exhibit 7, second page, the second row
10  down which is -- I didn't bring my glasses,
11  unfortunately, 8303.  It's a file copy, Illinois
12  River Energy.MSG, which is an e-mail file.  It
13  says "file copy."  But I don't see any other
14  copies about where the destination was.
15      Q.    Yes.  That's correct.  The -- well,
16  actually maybe not.  If you look -- so you're
17  looking at row 8303, is that correct, on Exhibit
18  7?
19      A.    I am.
20      Q.    Okay.  What about if you turn back to
21  page 1, the destination file path?
22      A.    Okay.  So this is -- so page 1 is other
23  additional columns of the same rows.
24      Q.    That's correct.  Yes, to also clarify,

Page 57

1  if you look at the rows on page 1 and 2 of Exhibit
2  7, the rows match, and that's because there are so
3  many columns in Exhibit 4 that for -- you were
4  looking at row 8303, right?
5      A.    Yes.
6      Q.    So page 1 gives you some columns for
7  row 8303, and when you flip to page 2 there are
8  more columns for the same row 8303?
9      A.    I understand.
10      Q.    So, for example, then, in row 8303, you
11  pointed out in column EH, the operation type is a
12  file copy, right?
13      A.    Yes.
14      Q.    And in page 1 in the destination file
15  path column, the Digital Guardian report tells you
16  that the file was copied to what appears to be
17  Grailer's INetCache folder; is that correct?
18      A.    Yes, it does.
19      Q.    And what is the INetCache folder?
20      A.    That is -- my understanding is a
21  Windows Explorer/Internet browser system file that
22  records human activity.
23      Q.    That's what the INetCache folder shown
24  in the destination file path column is?

Laurence D. Lieb
January 23, 2024

Page 58

1    A.    That's my understanding of what
2    INetCache is, yes.
3       Q.    Okay.  Do you know whether or not the
4    INetCache folder contains copies of temporary
5    files?
6       A.    I don't know if I characterize it as a
7    temporary file.  I would characterize it as a
8    system file.
9       Q.    Do you know when somebody adds an
10   attachment to an e-mail, do you know if it is
11   saved to an INetCache folder like we're seeing
12   here in row 8303 of Exhibit 7?
13      A.    I don't know.
14      Q.    Do you know whether when someone opens
15   an attachment to an e-mail it is saved to an
16   INetCache folder like we're seeing here in 8303 of
17   Exhibit 7?
18      A.    I don't know.
19      Q.    Do you know whether after a file is,
20   for whatever reason, saved to the INetCache
21   folder, it is then automatically deleted later?
22      A.    Your question is whether that file is
23   saved to that folder?  That's -- your question
24   doesn't actually make sense.  So the INetCache is

Page 59

1    a system file that's recording -- my understanding
2    it's recording activity.  So it's not holding a
3    copy of a file, per se.  It's recording activity a
4    user of a laptop is performing using Windows
5    Explorer and an Internet browser.
6          You asked me specifically if it is
7    keeping a copy of the file, so I wanted to be
8    clear that's --
9       Q.    And let me point out in column CZ,
10   destination file path in row 8303 of Exhibit 7, do
11   you see after INetCache it says "content.outlook"?
12         Do you see that?
13      A.    Which row?
14      Q.    Exhibit 7, row 8303, column CZ,
15   destination file path.
16      A.    Okay.
17      Q.    Do you see the INetCache and then
18   content.outlook after that?
19      A.    I do see that, yes.
20      Q.    Okay.  So do you think that this has
21   something to do with e-mail activity or web
22   browsing?
23      A.    I don't know.  I'd have to analyze that
24   specific file on the laptop to answer that

Page 60

1    question.
2       Q.    All right.  Am I right, though, that
3    you're not sure how the INetCache folder works?
4       A.    I've analyzed laptops and have
5    encountered the INetCache folder many times.  So
6    my understanding is that it's a system -- it's a
7    system artifact that is generated when a user is
8    performing activities on a laptop.
9       Q.    And it is not a folder then that the
10   user is adding copies of files to and deleting
11   copies of files to on purpose typically, right?
12      A.    That's the distinction I'm making.  It
13   is the result of a system.  So it's not a file
14   that a user would go "I'm going to open this up
15   and interact or copy files to this location."
16      Q.    Okay.  Got it.  So activity in
17   Grailer's INetCache folder, you would expect that
18   typically the user like Grailer wouldn't be aware
19   of what's happening in the INetCache folder?
20         MR. YOSHIMURA:  Objection.
21   BY THE WITNESS:
22      A.    I don't believe most computer users are
23   aware of how Window's system files work.
24      Q.    Okay.  So Exhibits 6 and 7, they

Page 61

1    provide information about, taken together, all of
2    the events that Digital Guardian recorded on
3    January 8th, 2023.  I'm telling you and you're
4    able to verify that later by looking at Exhibit 4,
5    right?
6       A.    If you're asking me if these Exhibits 6
7    and 7 represent information that was captured and
8    recorded by Digital Guardian, then, yes, that is
9    my opinion.
10      Q.    And you can figure out later if I've
11   accidentally left something out from this record
12   of the January 8th, 2023 events, right?
13      A.    I could.  And I don't have any evidence
14   that you've left anything out.
15      Q.    When you were reviewing the Digital
16   Guardian report, did you review its records about
17   events on January 8th, 2023?
18      A.    I did.
19      Q.    Okay.  And you did not find any
20   evidence of exfiltration on January 8th, 2023 in
21   the Digital Guardian report, correct?
22      A.    Correct.
23      Q.    But back in Exhibit 5, which we
24   painstakingly verified using Exhibit 4 on the

Laurence D. Lieb
January 23, 2024

Page 62

1   screen, we did see a record in Digital Guardian of
2   Grailer copying files to the same USB thumb drive
3   that you referenced in your report, right?
4       A.   I do see in the Exhibit 5 evidence
5   captured in the Digital Guardian report of Jessica
6   Grailer copying a file, drug screen registration
7   instructions.PDF and epassport_wd-121822-5u2yd.pdf
8   from a folder on her C drive to -- what I refer to
9   as the Emtec USB drive on December 20th, 2022.
10      Q.   And so in Exhibit 5 Digital Guardian
11  recorded the date and time of the copying, right?
12      A.   It did.
13      Q.   And it recorded the name of each file
14  that Grailer copied, right?
15      A.   It did.
16      Q.   And it recorded the drive and folder
17  that the file was copied from; is that right?
18      A.   It did.
19      Q.   And it also recorded the drive and
20  folder that the file was copied to, right?
21      A.   Correct.
22      Q.   And it recorded the serial number of
23  the USB thumb drive that it was copied to?
24      A.   It did.

Page 63

1       Q.   And, to your knowledge, does the
2   Digital Guardian report record Grailer copying any
3   files to that USB thumb drive again after December
4   20th, 2022?
5       A.   I did not find any evidence within the
6   Digital Guardian report of any file copying
7   activities on January 8th.
8       Q.   Did you look at the period from
9   December 21st through January 7th, 2023?
10      A.   I analyzed the entire report as part of
11  my forensic analysis process.
12      Q.   Do you know of any other instances
13  other than the two shown in Exhibit 5 where
14  Digital Guardian recorded Grailer copying files to
15  the USB thumb drive that you discuss in your
16  report?
17      A.   I don't recall.
18      Q.   And don't you want to know why, if
19  Digital Guardian recorded all of the information
20  shown in Exhibit 5, it didn't record similar
21  information on January 8th, 2023?
22           MR. YOSHIMURA:  Objection; asked and
23       answered.
24

Page 64

1   BY THE WITNESS:
2       A.   I stand by the findings in my
3   declaration, and any independent qualified
4   forensic expert analyzing Jessica Grailer's laptop
5   will come to the same conclusions as the evidence
6   is independently verifiable.
7       Q.   But that wasn't quite my question.
8            My question is:  We know that -- we saw
9   it in Exhibit 5, Digital Guardian recorded quite a
10  bit of information about instances where Grailer
11  copied files to her USB thumb drive on December
12  20th, 2022, right?
13      A.   In the exhibit there is two examples.
14      Q.   That's right.  And it recorded quite a
15  bit of information about those two examples,
16  correct?
17      A.   Recorded the source destination, the
18  make, model, serial number of the USB drive used,
19  which is the Emtec drive, as I refer to in my
20  report, and recorded the date and time of the file
21  copying.
22      Q.   So my question earlier and I'll ask
23  again was:  Don't you want to know why the Digital
24  Guardian report did not record any such

Page 65

1   information about any copying events on January
2   8th, 2023?
3            MR. YOSHIMURA:  Objection; asked and
4        answered multiple times at this point.
5   BY THE WITNESS:
6       A.   So my declaration contains wholly 100
7   percent scientific and independently verifiable
8   evidence of Grailer exfiltrating files and all of
9   the information that I cite in my declaration
10  refers to specific evidence located on her laptop,
11  the forensic image of her laptop, and can be
12  independently verified by any qualified peer.
13      Q.   I know you're attorney has said that it
14  is asked and answered.  I don't think it was
15  answered.
16           But I'm going to assume that you don't
17  want to know why Digital Guardian did not report
18  the kind of information that we see in Exhibit 5
19  for any events on January 8th, 2023.  If I'm
20  wrong, tell me.
21           MR. YOSHIMURA:  Objection.
22  BY THE WITNESS:
23      A.   In my opinion, your question doesn't
24  make sense.  It's irrelevant.  The evidence that I

Laurence D. Lieb
January 23, 2024

Page 66

1 found of Grailer's acts are independently
2 verifiable by any qualified peer analyzing her
3 laptop.
4       Q.    So in Exhibit 7 --
5       A.    Okay.
6       Q.    -- we can see that the last entry in
7 the Digital Guardian report is at 9:28 p.m. on
8 January 8th, 2023, right?
9       A.    I see that.
10      Q.    Okay.
11      A.    Wait.  Which row?
12      Q.    It is the last row at the bottom of --
13 well, the row is at the bottom of both pages of
14 Exhibit 7, but the event time is in column U on
15 page 1 of Exhibit 7.
16      A.    Okay.
17      Q.    And in row 8345 we see that the last
18 event recorded in the Digital Guardian report is
19 9:28 p.m. on January 8th, 2023, correct?
20      A.    That is correct.
21      Q.    And we also verified that by looking at
22 the Digital Guardian report in its original Excel
23 form, Exhibit 4, right?
24      A.    We did.

Page 67

1       Q.    All right.  So are you saying that all
2 of the exfiltration that you allege occurred after
3 9:28 p.m. on January 8th, 2023?
4       A.    I'm saying that the evidence that I
5 reference in my expert report, which I'd -- you'd
6 have to get more specific about times and dates,
7 are independently verifiable by any qualified
8 peer.
9       Q.    Except it just doesn't answer my
10 question because I'm -- this is just yes or no.
11       So 9:28 p.m. on January 8th, 2023,
12 there were times before 9:28 p.m. on January 8th,
13 2023, right?
14       MR. YOSHIMURA:  Objection.
15 BY THE WITNESS:
16      A.    So I did not find any evidence of
17 exfiltration within the Digital Guardian report,
18 which is why I didn't reference it in my expert
19 report.
20      Q.    I'm not asking you that.  I'm asking
21 you:  Are you claiming that Grailer exfiltrated
22 files before 9:28 p.m. on January 8th, 2023?
23      A.    In my expert report, I detail evidence
24 of exfiltration, consistent with exfiltration bulk

Page 68

1 filing -- file copying, and it's independently
2 verifiable by any qualified peer.
3       Q.    I'm going to ask the question again.
4 Yes or no, are you claiming that Jessica Grailer
5 exfiltrated any files at any time prior to
6 9:28 p.m. on January 8th, 2023?
7       A.    I don't recall.  You'd have to look --
8 I'd have to look at my report and what's detailed
9 in my report.  Can you ask me something specific
10 in my report?
11      Q.    So is the answer that you don't know?
12      A.    I don't have my report memorized, as I
13 sit here.  I can -- if you ask me a specific
14 question about the information I have in my
15 declaration, I'll answer that question.
16      Q.    Okay.  So you might be claiming that
17 Jessica Grailer exfiltrated files before the last
18 entry in the Digital Guardian report, correct?
19       MR. YOSHIMURA:  Objection.
20 BY THE WITNESS:
21      A.    What I'm saying is that all of the
22 evidence that I reference in my report has
23 footnotes to exactly where that evidence exists on
24 the forensic image of Jessica Grailer's laptop and

Page 69

1 all of that evidence can be independently verified
2 and replicated by a qualified peer.
3       Q.    I'm going to do this one more time.
4 And I'm just going to tell you, I think it is very
5 likely I'll move to compel an answer after the
6 deposition.
7       Yes, no, or you don't know.  Are you or
8 are you not claiming that Jessica Grailer
9 exfiltrated any files before 9:28 p.m. on
10 January 8th, 2023?
11      A.    I got to review my declaration to
12 answer that question.
13      Q.    Go ahead.  Can you, for the record, say
14 what exhibit are you looking at?  What is the
15 exhibit number?
16      A.    I'm looking at Exhibit 2.  I'm
17 referring to paragraph 17.  It says [as read]:
18 Forensic analysis of Ecolab laptop revealed
19 Jessica Grailer last connected an Emtec serial
20 number USB drive to her Ecolab laptop on January
21 8th, 2023 at 9:39 p.m., which is 10 minutes after
22 the Digital Guardian report ends.
23      Q.    So are you --
24      A.    And that's why I stated earlier that

Laurence D. Lieb
January 23, 2024

Page 70

1  the evidence of exfiltration that I describe in
2  the report, you asked me multiple times why do I
3  not see this in the Digital Guardian report, I've
4  answered multiple times.  I found no evidence of
5  exfiltration in the Digital Guardian report.  If I
6  did, I would report it.  I'm an independent
7  expert.
8        It clearly states in my declaration
9  here on 17 that she connected the drive that, in
10 my opinion, she used to exfiltrate the Emtec
11 drive, the same drive that was connected to her
12 laptop as recorded by the Digital Guardian report
13 on 12/20/2022, was done at 9:39 p.m.
14       I have a footnote so that any
15 independent expert can look at that same laptop,
16 that same forensic artifact, and confirm exactly
17 what I'm saying.  I'm not making up that time and
18 date.  That is exactly what is recorded by the
19 laptop.
20    Q.   So am I right then in inferring that
21 you are saying that all of the exfiltration that
22 you allege occurred after 9:39 p.m. and 51 seconds
23 on January 8th, 2023?
24       MR. YOSHIMURA:  Objection.

Page 71

1  BY THE WITNESS:
2     A.   I'll read my declaration.  So it says
3  [as read]:  Forensic analysis of the Ecolab laptop
4  revealed Jessica Grailer last connected an Emtec
5  32 gigabyte drive, serial number 070B4A71ADB22353,
6  what I'm referring to as the Emtec drive, to her
7  Ecolab laptop on January 8th, 2023, at 9:39 p.m.
8        My next paragraph says [as read]:
9  Forensic analysis of her Ecolab laptop revealed
10 Jessica Grailer accessed and exfiltrated multiple
11 files on January 8th, 2023 including the 259 files
12 described in Exhibit E based on -- what should be
13 my forensic analysis.  It is my opinion that the
14 259 exfiltrated files were copied by Jessica
15 Grailer to the Emtec drive on January 8th, 2023.
16       That is my opinion that can be
17 independently verified by any qualified peer.
18    Q.   Okay.  But in paragraph 18 you did not
19 write the time that you said the exfiltration
20 occurred.
21       So my question -- I'm going to ask this
22 again.  The exfiltration that you allege in
23 paragraph 18, are you claiming that that occurred
24 all after the connection event that you allege --

Page 72

1     A.   Yes.
2     Q.   -- in paragraph 17?
3     A.   Yes.
4     Q.   Okay.  So the exfiltration that you
5  claim Grailer engaged in, in your view, all
6  occurred after 9:39:51 p.m. on January 8th, 2023,
7  correct?
8     A.   Correct.  That's my opinion why it's
9  not appearing in the Digital Guardian report.
10    Q.   Got it.  So you are not opining that
11 Jessica Grailer exfiltrated any files at any time
12 before 9:39:51 p.m. on January 8th, 2023; is that
13 correct?
14       MR. YOSHIMURA:  Objection; misstates
15       testimony.
16 BY THE WITNESS:
17    A.   I believe you're mischaracterizing what
18 I'm stating in my expert report.
19       So a couple items.  One, you asked
20 earlier isn't it true that the Digital Guardian
21 report shows on December 20th, a connection of
22 this Emtec drive.  I said it absolutely does.
23       Then the forensic analysis of her
24 laptop shows that she last connected, according to

Page 73

1  my two forensic tools, the same Emtec drive to her
2  laptop on 9:39 p.m. which is after the last time
3  entry in the Digital Guardian report.
4     Q.   I understand all of that.  I thought
5  that what I was asking you to agree with just
6  flowed from what you already said.  So let's back
7  up and do this again.
8        You are opining in this case that
9  Jessica Grailer exfiltrated files on January 8th,
10 2023, right?
11    A.   That is my opinion based upon my
12 independent forensic analysis of the evidence
13 existing on her work laptop.
14    Q.   And I thought you just told me this a
15 few moments ago, but are you opining that all of
16 that exfiltration that, in your view, happened all
17 occurred after the 9:39:51 p.m. on January 8th,
18 2023 time that you identify in paragraph 17 of
19 your report?
20    A.   So it is my opinion based upon -- in
21 paragraph 18, that these 259 files described on
22 Exhibit E3 were exfiltrated by and copied by
23 Jessica Grailer to this Emtec drive on January
24 8th, 2023.

Laurence D. Lieb
January 23, 2024

Page 74

1    Q.    Yep, but that's not my question.
2          So is it your -- I understand because
3    you wrote it right there in your report that it is
4    your opinion that Jessica Grailer exfiltrated
5    files on January 8th, 2023.
6          I want you to focus on the time that
7    you wrote in paragraph 17.  9:39:51 p.m. on
8    January 8th, 2023.  Just stay focused on that
9    time.
10   A.    So what --
11   Q.    I have not asked the question yet.  I
12   want you to focus on that time.
13   A.    Okay.
14   Q.    And I want you to think about the time
15   before that time and the time after that time.
16   A.    Okay.
17   Q.    Make 9:39 p.m. on January 8th, 2023,
18   that's a dividing line here.  Are we on the same
19   page so far?  Do you understand what I'm just
20   saying?  Just focus on 9:39 p.m. on January 8th,
21   2023.
22   A.    Well, except for the fact that in
23   exhibits -- if we look at Exhibit F -- I believe
24   it is Exhibit F.

Page 75

1    Q.    Okay.  Let me make sure the record is
2    clear.  Are you in Deposition Exhibit 3, right
3    now?
4    A.    Sorry.  Yes, I am in Exhibit 3, to be
5    clear.
6    Q.    Deposition Exhibit 3.
7    A.    Exhibit 3.
8    Q.    Exhibit F to your report.
9    A.    Right.
10   Q.    All right.  Actually, let me -- I have
11   it as a freestanding exhibit.  Let's make the
12   record a little cleaner.
13         MR. SPLITEK:  I'm going to hand you
14   Exhibit 36 out of order.
15         (Deposition Exhibit No. 36 was
16            introduced to the witness.)
17   BY MR. SPLITEK:
18   Q.    So you tell me, is Exhibit 36 a copy of
19   Exhibit F to your report?
20   A.    Yes.
21   Q.    Great.
22         What would you like to tell me about
23   Exhibit F to your report?
24   A.    What I see -- and I came to this

Page 76

1    exhibit during my process of crafting my response
2    to Mr. Pixley's report.  And I noted in my
3    forensic tool that I found evidence of bulk rapid
4    selection of multiple files.
5          For example, on the -- I'll call it --
6    I'll call it the first page or the second page or
7    third page, we see that there's a file called
8    ADM2019plan.doc going all the way down to tier
9    two, 2021.xls.  It is a master file table date of
10   8:33 p.m. and they're all within microseconds of
11   each other.
12         From my experience and analysis in
13   many, many cases, this is -- sort of evidence is
14   consistent with an individual bulk selecting,
15   zipping, copying data.  This evidence is
16   inconsistent with a human being rapidly opening up
17   each individual files, you know, within
18   microseconds.  That just doesn't make any sense.
19   Q.    Okay.
20   A.    Sorry.  Go ahead.
21   Q.    So let's just focus on the first page
22   of Exhibit F so we're looking at something
23   concrete here.
24   A.    Okay.

Page 77

1    Q.    There's a bunch of timestamps there for
2    12:41:32 on January 8th, 2023, right?
3    A.    Yes.
4    Q.    And by the way, what offset did you use
5    when converting that from UTC to Central Standard
6    Time?
7    A.    I believe that is Central Standard Time
8    in my database.  But I believe I set it at Central
9    Standard Time in OSForensics.
10   Q.    Is it possible that you --
11   A.    It's UTC?
12   Q.    Well, no.
13         Is it possible that you prepared it
14   after we went back to Daylight Savings Time and
15   used the wrong offset?
16   A.    I don't have any recollection of doing
17   that.
18   Q.    Anyway, we see timestamps that are all
19   much earlier on January 8th, 2023 than 9:30 p.m.,
20   right?
21   A.    We do.  And it is also important to
22   note these are actually folders.  These are not
23   files.
24         So I would have to address each of the

Laurence D. Lieb
January 23, 2024

Page 78

1  files listed in there, I'd have to expand that
2  out.  I can if I'm asked to do that.
3      Q.    So if we turn to the next page.
4      A.    Okay.
5      Q.    So this is page 2 of your Exhibit F?
6      A.    I see that.
7      Q.    So there's files listed there, right?
8      A.    I do see them.
9      Q.    And there's identical timestamps of
10  8:33 p.m.?
11      A.    Yes.
12      Q.    And that's still earlier than the last
13  entry in the Digital Guardian report, right?
14      A.    It is.
15      Q.    Okay.
16      A.    And I have not analyzed this, but it
17  would be interesting to search in the -- because
18  this is clearly evidence of bulk selecting and
19  interacting with these files, in my opinion, not
20  individually opening them up one at a time.
21          It is possible someone could have
22  mistakenly selected all of these files and hit
23  open.  I found no evidence of that.
24          But it would be interesting to look at

Page 79

1  the Digital Guardian report to see if the access
2  of these files, so, for example, the
3  ADM2019.plan.docx on page 2, which was at 8:33
4  p.m. is in the Digital Guardian report.  I didn't
5  look -- I didn't search for that file in the
6  Digital Guardian report during my analysis.
7      Q.    So are you claiming that Grailer
8  exfiltrated files to her USB thumb drive around
9  8:33 p.m. on January 8th, 2023?
10      A.    What I'm stating is exactly what I say
11  in my report, is that this evidence is consistent
12  with an individual I believe to be Jessica Grailer
13  bulk selecting huge numbers of files to copy them,
14  zip them.
15      Q.    This is just a yes-or-no question.
16          I want you to look at page 2 of your
17  Exhibit F.
18      A.    Okay.
19      Q.    There are a bunch of files there with
20  timestamps of 8:33 p.m. on January 8th, 2023.
21      A.    Yes.
22      Q.    Are you or are you not claiming that
23  Jessica Grailer exfiltrated those files around
24  8:33 p.m. on January 8th, 2023?

Page 80

1      A.    I'm claiming that she -- and the
2  forensic evidence is consistent with the fact that
3  she, an individual I believe to be Jessica
4  Grailer, bulk selected and interacted with these
5  files.  And this is consistent with evidence of
6  dragging and dropping them to an external media,
7  zipping them, exfiltration.
8          So it's consistent with exfiltration,
9  yes.
10      Q.    And I'm going to ask it again.  It is a
11  yes-or-no question.  I'm only going to ask it once
12  more.  I'm going to tell David again.  If I'm not
13  getting an answer, I'm probably going to move to
14  compel.
15          If you look at, just for -- you know,
16  there is a lot of timestamps in your Exhibit F.
17      A.    Okay.
18      Q.    We're looking for an example of -- on
19  page 2 of your Exhibit F, the files that have an
20  MFT modified date timestamp of 8:33 p.m.
21      A.    I see that.
22      Q.    So yes, no, or you don't know, are you
23  or are you not claiming that Jessica Grailer did
24  exfiltrate those files at that time of 8:33 p.m.

Page 81

1  on January 8th, 2023?
2          MR. YOSHIMURA:  Objection; asked and
3      answered.
4  BY THE WITNESS:
5      A.    Yeah, this evidence of rapid
6  interaction with multiple files, from my
7  experience, is consistent with an individual
8  exfiltrating files, bulk selecting, copying files,
9  yes.  I've never seen evidence -- I have no
10  evidence in this case that this is evidence of
11  someone rapidly within microseconds opening up
12  files one at a time.
13          So in my opinion, this evidence is
14  consistent with an individual I believe to be
15  Jessica Grailer exfiltrating these files.
16      Q.    At 8:33 p.m. on January 8th, 2023?
17      A.    Yes.
18      Q.    How could Grailer exfiltrate the files
19  shown on page 2 of your Exhibit F at 8:33 p.m. on
20  January 8th, 2023, without Digital Guardian
21  recording that copying?
22      A.    I don't know.  As I stated earlier, I
23  found no evidence of exfiltration by Grailer
24  within the Digital Guardian report because,

Laurence D. Lieb
January 23, 2024

Page 82

1  otherwise, I would have reported on that.
2          But I found significant evidence of --
3  independently verifiable evidence of Grailer
4  exfiltrating files from her laptop on the laptop
5  itself.
6      Q.    But now we've established that it is
7  your opinion that Grailer exfiltrated files to her
8  USB thumb drive before the last entry in the
9  Digital Guardian report, right?
10     A.    It is my opinion that this evidence is
11  consistent with an individual I believe to be
12  Jessica Grailer bulk selecting files and folders
13  on January 8th, which is consistent with my
14  experience with exfiltration.
15     Q.    And doing that before the last entry in
16  the Digital Guardian report, right?
17     A.    In my opinion, on page 2 of Exhibit 36,
18  I see a bunch of loose files that were all
19  selected at 8:33:25 microseconds, some of them are
20  24, or milliseconds -- or seconds, sorry, that's
21  seconds, 25 seconds.
22          So, yes, that evidence is consistent,
23  in my opinion, with an individual I believe to be
24  Jessica Grailer selecting those files and

Page 83

1  exfiltrating them, yes.
2      Q.    And so your opinion is that Jessica
3  Grailer exfiltrated files to her USB thumb drive
4  during a time when the Digital Guardian report was
5  still recording entries but without her
6  exfiltration being recorded in the Digital
7  Guardian report?
8      A.    Now, you're mischaracterizing what I'm
9  saying.  So I don't have the Digital Guardian
10  report in front of me.
11          Again, what I would recommend is you
12  can have me do it, you can do it, is search for
13  these file names within the report.  Because this
14  evidence is obviously independent.  It is clear
15  that an individual I believe to be Jessica Grailer
16  bulk selected these files, interacted with these
17  files all on January 8th at 8:33 p.m.
18          So is that -- I don't know if those --
19  I did not look to see if those files were in the
20  -- evidence of that interaction were in the
21  Digital Guardian report, but it would be
22  interesting to see.
23     Q.    If Grailer exfiltrated files to her USB
24  thumb drive at 8:33 p.m. on January 8th, 2023,

Page 84

1  would that exfiltration be recorded in the Digital
2  Guardian report?
3      A.    What I'll state is that I don't -- I
4  found no evidence of exfiltration within the
5  Digital Guardian report.  I did find evidence that
6  can be independently verified by any qualified
7  peer of significant file exfiltration as detailed
8  in my expert report.
9      Q.    That wasn't my question.
10          My question is:  If Grailer exfiltrated
11  files to her USB thumb drive at 8:33 p.m. on
12  January 8th, 2023, would you expect to see that
13  exfiltration recorded in the Digital Guardian
14  report?
15     A.    Again, I'm an independent expert.  I do
16  not have -- well, I have not searched the Digital
17  Guardian report for these particular file names
18  that I'm seeing -- that I'm seeing that she bulk
19  interacted with, in my opinion, at 8:33 p.m. on
20  January 8th.
21          If you have the Excel spreadsheet I
22  think I would recommend doing a search for one to
23  see if one appears in that report and see if
24  Digital Guardian reported this interaction that

Page 85

1  clearly exists on the laptop.
2      Q.    But that wasn't my question.
3          My question is -- just try to focus on
4  what I'm saying here.  If Grailer exfiltrated
5  files to her USB thumb drive at 8:33 p.m. on
6  January 8th, 2023, would you expect to see that
7  exfiltration recorded in the Digital Guardian
8  report?
9      A.    I don't know.
10          I do know that the evidence here of
11  exfiltration can be independently verified by any
12  qualified peer.  I don't know why these ones --
13  the OSForensics, which, again, I came to through
14  analysis in response to the Pixley declaration.
15          So, for example, I don't see -- there's
16  multiple files or folders -- I'm referring to
17  Exhibit 36, the first page.  I see a huge number
18  of folders that were all bulk selected and
19  interacted with at 12:41 p.m., which is prior to
20  the 9:28 p.m. cutoff of the Digital Guardian
21  report.
22          But, again, we'd have to look at the
23  individual files within there to see what those
24  access dates were, those interaction dates were.

Laurence D. Lieb
January 23, 2024

Page 86

1  I didn't do that for the purposes of this.  I just
2  noted that, as I state in my -- let's see.
3  Forensic analysis of the Ecolab laptop also
4  revealed that Jessica Grailer accessed multiple
5  additional files and folders in rapid succession
6  on January 28th, 2023 [sic].  That is
7  independently verifiable.
8            I've included six screen shots of the
9  Ecolab which display the files and folders
10 accessed by Jessica Grailer on January 8th, 2023,
11 as Exhibit F.  Due to the fact that it is
12 impossible for a human being to access and open
13 hundreds of files within seconds of each other, it
14 is any opinion that Jessica Grailer copied those
15 files and folders to the Emtec drive on January
16 28th, 2023, in addition to the files described in
17 Exhibit E.
18           Those files don't appear in the Digital
19 Guardian report, as I've stated multiple times.  I
20 don't see any evidence of exfiltration within the
21 Digital Guardian report.  I do not have an
22 explanation why.
23           But I do have and I'm referencing
24 independently verifiable evidence that is

Page 87

1  consistent, in my experience, with exfiltration on
2  her laptop.
3     Q.    You have no many explanation as to how
4  Grailer could have exfiltrated files to her USB
5  thumb drive before the Digital Guardian reports'
6  last entry without Digital Guardian recording that
7  activity, right?
8     A.    I have no explanation, as I'm sitting
9  here, why Digital Guardian did not report on the
10 activity that is clearly -- clearly exists and is
11 independently verifiable on a laptop as I'm
12 describing in paragraph 19.
13    Q.    You testified in your February 2023
14 declaration that the Digital Guardian report
15 covered activities through and including January
16 18th, 2023; is that right?
17    A.    No.  The Digital Guardian report only
18 goes up to, and I'm trusting that this is the last
19 line that you're displaying in Exhibit 7, 9:39,
20 activity after her last date of employment was
21 captured and recorded by Office 365's audit log,
22 which I know was produced as a file called
23 JGrailer.Excel.  And then later on more data was
24 recovered from a tool called Elastic that Ecolab

Page 88

1  uses.
2            MR. SPLITEK:  I'm handing you
3     Exhibit 8.
4            (Deposition Exhibit No. 8 was
5            introduced to the witness.)
6  BY THE WITNESS:
7     A.    Okay.
8     Q.    This is a copy of your February 2023
9  declaration, right?
10    A.    Okay.
11    Q.    Is that correct?
12    A.    Exhibit C?
13    Q.    Well, I've marked it as Exhibit 8.
14    A.    Sorry.  Yes.  Yes.  So Exhibit 8, yes,
15 Exhibit 8.
16    Q.    Is your February 2023 declaration?
17    A.    Okay.
18    Q.    Is that right?
19    A.    I'm reviewing it.
20           Yes.  And I see where you say in -- in
21 paragraph 15 it says January 18th, 2023 so that's
22 a typo.  It should be January 8th, 2023.
23    Q.    Okay.  And let's look at this actually
24 at page 3 in your February 2023 declaration.

Page 89

1     A.    Okay.
2     Q.    You begin a section called "Forensic
3  Analysis, Digital Guardian Report."
4     A.    Okay.
5     Q.    Right?  Is that correct?
6     A.    It is.
7     Q.    Okay.  And then it looks to me like the
8  next section doesn't begin until paragraph 19; is
9  that correct?
10    A.    That is correct.
11    Q.    Okay.  So in paragraph 15 you testified
12 that [as read]:  Ecolab's data loss prevention
13 tool, Digital Guardian Version 8.4.0.0263
14 generated a report of all interactions former
15 employee Jessica Grailer performed regarding
16 Ecolab files during the period November 14th, 2022
17 through January 18th, 2023, inclusive."
18    A.    Okay.
19    Q.    Is that right?
20    A.    Yes.
21    Q.    And then you said that you forensically
22 analyzed the Digital Guardian report and came to
23 the forensic observations and opinions set forth
24 in your declaration; is that right?

Laurence D. Lieb
January 23, 2024

Page 90

1    A.    Yes.
2    Q.    And then the next paragraph you talk
3  about an event on January 14th, 2023, correct?
4    A.    It says paragraph 16, Exhibit 8
5  [as read]:  Forensic analysis revealed Jessica
6  Grailer accessing her Ecolab OneDrive account
7  using a heretofore undisclosed iPhone 12 mini on
8  January 14th, 2023."
9          The evidence of this appears in a file
10 that was provided to me by Jennifer Semmler of
11 Ecolab IT called JGrailer.xlsx.  That file is
12 actually an Office 365 audit log.  That audit log
13 -- the Office 365 audit log, my understanding,
14 upon information and belief, I was provided a copy
15 with was also supplemented by a -- with more
16 columns from -- as it was restored from a tool
17 called Elastic that Ecolab uses to aggregate logs
18 in an automated fashion.
19   Q.    But why in your February 2023
20 declaration did you not mention the document that
21 you had gotten from Jennifer Semmler?
22   A.    I don't recall, but it's possible that
23 the date that I wrote this I assumed that the
24 JGrailer.Excel file, which is actually -- that's

Page 91

1  the post -- posted last date of employment was
2  also a Digital Guardian tool.
3          So I should have been -- I could have
4  been more specific.  I guess at the time I wrote
5  this I assumed that those two reports were both
6  from Digital Guardian.  That is not correct.
7          The Digital Guardian report only goes
8  through January 8th and then subsequent activity
9  post her January 8th derives from the Office 365
10 audit log that was originally provided to me as a
11 file named JGrailer.xlsx and then later
12 supplemented by Office 365 audit log data that
13 that was restored from Ecolab's Elastic system.
14   Q.    Understood.
15         I want you to take a look at -- still
16 in Exhibit 8.
17   A.    Okay.
18   Q.    Let's go to paragraph 24 of your
19 February 2023 declaration.
20   A.    Okay.
21   Q.    No.  Check that.
22         Let's go to paragraph 24.  Did I say
23 that right?  Paragraph 24 of your February 2023
24 declaration.

Page 92

1    A.    Okay.
2    Q.    In paragraph 24 of your February 2023
3  declaration you testify that forensic analysis of
4  the laptop had revealed Jessica Grailer
5  exfiltrating multiple photographs.  And you say
6  that happened at 9:11 p.m. on January 8th of 2023,
7  correct?
8    A.    Forensic analysis of the laptop
9  revealed Jessica Grailer exfiltrating multiple
10 photographs of Ecolab equipment from her Ecolab
11 OneDrive account and taken by her iPhone 6S.
12         It doesn't say like on January 8th,
13 2023, 9:11 p.m.  It doesn't have a verb after
14 that.  But I recall that my forensic analysis of
15 photos, it had this iPhone 6S metadata imbedded in
16 the photographs.  And that's how I came to the
17 opinion that these photographs were taken by that
18 phone.
19   Q.    Were you or were you not saying in
20 paragraph 24 of your declaration that the alleged
21 exfiltration occurred at 9:11 p.m. on January 8th,
22 2023?
23   A.    I believe that is what I am saying.
24 I'm just looking at -- it's like a footnote.

Page 93

1  Let's see.
2          It says -- which is coming from the
3  decrypted image, OneDrive pictures, Adkins Evap
4  inspection, September 23rd, 19.  Evap overview,
5  pictures and IMG3654.jpeg.
6          So that's the file -- my recollection
7  is a forensic analysis of this picture file,
8  IMG6354.jpeg was -- the embedded metadata shows it
9  was taken by an iPhone 6S.
10   Q.    But that's not my question.
11         My question is:  Were you saying that
12 the exfiltration you were alleging in paragraph 24
13 occurred at 9:11 p.m. on January 8th, 2023?
14   A.    As I read that, I'd say yes.
15   Q.    Okay.
16   A.    But I'd have to look at the -- I don't
17 have the forensic database.
18   Q.    Let's turn to paragraph 30 of your
19 February 2023 declaration.
20   A.    Okay.
21   Q.    In paragraph 30 of your 2023
22 declaration you testified that Jessica Grailer
23 exfiltrated files at 7:20 p.m. and 8:48 p.m.?
24   A.    Sorry, which paragraph?

Laurence D. Lieb
January 23, 2024

Page 94

1    Q.    Paragraph 30.
2    A.    Okay.
3    Q.    You testified that Jessica Grailer
4  exfiltrated files at 7:20 p.m. and 8:48 p.m. on
5  January 8th, 2023.
6    A.    Okay.
7    Q.    Correct?
8    A.    Yes, that is what my declaration
9  states.
10   Q.    Okay.  And you would agree that both of
11 those times are earlier than the last entry in the
12 Digital Guardian report?
13   A.    Yes.
14   Q.    All right.
15   A.    I'd also like to state that in
16 paragraph 29 I'm seeing that forensic analysis of
17 the laptop revealed Jessica Grailer accessing the
18 below folders and files from the Emtec USB drive.
19 It shows the same D, June 22nd VR meeting, VR
20 Nalco, evaporative inspection with performance
21 index PDF.
22        And so as I sit here, I don't recall
23 searching for these file names through the Digital
24 Guardian report, but I probably did.  But you

Page 95

1  could actually search for them now because it
2  clearly -- again, this is independently verifiable
3  through a forensic analysis of her laptop that
4  Jessica Grailer had these folders on her Emtec
5  drive containing these files.
6    Q.    I want you to turn to paragraph 31 of
7  your February 2023 declaration.
8    A.    Paragraph which?
9    Q.    31.
10   A.    Okay.
11   Q.    In paragraph 31 you testified that
12 Jessica Grailer exfiltrated a document at 8:56
13 p.m. on January 8th, 2023, right?
14   A.    Yes.
15   Q.    And, again, that's before the last
16 entry in the Digital Guardian report, correct?
17   A.    Yes.
18   Q.    All right.  Look at paragraph 32.
19   A.    Okay.
20   Q.    You testified that Grailer exfiltrated
21 files at 7:33 p.m. and 9:04 p.m. on January 8th,
22 2023, correct?
23   A.    Yes.
24   Q.    And that, again, was before the last

Page 96

1  entry in the Digital Guardian report, right?
2    A.    Yes.
3    Q.    Okay.  Paragraph 33 you testified that
4  Grailer exfiltrated files at 9:11 p.m. on January
5  8th, 2023, right?
6    A.    Yes.
7    Q.    And, again, that was before the last
8  entry in the Digital Guardian report?
9    A.    Yes.
10   Q.    Okay.  Why did you never mention in
11 your report in Exhibit 2 that the Digital Guardian
12 report does not show Grailer copying any files to
13 her thumb drive on January 8th, 2023?
14   A.    Well, I found no evidence of
15 exfiltration of files through my analysis of the
16 Digital Guardian report so I didn't refer to any
17 analysis because I didn't find any evidence of
18 exfiltration as recorded by the Digital Guardian
19 report.
20        My evidence of exfiltration all derived
21 from -- and can be scientifically and
22 independently verified through analysis of her
23 work laptop.
24   Q.    So you only put in your report

Page 97

1  information that you thought supported the
2  conclusion of exfiltration; is that right?
3        MR. YOSHIMURA:  Objection; leading,
4        argumentative.
5  BY THE WITNESS:
6    A.    My reports all contain evidence --
7  you'll notice they're all footnoted.
8    Q.    That is not my question.  I'll ask it
9  again and you can answer it or not.
10        But in your report, you agree you've
11 never disclosed that the Digital Guardian report
12 does not record any of the exfiltration that you
13 allege, right?
14   A.    The question doesn't make sense because
15 I did not find evidence of exfiltration recorded
16 by the Digital Guardian report.  I found evidence
17 of exfiltration, as described in my reports, on
18 the laptop and I cite them and any independently
19 veer -- any independent scientific qualified peer
20 can look at the forensic image of the laptop in
21 the same location and find the same exact evidence
22 that I'm describing in my expert report.
23   Q.    In your February 2023 declaration, you
24 told the judge about the Digital Guardian report,

Laurence D. Lieb
January 23, 2024

Page 98

1  right?
2      A.    If it reference -- yes, it references
3  the Digital Guardian report.
4      Q.    And your declaration, like your report,
5  never disclosed that the Digital Guardian report
6  recorded no copying on January 8th, 2023, right?
7      A.    If you're asking me does -- do any of
8  my reports contain the sentence that I found no
9  evidence of exfiltration within the Digital
10  Guardian report itself, I don't believe they do.
11      I believe all of the evidence of
12  exfiltration that I cite in my report exists on
13  the laptop.
14      Q.    And you went to a court hearing in
15  March of 2023, right?
16      A.    I did.
17      Q.    You were prepared to testify at that
18  hearing, right?
19      A.    I was.
20      Q.    Were you going to tell the judge that
21  day that the Digital Guardian report did not show
22  Grailer copying any files to her USB thumb drive
23  on January 8th, 2023?
24          MR. YOSHIMURA:  Objection.

Page 99

1  BY THE WITNESS:
2      A.    If I was -- if I had been asked if the
3  Digital Guardian report contained any evidence of
4  exfiltration of files, I would have answered
5  correctly and honestly the same way I did today;
6  that I didn't find any evidence of exfiltration
7  with the Digital Guardian report.
8      All the evidence of exfiltration I
9  found all through forensic analysis of the laptop.
10  All of the evidence is cited and can be
11  independently verified and replicated by a
12  qualified peer.
13      Q.    Who prepared the Digital Guardian
14  report?
15      A.    I believe it was Jennifer Semmler,
16  S-E-M-M-L-E-R.
17      Q.    Do you know how she prepared it?
18          MR. YOSHIMURA:  Objection.
19  BY THE WITNESS:
20      A.    I do not.
21      Q.    Have you ever personally generated a
22  Digital Guardian report?
23      A.    I have not.
24      Q.    How many Digital Guardian reports have

Page 100

1  you analyzed during your career?
2      A.    At least four different reports.
3      Q.    When was the first one?
4      A.    It was in the Ridley matter.
5      Q.    And is one of the four in this Jessica
6  Grailer matter?
7      A.    Yes.
8      Q.    What are the other two?
9          MR. YOSHIMURA:  Objection.
10  BY THE WITNESS:
11      A.    The other Ecolab matters.
12      Q.    Okay.  So all four Digital Guardian
13  reports that you've analyzed have been in your
14  Ecolab matters?
15      A.    Correct.
16      Q.    Have you received any training relating
17  to Digital Guardian?
18      A.    I have not.
19      Q.    Have you received any training on how
20  to interpret the data contained in a Digital
21  Guardian report?
22      A.    If you're asking me if I've gone
23  through any sort of formal certification training
24  process with the company Digital Guardian, I have

Page 101

1  not.
2      Q.    Have you received informal training on
3  how to interpret Digital Guardian reports?
4      A.    So in my forensic analysis, in my
5  career, since I've been doing this for 20 years,
6  it is common on every case involving theft of
7  trade secrets for me to collect and analyze
8  business system logs such as Office 365 audit log,
9  Digital Guardian's data loss prevention log.
10      I actually have a CLE class that I --
11  called "Theft of Trade Secrets Best Practices."
12  One of the slides recommends and suggests that it
13  is important to preserve these sorts of logs as
14  fast as humanly possible because that data is
15  ephemeral in nature.
16      So I have experience -- extensive
17  experience analyzing business logs, recording
18  human interactions with files.  And I've actually
19  included that in a CLE class that I wrote and
20  published.
21      Q.    You have experience analyzing four
22  Digital Guardian reports, correct?
23      A.    Correct.
24          MR. YOSHIMURA:  We've been going for a

Laurence D. Lieb
January 23, 2024

Page 102

1  while.  Is it okay to take a break?
2          MR. SPLITEK:  Sure.  Go right ahead.
3          THE VIDEOGRAPHER:  The time is 11:14
4  a.m.  We are going off the record.
5              (Whereupon, a break was taken,
6              after which the following
7              proceedings were had:)
8          THE VIDEOGRAPHER:  The time is
9  11:30 a.m. and we are back on the record.
10         MR. SPLITEK:  Mr. Lieb, I'm handing you
11  Exhibit 9.
12             (Deposition Exhibit No. 9 was
13             introduced to the witness.)
14  BY THE WITNESS:
15     A.   Okay.  And I understand that I'm still
16  under oath.
17     Q.   That's my understanding too.
18     A.   Okay.  Yes.
19     Q.   And I will tell you Exhibit 9, these
20  are screenshots.  As you can see on page 1, you
21  are getting rows 1 through 44, and then page 2
22  you're getting rows 45 through 77.  And this is
23  not intended to be filtered in any way.  This is
24  supposed to be a complete screenshot of a

Page 103

1  spreadsheet.
2          Having Exhibit 9 before you, Mr. Lieb,
3  can you tell me what it is?
4     A.   Yeah.  This appears to be a true and
5  exact copy of a file that was originally provided
6  to me by Jennifer Semmler of Ecolab IT.  The file
7  name when it was originally provided to me was
8  JGrailer.xlsx.
9          I have come to find out or through
10  analysis that this is report actually is not a
11  Digital Guardian report.  This is an Office 365
12  audit log report.
13         And then this report was later
14  supplemented with more rows and columns, more data
15  after Ecolab restored backups from their Elastic
16  audit log aggregation tool.
17     Q.   So who first provided you with a log
18  marked as Exhibit 9?
19     A.   My recollection is it was Jessica --
20  I'm sorry, it was Jennifer Semmler, is my
21  recollection.
22     Q.   And when did she first provide you with
23  a log marked as Exhibit 9?
24     A.   I don't recall the specific date, but I

Page 104

1  believe it would have been sometime in February --
2  prior to the -- obviously prior to the publication
3  of my original report.
4     Q.   Okay.  You received it before your
5  February 2023 declaration?
6     A.   Yes.
7          THE VIDEOGRAPHER:  Hold on a second.
8  The time is 11:33 a.m.  We are going off the
9  record.
10             (Whereupon, a discussion
11             was had off the record.)
12         THE VIDEOGRAPHER:  The time is
13  11:33 a.m. and we are back on the record.
14         MR. SPLITEK:  Mr. Videographer, would
15  you like the court reporter to read back the
16  last question and answer?
17         THE VIDEOGRAPHER:  Yes, please.
18             (Whereupon, the record
19             was read as requested.)
20  BY MR. SPLITEK:
21     Q.   Do you know who prepared the log marked
22  as Exhibit 9?
23     A.   My recollection is that this log
24  Exhibit 9 was exported out of Ecolab's Elastic log

Page 105

1  aggregation tool.
2     Q.   And do you know who handled that
3  export?
4     A.   My recollection, it was Jennifer
5  Semmler.
6     Q.   You were not personally involved in
7  exporting the data shown in Exhibit 9?
8     A.   I was not.
9     Q.   And did you say that you later received
10  a supplement to Exhibit 9?
11     A.   I did.
12     Q.   When did you receive that supplement?
13     A.   It was around October of 2023,
14  October/November 2023.
15         MR. SPLITEK:  Okay.  I'm going to share
16  my screen again.  I'm showing you Exhibit 10
17  on the screen, Mr. Lieb.
18         THE WITNESS:  Okay.
19             (Deposition Exhibit No. 10 was
20             introduced to the witness.)
21  BY MR. SPLITEK:
22     Q.   In a moment -- so I'm showing it to you
23  as we received it.  In a moment I'm going to try
24  to make it a little easier to read.

Laurence D. Lieb
January 23, 2024

Page 106

1    But let me ask you so far:  Do you
2  recognize Exhibit 10 yet?
3    A.    This appears to be the Office 365 audit
4  log for Jessica Grailer that was restored from
5  Ecolab's Elastic log aggregation tool.
6    Q.    And then does Exhibit 10 also appear to
7  be the supplement that you referred to earlier?
8    A.    Is this Exhibit 10?
9    Q.    Exhibit 10 is on the screen, yes.
10    A.    Yes.  Yes.
11    Q.    Okay.
12    A.    Correct.
13    Q.    And I'm going to, just to make it a
14  little easier here, I'm going to auto fit the
15  column width.
16    A.    Freeze the top row.
17    Q.    I'm -- that's also a good idea.
18        First I'm going to make the row height
19  a normal row height and also --
20    A.    I think you have to hit the "enable
21  edit."
22    Q.    Ah-ha, thank you.  That's why I can't.
23  All right.  So we will --
24        Okay.  I'm going to back out.  We're

Page 107

1  going to start over with Exhibit 10.  You are
2  correct, I need to enable editing first.
3    A.    By the way, if you double click the
4  line between A and B it will automatically spread
5  them out.  And then if you move it -- yeah, and
6  double left click, it will do it -- there we go.
7  And you can do the same thing with the rows
8  between like -- yeah.
9    Q.    All right.  Very good.  Thank you.
10        And so as we -- again, there is a lot
11  of columns here.
12    A.    Sorry to interrupt.  If you don't mind
13  freezing the top row, that will definitely aid in
14  our analysis so we can see the column headers.
15    Q.    Freeze top row.
16    A.    Perfect.
17    Q.    And, again, in Exhibit 10 like in
18  Exhibit 4, there's -- there aren't as many rows
19  but there's too many columns to make it
20  manageable, but I'm scrolling through here.
21        And we see -- if we get to the bottom,
22  it starts in the morning of January 8th, 2023; is
23  that correct?
24    A.    Yes.

Page 108

1    Q.    Okay.  And then it runs through, at the
2  top, January 18th in the afternoon, correct?
3    A.    That is correct.
4    Q.    All right.  And do you now -- do you
5  recognize Exhibit 10 as that supplement that you
6  received in October of 2023; is that right?
7    A.    It is.
8    Q.    Okay.  So in your report you refer to
9  an Office 365 user activity log, right?
10    A.    Which exhibit are you referring to?
11    Q.    Your report, Exhibit 2.  And you can --
12    A.    I have multiple reports.
13    Q.    I understand.  Let's just have you turn
14  to Exhibit 2, paragraph 22.
15    A.    Of exhibit -- sorry.
16    Q.    Exhibit 2 of this deposition, paragraph
17  22.
18    A.    Got it.  Okay.
19    Q.    Okay.  Do you see you refer to an
20  Office 365 user activity log there?
21    A.    I do.
22    Q.    So in that paragraph in Exhibit 2 of
23  your report, are you talking about Exhibit 9 or
24  Exhibit 10?

Page 109

1    A.    In paragraph 2, if Exhibit 22 -- let's
2  see.  I have to read it.
3        Ecolab preserved Office 365 user
4  activity log capturing the fact that a person,
5  whom I assume to be Jessica Grailer, accessed her
6  former Ecolab OneDrive account on January 11th,
7  2023; January 12th, 2023; January 13th, 2023;
8  January 14th, 2023; January 15th, 2023; January
9  16th, 2023; January 17th, 2023; and January 18th,
10  2023 using an undisclosed computer.  Jessica
11  Grailer no longer had access to her Ecolab laptop
12  as of January 10th, 2023, and, therefore, must
13  have accessed her former Ecolab OneDrive account
14  using an undisclosed computer.
15        I've included a true and exact copy of
16  the log containing Jessica Grailer's activity as
17  Exhibit E.  So which -- is this -- is this Exhibit
18  E or do I have a different exhibit?
19    Q.    Let me back up a second here.
20        So in paragraph 2 -- in Exhibit 2,
21  paragraph 22, you refer to -- you capitalize it --
22  "Office 365 user activity log."
23        Do you see that?
24    A.    I do.

Laurence D. Lieb
January 23, 2024

Page 110

1    Q.    Okay.  My question to you is:  What are
2  you referring to there?
3    A.    It says: "I've included a true and
4  exact copy of the log containing Jessica Grailer's
5  activity as Exhibit E."
6    Q.    That's right.  But you didn't, right?
7    A.    I didn't what?
8    Q.    You did not include a true and correct
9  copy of the log as Exhibit E to your report?
10    A.    You're asserting that.  I don't have a
11  copy of Exhibit E.
12    Q.    You do.  It's in -- Exhibit 3 is all
13  the exhibits to your report.
14    A.    Exhibit 3?
15    Q.    Yeah.
16    A.    Okay.
17    Q.    Look at Exhibit E.
18    A.    Okay.  I will.
19          Well, Exhibit E appears to be files
20  exfiltrated by Grailer on January 8th.  It doesn't
21  appear to be the log.
22    Q.    That's right.
23          And if you turn back in your report to
24  paragraph 18 of your report; so this is paragraph

Page 111

1  18 of Exhibit 2.
2    A.    Okay.
3    Q.    You say there that Exhibit E is the
4  list of files that you --
5    A.    Okay.  So paragraph 22, when I'm
6  referring to the log, I must have missed that.  It
7  should have been Exhibit F.  And Exhibit F should
8  have been referred to as the JGrailer.xls report,
9  which has more information, more columns and rows
10  as what you're seeing as Lieb Exhibit 10.
11          So that's what I'm refer to in
12  paragraph 2020 -- what I'm referring to in
13  paragraph 22, the user activity log, I'm referring
14  to it as the original JGrailer.xlsx file that was
15  produced to me.
16          The subsequent expanded version that
17  was recovered from the Elastic's system does not
18  contain the information that contradicts or
19  changes my opinions that I've stated in 22 or in
20  my report.  It just contains more columns and more
21  detail.
22    Q.    Okay.  So to be clear, in paragraph 22
23  of your report, which we marked as Exhibit 2, when
24  you refer to the Office 365 user activity log, you

Page 112

1  are referring to Exhibit 9; is that correct?
2    A.    Yes.
3    Q.    Okay.  At some point did you analyze
4  Exhibit 10 also?
5    A.    Yes.
6    Q.    Did you do that before or after
7  preparing your report that's marked as Exhibit 2?
8    A.    I'll have to look at production, when I
9  produced this.  I'm looking to see the date that
10  I -- hopefully I put a date on here.  Oh,
11  November 13th.
12          I'd have to see the exact date that I
13  got the restored expanded version which is your
14  Exhibit 10.  So as I'm sitting here, I don't
15  recall because this is November 10th, 2023, which
16  is right about the time I was provided with a new
17  expanded audit log restored from Ecolab -- or from
18  their Elastic system.
19    Q.    And who first provided you with a log
20  marked as Exhibit 10?
21    A.    Exhibit 10?
22    Q.    On the screen.
23    A.    I don't recall.
24    Q.    Do you remember how you received the

Page 113

1  log marked as Exhibit 10?
2    A.    I don't.
3    Q.    Do you remember whether it was someone
4  from Ecolab or Fisher Phillips or the Faegre law
5  firm?
6    A.    I recall an Ecolab IT professional
7  called Austin -- it's not Austin Powers -- it's
8  Austin -- it's something like that.  It's Austin
9  Peters, something like that; was the gentleman at
10  Ecolab IT who restored this Exhibit 10 from -- or
11  actually had Elastic, the company, restore an
12  archived backup then provided this log.
13          I believe what you're asking me is how
14  was that -- after it was generated by Austin after
15  being restored by the company Elastic and how it
16  was transmitted to me as like an e-mail attachment
17  or uploaded to my share file, I don't recall.
18    Q.    And do you know how anyone prepared the
19  log marked as Exhibit 10?
20    A.    Well, I was informed that Ecolab went
21  to the company Elastic, who is this log
22  aggregation software tool, and Elastic restored a
23  backup archived that they had and was able to run
24  this report, which is why we can see in some of

Laurence D. Lieb
January 23, 2024

Page 114

1  the -- in your Exhibit 10 you can see some -- some
2  columns are related to Elastic, this log
3  aggregation tool, and some columns are directly
4  from Microsoft.
5      Q.   Did you ask for the log marked as
6  Exhibit 10 or was it given to you without you're
7  having to ask for it?
8      A.   I don't recall.
9      Q.   During the time you had the log marked
10  as Exhibit 9 but not the log marked as Exhibit 10,
11  did you ever feel that you were missing relevant
12  information?
13      A.   No.
14      Q.   During that time did you ever ask
15  anyone for additional information beyond what had
16  been provided to you in the log marked as
17  Exhibit 9?
18      A.   I recall at the time asking Jennifer
19  Semmler if there -- if there were -- was more data
20  from the office -- the Office 365 audit log, and I
21  believe that was in February of 2023, and she said
22  this is the data.
23           So subsequent to that, conversations
24  that I was not part of led to the company Elastic

Page 115

1  restoring the more thorough, more data, more rows
2  and columns of this Office 365 audit log, which is
3  now -- is my opinion is this Exhibit 10 on the
4  screen.
5      Q.   And have you received any training
6  relating to logs like the ones marked as Exhibits
7  9 or 10?
8      A.   I have not received formal Microsoft
9  certification training, but I interact with
10  Microsoft audit logs.  I personally collect and
11  generate those logs for some cases and clients.
12  And I've done that at least 100 times and I
13  describe that in the best practice of collecting
14  such logs in my Theft and Trade Secrets Best
15  Practice CLE class.
16      Q.   Okay.  So I'm going to bring down
17  Exhibit 10.
18      A.   Okay.
19      Q.   And I'm going to focus on Exhibit 9
20  because that is the log you said you're
21  identifying in paragraph 22 of your report.
22      A.   Got it.
23      Q.   Okay.  So let's look at Exhibit 9.
24      A.   Okay.

Page 116

1      Q.   Do you see on both pages of Exhibit 9
2  there are "hard delete events"?  The value is
3  "hard delete" in the "Event" action column?
4      A.   Yes.
5      Q.   So what does a hard delete event mean
6  to you?
7      A.   Well, a hard delete -- so in Office 365
8  audit logs there -- and it doesn't show in these
9  columns, but there's -- the most important type of
10  deletion to record is what's known as a
11  first-stage recycle bin and a second-stage recycle
12  bin.  So that is in terms of file.
13           So a first-stage recycle bin, that's
14  the end user is moving date to just their normal
15  Office 365 trash bin.
16           A second-stage recycle bin, means it's
17  actually purged and no longer recoverable; this is
18  according to Microsoft.
19           So I'd be speculating about what the
20  "hard delete" is referred to.  But I will note
21  that my analysis of what you're referring to as
22  Exhibit 10, if we look at those columns, the hard
23  delete is calendar entries.
24      Q.   Okay.  And so let's break this down.

Page 117

1  So the hard delete events, what is being deleted
2  is calendar entries; is that correct?
3      A.   According to the Exhibit 10, yes.
4      Q.   Okay.  And to the best of your
5  knowledge, that's what was being hard deleted,
6  calendar entries?
7      A.   Yes.
8      Q.   Okay.  And then you also talked about
9  the first stage -- was it the first-stage recycle
10  bin?
11      A.   It's called a first-stage recycle bin
12  and a second-stage recycle bin.
13      Q.   And are you saying that the hard delete
14  event represents, in this case, the calendar
15  entries being permanently deleted from the
16  second-stage recycle bin?
17      A.   No.  That's a good question.
18           So when I've encountered first-stage
19  recycle bin entries and second-stage recycle bin
20  entries in Office 365 audit logs, that's been in
21  reference to files and folders.  So I would have
22  to research it to answer that question.
23           So the hard delete may specifically
24  refer to Outlook calendar entries instead of

Laurence D. Lieb
January 23, 2024

Page 118

1  individual files like PDF files.
2      Q.    Okay.  When -- I thought you did say
3  that it refers to calendar entries in this
4  instance.
5      A.    It does.
6      Q.    Okay.  When a calendar entry is being
7  hard deleted, what is happening to it?
8      A.    I don't know what the designation of
9  hard delete means beyond deletion of that entry.
10     Q.    Okay.  And do you know whether the hard
11 delete event for a calendar entry reflects a
12 user's action or the calendar entry being purged
13 from the recoverable items folder after being soft
14 deleted earlier?
15     A.    In my opinion, these entries in
16 Exhibit 9 that state hard delete were performed by
17 Jessica Grailer.
18     Q.    And why do you think that?
19     A.    In the expanded Exhibit 10 we can see
20 the user account says Jessica Grailer.
21     Q.    All right.  Any other reason?
22     A.    I've never encountered any instance
23 where a direct user account access password has
24 ever been provided to another employee.  That

Page 119

1  would not be best practice.  I've never seen that
2  done.
3          So, in other words, if another user had
4  deleted these calendar entries, it would show up
5  in their audit log under not JGrailer@Ecolab; it
6  would show up under somebody else's account.
7      Q.    Well, that wasn't quite my question.
8          Is it -- does a Microsoft audit log
9  ever record events that no user initiated such as
10 an automatic purge of items from the recoverable
11 items folder?
12     A.    I don't have any experience
13 encountering that in my analysis so I can't answer
14 that.  It is not in my experience.
15     Q.    Take a look at the user login failed
16 events that we see in both page 1 and page 2 of
17 Exhibit 9.  What are those showing us?
18     A.    Those are showing that Jessica Grailer
19 attempting to log in.  So, for example, row 13,
20 Exhibit 9, says "user login failed."  So outcome
21 failure.  Has an IP address 131.95.104.251, my
22 research showed that to be Charter Communications,
23 consumer -- consumer Internet account.
24          I asked Ecolab IT if they used Charter

Page 120

1  Communications in any capacity; they said no.
2          So my opinion, this is Jessica
3  Grailer's home Internet and it shows that it was
4  done by -- she used a -- under "User Agent",
5  column F, an Apple iPhone.  It says 13C1.  That
6  actually is actually an iPhone 12 mini, slash,
7  2003.85.  That 2003.85 refers to the operating
8  system version of her iPhone 12 mini.
9          And if we look at Exhibit 10, which has
10 even more columns, it says the reason for the user
11 login failure, it says "user error."
12     Q.    And did you do any analysis to
13 determine whether an application installed on
14 Grailer's iPhone could have initiated that failed
15 user login event without Grailer's intervention?
16     A.    I was not provided with a forensic
17 image of Ms. Grailer's iPhone 12 mini so I can't
18 opine as to what evidence exists on the iPhone 12
19 mini.  I was not provided with that.
20          But it is my opinion that Jessica
21 Grailer attempted to log in to her former Ecolab
22 work account on multiple days, as recorded in this
23 log, attempted to and failed using her iPhone 12
24 mini.

Page 121

1      Q.    And in those events, she did -- in any
2  event, she did not gain access to her account; is
3  that correct?
4      A.    Well, she didn't access -- according to
5  these logs, she didn't gain access using her
6  iPhone 12 mini.  It said "login failure."
7      Q.    So, for example, in row 43 at 52
8  minutes after midnight on January 14th --
9      A.    Sorry, are you on the second page?  You
10 said row --
11     Q.    First page of Exhibit 9, row 43.
12     A.    Oh, 43.  Sorry.  Yes, user login
13 failed, event outcome failure.  Shows the source
14 IP address.  And then it, again, shows it is her
15 iPhone 12 mini.
16     Q.    But that's an example of Grailer not
17 gaining access to her account at 12:52 a.m. on
18 January 14th, correct?
19     A.    Correct.  All of the entries captured
20 in Exhibit 9 that relate to her iPhone 12 mini
21 show that she was not successful; that her user
22 login failed or she failed to log in into her
23 former work account user her iPhone 12 mini.
24     Q.    But in your February 2023 declaration

Laurence D. Lieb
January 23, 2024

Page 122

1    you testified that Grailer did access her account
2    at that exact date and time, didn't you?
3         A.    She attempted to access her account.
4    This is accessing her account.  Her login failed
5    but she did access her account.  So I mean, she
6    went to the house to go into it, knocked on the
7    door, it was locked.  Her key didn't work.
8         So to me that's her attempting to enter
9    the house.  That's what I mean by access.
10        Q.    So when you testified in your
11   declaration that Jessica Grailer accessed her
12   Ecolab OneDrive account on January 14th, 2023, at
13   52 minutes after midnight you meant that she tried
14   to login but failed to do it?
15        A.    That's -- that's what the evidence
16   shows.
17        Q.    There are a series of filed previewed
18   events on page 1 of Exhibit 9.
19        A.    Yes, I see those.
20        Q.    What does a "file previewed event" mean
21   to you?
22        A.    In my opinion that means interaction
23   with those files.
24        Q.    Well, that's really vague.  What kind

Page 123

1    of interaction?
2         A.    In my opinion, and the evidence is
3    consistent with Jessica Grailer using an
4    undisclosed computer to access her former work
5    accounts on these dates, access these files and
6    she is in possession of those files.
7         Q.    But I don't -- it still is pretty
8    vague.
9         What do you mean by access the files
10   and be in possession of them?  On the page it just
11   says "file previewed," right?
12        A.    Right.
13        Q.    So tell me as precise as you can, what
14   do you think happened at 1:01 p.m. on January 15th
15   to result in these file previewed events in the
16   log?
17        A.    Right.  So if we look at the timestamps
18   -- again, this is in rapid succession.  So in my
19   opinion, she used an undisclosed device,
20   successfully accessed and logged into her former
21   work account and took exfiltrated copies of all of
22   these files.
23        It's my opinion that a forensic
24   analysis of this undisclosed device, potentially

Page 124

1    her new Chem Tree laptop, her Emtec USB drive
2    would show evidence of these files existing on
3    those devices.
4         Q.    How did she exfiltrate them?  I don't
5    understand.  Logistically.
6         A.    Downloaded.
7         Q.    So the file previewed events that we
8    see in Exhibit 9, you're saying that she accessed
9    the files and downloaded the files; is that right?
10        A.    In my opinion, this evidence is
11   consistent with a person, I believe to be Jessica
12   Grailer, accessing her former work account using
13   an undisclosed computer device, and then in rapid
14   succession accessing all of these files and
15   downloading them, taking a copy of them.
16        Q.    So you're saying --
17        A.    Sorry, go ahead.
18        Q.    So you're saying that when someone
19   accesses and downloads files, what results are
20   entries in the log that say "file previewed"?
21        A.    Yes.  It says "file previewed" but
22   you'll notice that the timestamps are within two
23   seconds of each other.  So, again, a human being,
24   just as we saw with evidence on her laptop, a

Page 125

1    human being is not opening up -- I don't
2    believe -- it is not my opinion that Jessica
3    Grailer opened up these dozen-plus files within
4    seconds -- within microseconds of each other.
5         It's, in many opinion, the evidence is
6    consistent with the fact that she successfully
7    accessed her account using an undisclosed device
8    on that date and then accessed these files to take
9    them, and she did.
10        And my opinion is that a forensic
11   analysis of her -- this undisclosed computer, the
12   Emtec USB drive and her new Chem Tree work
13   computer e-mail account, new Chem Tree OneDrive
14   would show evidence of these files existing in
15   those locations, one or more of these locations,
16   and information derived from these files.
17        Q.    Did you look up who owns the IP address
18   that shows up in column D next to the "file
19   previewed" events on page 1 of Exhibit 9?
20        A.    I did.
21        Q.    And who owns it?
22        A.    Microsoft.
23        Q.    In paragraph 30 of your report --
24        A.    Which exhibit?

Laurence D. Lieb
January 23, 2024

Page 126

1    Q.    Exhibit 2.
2    A.    I'm there.
3          -- you say that [as read]:  The Ecolab
4    OneDrive log shows that Jessica Grailer
5    successfully logged in and opened and deleted
6    files on multiple dates after her resignation on
7    January 8th, 2023.
8    A.    I see that.
9    Q.    Right?
10         So which -- well, let's break it down.
11         Which rows in Exhibit 9 show Grailer
12   successfully logging into her account?
13   A.    So -- well -- okay.
14         So the fact that she was able to
15   interact with files, preview them, download them
16   in my opinion, the fact that she was able to
17   delete entries -- now -- and at the time I wrote
18   paragraph 30 in February of 2023, I was not -- I
19   did not have access to what you're Exhibit 10 is,
20   the expanded.  That actually showed the column of
21   what the hard delete was, that it was calendar
22   events.
23         So paragraph 3, it said deleted files
24   on multiple dates.  Now that I have access

Page 127

1    subsequent to that with your Exhibit 10, it
2    actually shows they were not PDF files or Word
3    files.  They were actually calendar entries that
4    she deleted.
5    Q.    All right.  I want to be clear, though.
6          I'm looking at Exhibit 2, paragraph 30.
7    A.    Right.
8    Q.    It's your November report.  Are you in
9    Exhibit 2?
10   A.    Okay, I'm there.
11   Q.    Paragraph 30.  You say that [as read]:
12   The OneDrive log shows that Jessica Grailer
13   successfully logged in and opened and deleted
14   files on multiple dates.
15   A.    Okay.
16   Q.    But you're saying now it's calendar
17   entries; it's not files?
18   A.    I mean, clearly Exhibit 10 -- again, as
19   I sit here, when I looked at 30, I may have been
20   referring to your Exhibit 9, which doesn't have
21   the columns for what was specifically hard
22   deleted.
23         Your Exhibit 10, it does have the
24   columns so we can see that it was calendar entries

Page 128

1    that were deleted.
2    Q.    Okay.  And which rows in Exhibit 9,
3    again, show Grailer logging in successfully?
4    A.    I don't see any entries for user login
5    success.  But clearly she must have successfully
6    logged in because the activities that -- well, it
7    is in Exhibit 10, it shows that the user account
8    that was performing these activities in Exhibit 9
9    are all under the J. Grailer account.
10         So, therefore, she must have been able
11   to login successfully to perform actions that were
12   recorded by Office 365.
13   Q.    But how did she manage to log in
14   without generating a user logged-in event in the
15   log?
16   A.    I don't know why this audit log doesn't
17   record the login success.
18   Q.    Okay.  But that's what you're say is
19   the log just -- it doesn't record when users log
20   in?
21   A.    This log doesn't contain -- neither
22   Exhibit 9 nor Exhibit 10, as far as I can tell --
23   you'd have to look at Exhibit 10 to see if there
24   is a login success entry.

Page 129

1    Q.    Okay.
2    A.    You can go data and search for that and
3    see if there's a login success entry.  I don't
4    recall one.
5          But the fact that on Exhibit 10 we can
6    see these activities were performed by the user
7    account JGrailer@Ecolab.com.  So in my opinion,
8    that's Jessica Grailer.
9    Q.    And it looks like, for whatever reason,
10   it looks like to you that the log just wasn't
11   recording when there was a successful login.  It
12   was only recording when there was a failed login;
13   is that right?
14   A.    Yes.
15   Q.    Okay.
16   A.    And in Exhibit 10 -- I don't have
17   Exhibit 10 in front of me, but if you brought it
18   back up we might be able to sort the event action
19   outcome to see if the expanded log actually has a
20   login success.  It may.  I don't recall.
21   Q.    Yeah.  You think there is not one in
22   there, I take it?
23   A.    I don't recall.
24   Q.    Which rows in Exhibit 9 show Grailer

Laurence D. Lieb
January 23, 2024

Page 130

1  opening any files?
2      A.   Well, it is rows 22 through 41, which
3  show the files that I described, I believe in
4  multiple declarations.
5          So in my Exhibit 2 it is table 1, files
6  accessed by Jessica Grailer on January 15th.
7      Q.   I'm going to cut you off.
8          In Exhibit 9, which rows in Exhibit 9
9  show Grailer opening any files?
10     A.   Well, I see her accessing and
11 downloading and exfiltrating the files. It is my
12 opinion that she opened, accessed, downloaded
13 these files that are listed in Exhibit 9 in rows
14 22 through 41.
15     Q.   Okay.  But you're saying that you
16 believe rows 22 through 41 of Exhibit 9 show
17 Grailer opening the files that are listed?
18     A.   It is any opinion that Jessica Grailer
19 accessed, opened, downloaded, has a copy --
20 exfiltrated these files.  It is -- again, in your
21 Exhibit 10 it shows it was done by the Jessica
22 Grailer account.
23          It is my opinion that that is Jessica
24 Grailer surreptitiously accessing her former work

Page 131

1  account and exfiltrating these files using an
2  undisclosed computer.  I'd like her to explain why
3  or what device she used.  Did she explain to
4  anyone what device she was using?
5          MR. YOSHIMURA:  Larry, you don't ask
6      questions.
7          THE WITNESS:  I know.  Sorry.
8          MR. SPLITEK:  All right.  I'm going to
9      hand you Exhibit 11.
10         (Deposition Exhibit No. 11 was
11              introduced to the witness.)
12 BY THE WITNESS:
13     A.   Okay.
14     Q.   And you'll be able to verify this for
15 yourself, if you would like later, but Exhibit 11
16 are screenshots showing not all of the columns
17 because, as we saw, there is a lot of columns, but
18 some of the columns for all of the earliest
19 records --
20     A.   Okay.
21     Q.   -- from the log that we marked as
22 Exhibit 10.
23         MR. YOSHIMURA:  Are these row numbers
24      going to match up?

Page 132

1          MR. SPLITEK:  These row numbers are
2      going to match up because you can't sort
3      Exhibit 10 as easily because of the way that
4      they have formatted the timestamp.
5  BY THE WITNESS:
6      A.   Okay.
7      Q.   All right.  So these are the earliest
8  records, and so the earliest record begins at
9  10:51 a.m. on January 8th, and then on this
10 Exhibit 11, the latest record is 8:12 p.m. on
11 January 8th.
12         There are, of course, many other
13 records in Exhibit 10, right?
14     A.   There are.
15     Q.   And then by the way, just to make sure
16 we're all clear on this, each page of Exhibit 11
17 shows different columns for the same rows.  So if
18 you look, each page of Exhibit 11 is the same rows
19 393 through 435.  And as you turn through the
20 pages, you get more and more columns relating to
21 those rows.
22     A.   I understand.
23     Q.   Okay?
24     A.   Yes.

Page 133

1      Q.   So I want to just talk through a couple
2  of these by -- as examples so you can help me
3  understand how you're approaching this.
4      A.   I would note that on your Exhibit 11
5  the first page, row 433, it says "user logged in."
6      Q.   Yes.  I actually want to ask you about
7  row 433.
8          So column Y.  The event action column,
9  it says "user logged in."
10     A.   Yes.
11     Q.   So what does that mean to you?
12     A.   It means that Jessica Grailer logged
13 into her account.
14     Q.   Okay.  And how did Jessica Grailer, in
15 your view, log in to her account after January
16 8th, 2023, without generating a user logged-in
17 event in the log?
18     A.   I don't know why the -- well, it is
19 interesting.  So if we look at -- if we look at
20 column GP on the last page, right, we can see rows
21 409, 410, 411, it has references to an HP
22 EliteBook X360, which is consistent with the make
23 and model of her former work laptop.
24         So the row where you're saying where it

Laurence D. Lieb
January 23, 2024

Page 134

1  says "login," it just references a -- it says
2  AppleWebKit, Chrome.  So it doesn't reference a
3  device.  So -- well, it says "user agent OS name,"
4  it says "Windows."  So it's a Windows device,
5  according to this log.
6           But it doesn't -- unfortunately it
7  doesn't have a -- when it says user logged in, it
8  doesn't have, in column GP, it doesn't have
9  reference to a device.
10     Q.   Yeah.  But that really wasn't my
11  question.
12           So you agree that Jessica Grailer
13  logged into her account on January 8th, 2023,
14  right?
15     A.   That's what the log shows and, yes,
16  that's what is consistent with what this log
17  shows.
18     Q.   And when she logged in, it generated a
19  user logged-in event in the log, right?
20     A.   It did.
21     Q.   So my question is:  How could Grailer
22  have later logged in without generating any user
23  logged-in events?
24     A.   So it is a good question.  I looked at

Page 135

1  this closely.  So because there is not a --
2  there's not any indication of what device was used
3  to log in on the 8th, my current opinion is that
4  she logged in successfully using this undisclosed
5  device, and then she may have stayed logged in.
6  That would be a reasonable explanation.
7     Q.   She logged in when and stayed logged
8  in?
9     A.   Well, it says -- so we have on January
10  8th, it says "user login success."
11           Again, we don't have any indication
12  from this Office 365 log what specific device she
13  used to log in, but I don't see any log out.
14  There is user login.  I don't see any log out.
15     Q.   I agree.  I don't see those either.
16     A.   Let me look at row 406.
17     Q.   Are you saying that Jessica Grailer
18  logged in on January 8th, 2023, and then stayed
19  logged in through January 15th, 2023?
20     A.   Yeah, that's a reasonable explanation;
21  that once the device is logged in, unless she,
22  like, logs out, it would remain logged in.  So,
23  again, like -- I'm looking at row 406, which is
24  another user logged-in action, but unfortunately

Page 136

1  it doesn't show a device was used.  It just shows
2  it was a Windows -- it just shows Windows
3  authentication provider 10 Windows.  So it doesn't
4  show.
5           So if you're asking why in the exhibit
6  the larger -- well, the expanded exhibit, so the
7  surreptitious -- what I'm describing as
8  surreptitious activity and access and exfiltration
9  of files, why it doesn't -- none of the logs show
10  the specific device.
11           That's why, in my expert report, I
12  don't say, oh, she used a -- an undisclosed device
13  is a Windows machine or it's an iPad.  The logs
14  don't show that so I'm not going to make it up.
15           But clearly it shows Jessica Grailer
16  user account performing this interaction that I
17  describe in my reports because it is under the
18  JGrailer@Ecolab.com.
19           She returned her work laptop and her
20  iPhone 6S and iPhone XR -- it says, I have the
21  chain of custody, January 10th.  She no longer had
22  custody and control over her work HP EliteBook or
23  her iPhone 6S and her iPhone XR.
24           On the later dates, the later dates I

Page 137

1  described after January 8th, we see in a log there
2  is evidence that she was not successfully able to
3  log in using her iPhone 12 mini but that on other
4  dates she was able to interact with files
5  including, in my opinion, evidence of the
6  exfiltration of the files that exist in Exhibit 9.
7           So which, again, in my opinion, it
8  falls on Ms. Grailer to explain what device she
9  was able to use to perform these interactions.
10     Q.   I want to make sure we're clear here.
11           So you're claim is that she logged in
12  sometime on January 8th, 2023, using an
13  undisclosed computer and stayed logged in through
14  January 15th, 2023; is that correct?
15     A.   I know you're not intentionally
16  mischaracterizing what I said so let me respond.
17  I know you're not, unlike other attorneys I've
18  encountered.  I appreciate you're not doing that.
19           So in here it says, "user logged in."
20  I don't see any reference in your Exhibit 10 to
21  what device was used to log in.  It says she was
22  logged in.
23     Q.   I know.  I'm going to cut you off
24  because it's just not my question.

Laurence D. Lieb
January 23, 2024

Page 138

1    I'm asking you -- and I'm not trying to
2  characterize --
3        A.    I'm answering your question.  You
4  mischaracterized what I said.
5        Q.    But my question is about a claim.
6        A.    Okay, sorry.
7        Q.    But I'm just asking you -- it's yes or
8  no -- are you claiming that Jessica Grailer logged
9  in using some undisclosed computer on January 8th,
10  2023, and stayed logged in through January 15th,
11  2023?
12        A.    No.
13             What I'm stating is that this expanded
14  Exhibit 10 or what you show as also Exhibit 11
15  which encompasses the information, shows that a
16  successful login by Ms. Grailer.  It doesn't show
17  what device was used.  We can just see it's a
18  Windows operating system.  It doesn't say which --
19  I noted it doesn't refer to her EliteBook, right?
20  Because that would be my opinion, that she used
21  the EliteBook.
22             So -- I'm sorry.  So the activity that
23  we see after January 8th, that obviously she was
24  using a device that was logged in.  If she

Page 139

1  couldn't log in -- if she was not logged in she
2  would not have been able to interact with --
3  perform the interactions that are recorded in the
4  log.
5             So the best explanation I have is that
6  a device --an undisclosed computing device had
7  successfully logged in prior and we don't see that
8  login because the -- and she used that device.
9             She had to have been able to access her
10  account.  She was able to access her account.  It
11  says the iPhone 12 mini was failed, but it clearly
12  shows that she was able to interact with these
13  files, in my opinion, exfiltrating the files
14  listed, deleting these calendar entries.  I have
15  no idea why she would delete calendar entries, but
16  using an undisclosed device.
17             To be clear, none of the audit logs
18  refer to what device it was, which is why I
19  describe it as an undisclosed device.  If I knew
20  specifically what it was, I would say what it was.
21  I don't know.  That's why one would have to ask
22  Ms. Grailer what device she used to perform these
23  interactions.
24        Q.    Let me ask you this a different way,

Page 140

1  though.  Somewhere in the log there is a -- the
2  user logged-in event, that later enabled Grailer
3  to perform the activities that you said she
4  performed on January 15th, correct?
5        A.    So I don't know if you're asking this.
6  But it could have been a device that -- you're
7  asking me to speculate.  So it could have been a
8  device that -- this log doesn't go back to January
9  1st.  So could that be that she's using this
10  undisclosed computer and logged in January 1st or
11  late December and just stayed logged in.  There's
12  no reason for her to log out.
13             And so we don't -- but, obviously, she
14  had to have been logged in to her account under
15  her JGrailer account to perform the activities
16  that the log --
17        Q.    Let me ask it -- back up and ask a
18  slightly different question.
19             If Grailer used an undisclosed computer
20  to log into her account --
21        A.    Okay.
22        Q.    -- and then on January 15th exfiltrate
23  files, at some point before January 15th, whatever
24  day it would have been on, whether it is shown in

Page 141

1  the logs we have or not, there would have been a
2  Microsoft audit log entry showing the login event
3  from her undisclosed computer?
4        A.    I would assume so, yes, that would be
5  my opinion.
6        Q.    Okay.
7        A.    And to further answer, we see user
8  logged-in entries on January 8th but,
9  unfortunately, it doesn't specify what device it
10  -- but it does say Windows operating system.  It
11  doesn't say the -- it even has a little bit more
12  information.  It says it was a Safari browser.
13        Q.    And you, I take it, didn't try to find
14  the login event that you believe later enabled her
15  to exfiltrate files on January 15th?
16        A.    Well, I analyzed the user audit logs
17  the first one that was provided to me, we'll call
18  it the truncated one, and then the subsequent, I
19  believe it's your Exhibit 10, that had more
20  columns, I looked at that very closely.
21        Q.    But that wasn't my question.
22             My question is:  You didn't try to find
23  the user logged-in event that you're now saying
24  enabled to Grailer to exfiltrate files on January

Laurence D. Lieb
January 23, 2024

Page 142

```
 1  15th?
 2            MR. YOSHIMURA:  Objection.
 3  BY THE WITNESS:
 4       A.    So I analyzed these logs to identify
 5  evidence of what this undisclosed computer was;
 6  make, model, entries.  I didn't find it in Exhibit
 7  11 or the expanded, the restored Elastic log.  I
 8  only see reference to this HP EliteBook X360 and
 9  the iPhone 12 mini.
10            And as I stated earlier, in this
11  exhibit -- your Exhibit 11, we see user logged-in
12  activities, but it doesn't list what device was
13  used, unfortunately.
14       Q.    In column AA, in row 433, what do you
15  believe -- sorry, I apologize.  We're still in
16  Exhibit 11 to make sure.
17       A.    I'm here.
18       Q.    Exhibit 11, row 433, column AA, event
19  category.  What do you believe the terms "web" and
20  "authentication" are telling us?
21       A.    So my understanding is that in order
22  to -- for an employee of Ecolab to successfully
23  access an Ecolab company system, that device has
24  to be authenticated as a security measure by
```

Page 143

```
 1  Ecolab's IT.
 2            So the authentication, in my opinion,
 3  is showing that Ecolab said, okay, this is an
 4  approved -- for lack of a better term, an approved
 5  device.  It's a security measure so that some
 6  hacker, you know, can't log into -- that's why, in
 7  my opinion, the iPhone 12 mini was blocked.
 8            I don't know.  I'd be happy to be
 9  informed as to what the purchase date of her
10  iPhone 12 mini was, but I don't see any other
11  earlier access of her accounts or attempts to
12  access with her account.
13            If she had earlier and that device had
14  been approved by Ecolab, I think she would have
15  been able to successfully log in using that iPhone
16  12 mini.  But the evidence I see here shows that
17  after she left employment she attempted to access
18  her accounts using her iPhone 12 mini, including
19  from what I believe to be her home network, and it
20  was blocked.
21       Q.    And what does the term "web" tell us in
22  column AA, row 433 in Exhibit 11?
23       A.    Well, it says "web authentication."  So
24  if we look at --
```

Page 144

```
 1       Q.    But I'm asking about web.  Just tell me
 2  about web.  What does it mean to you there?
 3       A.    I believe it's related to the type of
 4  access that she was using, like an Internet
 5  browser.  So if we see, for example, in column --
 6  the next column says "OS browser, browser type is
 7  compliant and managed."
 8       Q.    All right.  And then in column AJ, the
 9  event type column, still in row 433, what does the
10  term "info" mean to you there?
11       A.    Which page?
12       Q.    Page 1 of Exhibit 11, row 433, column
13  AJ?
14       A.    Oh, "info"?
15       Q.    The first word is "info."  Why is that
16  there, in your view?
17       A.    I don't know what that means.
18       Q.    Okay.  Then the next word is "start."
19  Why is "start" there, in your view?
20       A.    I don't know what "start" or "access"
21  means.
22       Q.    Okay.  Column -- so page 2 of Exhibit
23  11, still in row 433.  Let's take a look at column
24  FV, source is organization name?
```

Page 145

```
 1       A.    Yes.
 2       Q.    Z-S caler?
 3       A.    Zscaler.
 4       Q.    Thanks.  Do you recognize that?  What
 5  is Zscaler-SJC1?
 6       A.    I recall that my analysis of the IP
 7  address, I believe that is an IP.  I believe it is
 8  Verizon business.
 9       Q.    So what is it?  What are we learning
10  here in column FV?
11       A.    I believe it is -- I believe it's
12  reference to the ISP or the Internet service
13  provider that she used.  As part of -- my
14  recollection is part of the -- part of -- as part
15  of the corpus of evidence that was provided to me
16  at the outset of this engagement, I was provided
17  with a wireless hotspot, and my recollection it
18  was a Verizon device.
19            And so, again, in my analysis of the
20  device I tracked down what these different IP
21  address, which Internet provider, Internet service
22  provider these relate to.  That's how I know the
23  starting one, 131 is Charter Communications.  The
24  other ones we see is Microsoft themselves.  And I
```

Laurence D. Lieb
January 23, 2024

Page 146

1 believe the Zscaler is -- I don't have my own
2 version of this file where I -- you know, I
3 created another tab where I took out each of the
4 IP addresses and looked up what ISP they relate
5 to.
6         I believe Zscaler relates to Verizon
7 Wireless, which would be consistent with the fact
8 that she had a Verizon Wireless hotspot.
9     Q.   Verizon Wireless hotspot provided by --
10    A.   Ecolab.
11    Q.   -- Ecolab?
12    A.   Correct.
13    Q.   And then in columns FX and GE, still in
14 the second page of Exhibit 11 --
15    A.   I'm in.
16    Q.   -- we see Chicago and then an IP
17 address?
18    A.   Yes.
19    Q.   How do you explain those?
20    A.   Again, my recollection is that Zscaler
21 Chicago in this IP address correlates to Verizon
22 Wireless.
23    Q.   To the hotspot she received from
24 Ecolab?

Page 147

1     A.   I was provided with a Verizon Wireless
2 hotspot.  I looked up this IP address using one of
3 my tools.  It said that this IP address is owned
4 by Verizon Wireless.  I don't know why it says
5 Zscaler.  But in my opinion -- again, my
6 recollection is that these are actually Verizon
7 Wireless, owned by Verizon Wireless, which would
8 make sense given the fact that she had a Verizon
9 hotspot.
10    Q.   And then column GP and GT on the last
11 page of Exhibit 11.
12    A.   I'm there.
13    Q.   What are these telling us together?
14    A.   These actually show the application
15 being used in some instances.  So we'll see like
16 going from the top it says Microsoft Excel, the
17 version, it was a Windows 10 machine.  It was a
18 desktop application.  And then we can see the HP
19 EliteBook X360 1030.
20    Q.   And let's focus on row 433 in columns
21 GP and GT.
22    A.   Yep.
23    Q.   And I know you talked a little bit
24 about that before.  But what then --

Page 148

1     A.   So 433 shows that it was -- this
2 activity was performed using a -- using the
3 Mozilla Firefox browser.  It says AppleWebKit, but
4 my interpretation is that it's Windows -- it's
5 Windows -- not Windows.  Sorry.  It is actually
6 the Mozilla browser.  Then it says Chrome.  So
7 it's kind of contrary.  It says Mozilla and
8 Chrome.  Chrome is made by Google.  And then it
9 says Safari, which is an Apple browser.  And then
10 it says Edge.  So -- and then it says operating
11 system is Windows.
12        So I don't have an explanation as to
13 why the user agent has Mozilla Firefox,
14 AppleWebKit, which would relate to the Safari
15 browser, Google Chrome browser and Microsoft Edge
16 browser, all three.  I don't want to speculate why
17 all three are listed in there.  It doesn't list
18 the device that was used.
19    Q.   Let's go back to the first page of
20 Exhibit 11.  And I want to look at row 417 now.
21    A.   Okay.  I'm there.
22    Q.   In column Y, what does the term "file
23 accessed" mean to you in column Y, row 417 of
24 Exhibit 11?

Page 149

1     A.   Means that she accessed a file.
2     Q.   Okay.  And how, though, on January
3 15th, do you think she was able to access files
4 without generating any file accessed events in the
5 log?
6     A.   I don't want to opine as to what this
7 specific difference between file access and file
8 previewed is.  But in my opinion, that is evidence
9 of human interaction and is consistent with,
10 again, my opinion, that Jessica Grailer used an
11 undisclosed computer or January 15th to exfiltrate
12 multiple files.
13    Q.   But you don't have an opinion on what
14 the difference is between a file-accessed event
15 like we're seeing in Exhibit 11 and the
16 file-previewed events that happened on January
17 15th, right?
18    A.   I do not.
19    Q.   Okay.  Column AA, still in Exhibit 11,
20 row 417.
21    A.   Okay.
22    Q.   Column AA.  We already talked about the
23 term "web" earlier.
24    A.   Okay.

Laurence D. Lieb
January 23, 2024

Page 150

1    Q.    But there is another term here, "file."
2  What does "file" mean to you there in 417, column
3  AA in Exhibit 11?
4    A.    I don't know.
5    Q.    All right.
6    A.    Some say "web," some say "web, file,"
7  some say "web, authentication."  I don't know what
8  the distinction is.
9    Q.    Okay.  So Exhibit 11, row 417, column
10  AJ, the event provider column, that says
11  "OneDrive."
12    A.    Okay.
13    Q.    What is that telling us?
14    A.    That tells me that, in my opinion,
15  Ms. Grailer was interacting with files stored in
16  her OneDrive account.  Although, I will note that,
17  as I look at the other columns in this exhibit --
18  do you have a listing of what the file -- yeah, we
19  do see that.  We see in column -- sorry.
20    Q.    Is it column GG?
21    A.    Yes.  Exactly, right.  GG, then we see
22  it actually is referring to -- yeah, there is
23  actual file names.
24    Q.    Okay.  And so in column GG, let's take

Page 151

1  row 417, for example.
2    A.    Okay.
3    Q.    It says -- after the HTTP, there's
4  Ecolab-my.sharepoint.com/personal.  In here it's
5  JA Galliart.  But that,
6  my.sharepoint.com/personal, is that what is
7  telling us that we're in an employee's OneDrive
8  folders?
9    A.    So the way SharePoint works is an
10  employee will create a file.  They'll be the owner
11  of that file.  It will be stored obviously in
12  their own OneDrive account.  And if they give
13  access to that other employees, the other
14  employees will think that file exists in their
15  OneDrive account.  But it's really a pointer to
16  it.
17        So what this entry shows me is that
18  this file that Ms. Grailer was accessing, like the
19  actual underlying file, what's in shared folders
20  is originated from Josh Galliart.
21    Q.    From his OneDrive?
22    A.    Right.
23    Q.    Okay.  And then in row 418 just below
24  in column GG, that's in a J Grailer OneDrive

Page 152

1  folder, right?
2    A.    Yes.
3    Q.    Okay.  And you can tell that it's their
4  personal OneDrive folders because it says
5  my.Sharepoint.com/personal and then the employee's
6  name, right?
7    A.    Yes.
8    Q.    Okay.  Got it.
9        I need to clarify something for the
10  record because I think I made a misstatement due
11  to bad vision.  We talked about just a moment ago
12  on page 1 of Exhibit 11 the event provider column.
13  I believe I said it was column AJ.  It is actually
14  AI.
15        Do you agree?
16    A.    Yes.
17    Q.    Okay.  Sorry for that.  I'm getting
18  old.
19        What is the difference between OneDrive
20  and SharePoint?
21    A.    Well, OneDrive -- OneDrive is used for
22  what's known as personal or home directory.  So
23  each employee would be provided with their own
24  personal OneDrive account.  So OneDrive, they're

Page 153

1  file cabinets, right?  So it is their file
2  cabinet.
3        SharePoint -- SharePoint is Microsoft's
4  reference to files that can be accessed by more
5  than one person.  But, again, it is really
6  critical to understand that SharePoint is a
7  database with pointers to files.
8        So there might be an occasion where
9  there is a unique file that was created in share
10  file -- I don't believe that.  I may have
11  encountered that.  Generally speaking, it's files
12  that are created by employees, created and stored
13  in their OneDrive accounts.
14        And as they're shared to other
15  employees, the other employee thinks it's in their
16  account but it's really just a pointer and they
17  can download and access and open it.  But when we
18  go to do forensic collections of employee's
19  accounts, we collect their OneDrive accounts.
20        In some instances there is what's known
21  as share departmental folders in SharePoint.  It
22  would be like a sales department or an accounting
23  department, right, not tied to a single employee
24  and we can download specific SharePoint

Laurence D. Lieb
January 23, 2024

Page 154

1  directories.  But, in general, the best practice
2  is to download and preserve the employee's
3  OneDrive account because that is actually going to
4  grab the files that we're interested in.
5      Q.   In the last page of Exhibit 11 in
6  column GP --
7      A.   Okay.  I'm there.
8      Q.   I apologize.  On Exhibit 11, page 3 in
9  column GG in both row 417 and row 418, we saw file
10  paths going into employees' personal OneDrive
11  folders, right?
12     A.   Yes.  Says: My.sharepoint.com/personal
13  and J Grailer, and one above it shows Josh
14  Galliart and then Aaron Beranek.
15     Q.   And then if we turn back to the first
16  page of Exhibit 11, column, AI, the event provider
17  column, that confirms this is an event in
18  OneDrive, correct?
19     A.   Right.
20     Q.   Okay.  Now we can go to the last page
21  of Exhibit 11.
22     A.   Okay.
23     Q.   And let's stick with row 417 here.
24     A.   Okay.

Page 155

1      Q.   Column GP.  That column identifies
2  Grailer's work laptop, right?
3      A.   Yes.  But the only caveat I would say
4  is that I was provided with an HP EliteBook X3630
5  reported to be Jessica Grailer's, but this doesn't
6  have a serial number tied to it.  So I'm assuming
7  she was using her own HP EliteBook that X360.
8          If I perform forensic analysis of the
9  Axiom database, I could say, oh, you know, I see
10  on this date and time this Internet activity.  I
11  have not done that.  So more likely than not this
12  HP EliteBook X360 is referring to her former work
13  laptop.
14     Q.   Okay.  In any event, it records the
15  device that she was using when she accessed a
16  file, right?
17     A.   It does.
18     Q.   Okay.  And in column GT it also records
19  the operating system of the device she was using,
20  right?
21     A.   It does.
22     Q.   Okay.  So how then on January 15th
23  could she successfully access files without
24  leaving any trace of the device or the operating

Page 156

1  system she was using?
2      A.   Well, we would have to see the -- I
3  think it was your Exhibit 10 for those rows.  I
4  don't know if you can bring that up on the screen
5  but that's what we would want -- we would want to
6  look at the equivalent, whatever row GP and --
7      Q.   You would expect that --
8      A.   For me to be able to answer --
9      Q.   -- then you would see the device there?
10     A.   Well, I don't know.  I don't know.  I
11  don't have that Exhibit 10 memorized.
12     Q.   I'm not asking what's in it.  I'm
13  asking you what you would expect.
14         If an employee accesses files from a
15  computer and the computer is running an operating
16  system, we see here in columns GP and GT of
17  Exhibit 11 that the audit log made a record of the
18  device and operating system that Grailer was using
19  for the access event shown in row 417 in Exhibit
20  11, right?
21     A.   Yeah.  But I note the difference in the
22  -- in your Exhibit 11 it shows in column GG URL
23  original which is, you know, the equivalent of a
24  website URL, but it doesn't have the column file

Page 157

1  name.  I don't know why.
2      Q.   I'm sorry, what column are we looking
3  at?
4      A.   Sorry.  GG.
5      Q.   GG?
6      A.   Yeah, it says URL, U-R-L, original.
7      Q.   Yes.  I'm not looking at column GG, so
8  I want you to look at -- maybe I misspoke --
9  Exhibit 11, last page.
10     A.   Okay.
11     Q.   Column GP.  In row 417.
12     A.   Okay.
13     Q.   The log made a record of the computer
14  device that Grailer was using when she accessed
15  the file, right?
16     A.   Right.  417, using Microsoft Excel.
17     Q.   Yep.  And then in addition to column
18  GT, the log made a record of the operating system
19  running on the computer that Grailer was using
20  when she accessed a file, correct?
21     A.   It does, yeah.
22     Q.   Okay.  Would you expect the log to make
23  similar records regarding the computer and the
24  operating system she would have been using to

Laurence D. Lieb
January 23, 2024

Page 158

1  access files on January 15th?
2      A.    I don't know.  The answer lies in
3  Exhibit 10.
4      Q.    No, it doesn't.  Because that is a
5  question about what is in Exhibit 10.  And my
6  question is, what would you expect to see?
7          MR. YOSHIMURA:  Matt, I think you have
8      to give him an opportunity to answer the
9      question.  And now, objection; asked and
10     answered.
11  BY THE WITNESS:
12     A.    I don't have Exhibit 10 in front of me,
13  so I don't have it memorized so I'm not going to
14  speculate as to what I can't remember or have in
15  front of me.  Because it is like hundreds and
16  hundreds of rows.  So whatever that is showing is
17  what the evidence that was recorded.
18     Q.    But, again, I'm not asking you about
19  what is in Exhibit 10.  Let me ask a more general
20  question.
21          When an employee like Grailer accesses
22  a file from a computer, would you expect the log
23  to make a record of the device that the employee
24  was using?

Page 159

1      A.    Well, I don't know because I'm looking
2  at row 423 of Exhibit 11 which shows file preview,
3  web OneDrive, and if I go to the last page on 423
4  it doesn't list the device.
5          So for file preview it doesn't -- for
6  that row at least it doesn't list the device that
7  was used to preview that file.  It just lists that
8  it was done, OneDrive, and then 1.0.  So it
9  doesn't list the device.
10     Q.    It does list a user agent, though,
11  correct?
12     A.    For 423?
13     Q.    The field is not blank?
14     A.    423, user agent would be -- which
15  column?  Which page?
16     Q.    Column GP.
17     A.    GP.  Sorry.  423.  GP, row 423 says
18  OneDrive -- transform thumbnail 1.0.  I don't
19  think of OneDrive as an application.
20          So if you're asking if that user agent
21  is an application, I think of OneDrive as a file
22  storage source, not an application, per se, like
23  an Internet browser or a Microsoft Excel.
24     Q.    Have you ever -- do you have any

Page 160

1  experience with that terminology that we're seeing
2  there, OneDriveMPC-transform_thumbnail?  Does that
3  mean anything to you?
4      A.    It does not.
5      Q.    You've never reviewed any materials
6  that Microsoft might make available relating to
7  that term?
8      A.    I have not researched what that term
9  specifically refers to.
10     Q.    All right.  Do you know if nonuser
11  activities can generate any log entries in a log
12  relating to a user's account?
13     A.    So the way I'll answer that is when I
14  personally collect and generate Office 365 audit
15  logs from Microsoft, what used to be known as
16  their compliance center, they call it something
17  different now, the available fields columns that
18  one can export, there is hundreds and hundreds of
19  them.  And so I -- personally I limit the fields I
20  export to human interaction.
21          So I believe my recollection is that
22  there are fields that are -- that would be system
23  related, system generated, nonhuman related.  I
24  don't recall.  I'd have to see.  I can log into my

Page 161

1  own Tyger Forensics 365 compliance center, run the
2  user audit log and you can see in the drop-down,
3  it's like a crazy number of columns that can be
4  exported.
5          But I personally historically limit
6  what I export in reports to fields and columns
7  that directly tied to human activity because
8  that's what -- my opinion would only be what's
9  only relevant to dispute resolution.
10     Q.    I'm handing you Exhibit 12.
11     A.    Okay.
12          MR. YOSHIMURA:  Matt, if this one is
13     going to take the same amount of time as the
14     last one, I'd make a suggestion we break for
15     lunch before we do this one or after?
16          MR. SPLITEK:  Why don't we do this
17     exhibit.  I've already handed it to you,
18     so ...
19          MR. YOSHIMURA:  All right.
20              (Deposition Exhibit No. 12 was
21              introduced to the witness.)
22  BY MR. SPLITEK:
23     Q.    I will tell you, Exhibit 12 is more
24  information about events that are shown in the log

Laurence D. Lieb
January 23, 2024

Page 162

1  marked as Exhibit 10.  It captures rows 21 through
2  64 and that spans the entire time period between
3  January 13 and January 16 of 2023.  And then,
4  again, there are select columns similar to Exhibit
5  11.
6          Do you understand?
7      A.   Yes.  I'm noting that there is -- yeah,
8  not all columns are obviously visible because it
9  goes from column A to column Y, so columns B
10  through X are hidden, in my opinion.  Not all the
11  rows are visible because it goes from 1 to 21.
12          So it goes through -- is row 21, is
13  that January 17th?
14      Q.   Yes.
15      A.   So then it goes 17, 16.  So there's
16  nothing for January 18th in this.
17      Q.   On Exhibit 12.
18      A.   On Exhibit 12.
19      Q.   There is in Exhibit 10.  But Exhibit 12
20  is a screenshot of only a certain time range.
21      A.   So it's specific -- it's specific rows
22  and columns that you have made visible from the
23  total corpus.
24      Q.   That is correct.  And it captures the

Page 163

1  entire January 13 through January 16th time
2  period.
3      A.   Well, plus January 17th.
4      Q.   And it also captures little parts of
5  the 17th and the 12th, that's correct.
6      A.   Okay.
7      Q.   Okay.  So let's focus in on rows 31
8  through 50.  I think we've already talked about
9  some of this data when it was in the smaller log
10  marked as Exhibit 9, right?
11      A.   Uh-huh.
12      Q.   So in column AA, event category, do you
13  make anything of the fact that it says only "web"
14  and never "file" in rows 3150, column AA?
15      A.   I do not.  It says file previewed --
16      Q.   No, column AA.
17      A.   It says web.  Interesting.  Column DM
18  says "is a managed device," it says "false."
19  Interesting.
20      Q.   I'm asking about column AA.  It says
21  only "web."
22      A.   Yeah.
23      Q.   It never says "file."  So I'm asking
24  you, do you make anything of that fact, that it

Page 164

1  never says "file" in that column?
2      A.   Well, what I'm making is column M shows
3  that it's not a managed device.
4      Q.   I'm not asking about column M.
5      A.   Well, I'm answering that the exhibit
6  you showed me shows that all these files that my
7  opinions she exfiltrated, it shows it was from a
8  device that was not -- says "audit is not
9  managed."
10          It does show that it was file
11  previewed.  It shows web.  I don't see the web
12  file.
13          MR. YOSHIMURA:  Larry, if you'd avoid
14      crosstalk on the record.  Please let him
15      finish his question and then you can finish
16      your answer.
17  BY MR. SPLITEK:
18      Q.   My question is about column AA, event
19  category.
20      A.   Okay.
21      Q.   Do you see how it says "web" and it
22  never says "file"?
23      A.   I do.
24      Q.   My only question is:  Do you make

Page 165

1  anything of that fact?
2      A.   No.
3      Q.   Okay.  In column AI, the event provider
4  column, do you see how in rows 31 through 50 it
5  always says "SharePoint" and never says
6  "OneDrive"?
7      A.   Hold on.  AI shows SharePoint, yes.
8      Q.   Okay.  And it never shows OneDrive,
9  right?
10      A.   It does not show OneDrive.
11      Q.   Do you make anything of that fact?
12      A.   In a vacuum, no.
13      Q.   How about at all?
14      A.   I agree that that column contains the
15  word "SharePoint."
16      Q.   I mean, does that mean anything to you?
17          MR. YOSHIMURA:  Objection.
18  BY THE WITNESS:
19      A.   Well, in a vacuum, no.  One has to
20  consider all of the columns to -- for me to form
21  an opinion as to what that activity has been
22  recorded.  So, for example, SharePoint if we go --
23  let's see if we got the -- yeah, so if we go to
24  column GG.

Laurence D. Lieb
January 23, 2024

Page 166

1    Q.    Yes.
2    A.    You see, it's Ecolab, SharePoint, we've
3  got sales portal, products, products, documents.
4  So, yes.  So, okay, so it does -- again, this is
5  why -- I'm answering your questions.
6          So OneDrive correlates to what is known
7  as personal home directories.  Each employee is
8  provided with their own OneDrive account.  Files
9  can be shared from OneDrive to other employees.
10 That typically is what's known as SharePoint.
11 Other employees think, oh, I have a copy of it in
12 my OneDrive.  They don't really have a copy of it
13 in their OneDrive.  They have a pointer to it.
14         As I mentioned earlier, there are other
15 instances where there are, we'll call shared
16 departmental directories, the HR department, the
17 sales department and they are not tied to a single
18 unique employee's OneDrive account.
19         So we see here in column GG it says
20 Ecolab SharePoint sites products, product
21 documents, Perm-Clean, PC60 membrane, cleaning
22 compound.  So that is row 42.
23         So my opinion, Ms. Grailer accessed
24 this file that, in my opinion, and the evidence is

Page 167

1  consistent with her exfiltrating this membrane
2  compound that was originally stored in a shared
3  departmental folder in SharePoint, not her
4  personal OneDrive account, not Josh Galliart's
5  OneDrive account, but from a shared -- what I
6  refer to as a shared departmental folder.
7    Q.    Okay.  So based on column GG, you are
8  saying that Grailer exfiltrated the files from
9  shared folders in SharePoint, not from her
10 personal OneDrive folders; is that right?
11   A.    Correct.  That's what the evidence
12 shows.
13   Q.    Okay.  And the fact that the URL's in
14 column GG go to group SharePoint folders would be
15 consistent with the fact that SharePoint is the
16 only value shown in column AI, the event provider
17 column, right?
18   A.    Exactly right.
19   Q.    Okay.  In column AJ, the event type
20 column, do you see how it always says "info" and
21 it never says "access"?
22   A.    I see in Exhibit 12, column AJ, it
23 says -- well, it says "info," sometimes "info
24 start access."

Page 168

1    Q.    I want you to focus on rows -- and I
2  probably wasn't clear -- rows 31 through 50, the
3  file previewed events.  In the event time column
4  in column AJ, the only value is info; access is
5  never a value, correct?
6    A.    Correct.
7    Q.    Does that mean anything to you?
8    A.    I don't know what that field means.
9    Q.    Okay.  I want you to go to page 2,
10 column DF.
11   A.    Okay.
12   Q.    There is an alphanumeric code that
13 appears in rows 31 through 50 of column BF,
14 correct?
15   A.    Okay.
16   Q.    Do you know what that alphanumeric code
17 refers to?
18   A.    I do not.
19   Q.    Did you try to figure it out?
20   A.    I don't recall if I researched that
21 particular code.  As I sit here, I don't know what
22 it refers to.
23   Q.    And do you know if column BF is
24 identifying an application?

Page 169

1    A.    I don't know.
2          MR. YOSHIMURA:  Objection.
3  BY MR. SPLITEK:
4    Q.    Do you know whether the value in rows
5  31 through 50 of column BF of Exhibit 12
6  identifies a Microsoft application called People
7  Predictions?
8          MR. YOSHIMURA:  Objection; asked and
9  answered.
10 BY THE WITNESS:
11   A.    I don't know what those codes in column
12 BF refer to.
13   Q.    Did you do any analysis to determine
14 whether a Microsoft application called People
15 Predictions could have caused the log entries that
16 we see in rows 31 through 50 of Exhibit 12?
17   A.    I've never heard --
18         MR. YOSHIMURA:  Objection.
19 BY THE WITNESS:
20   A.    I've actually never heard of an
21 application called People Prediction.
22   Q.    Did you do any analysis to determine
23 whether any application could have caused the log
24 entries that we see in rows 31 through 50 of

Laurence D. Lieb
January 23, 2024

Page 170

1  Exhibit 12?
2          MR. YOSHIMURA:  Objection; asked and
3      answered.
4  BY THE WITNESS:
5      A.   It is my opinion that Jessica Grailer
6  used an undisclosed device to access those files
7  and exfiltrate them on that date.
8      Q.   But that wasn't quite my question.
9          My question was: Did you do any
10  analysis to determine whether any application
11  could have caused the log entries that we see in
12  rows 31 through 50 of Exhibit 12?
13          MR. YOSHIMURA:  Objection.  I think he
14      answered that question and every other
15      question you've asked about those specific
16      cells multiple times now.
17  BY THE WITNESS:
18      A.   It's my opinion that -- and the
19  evidence is consistent with Jessica Grailer having
20  logged in under her -- these columns are not
21  visible in your Exhibit 11, but we can show -- the
22  columns show, like, the user account is Jessica
23  Grailer.
24          So it's Jessica Grailer logging in

Page 171

1  using an undisclosed device to exfiltrate those
2  files, in my opinion.
3      Q.   And my question was just a yes-or-no
4  question about whether you performed any kind of
5  analysis.
6          How about this:  If you performed any
7  analysis to determine whether any application
8  could have caused the log entries shown in rows 31
9  through 50 of Exhibit 12 now is your time to tell
10  me.
11          MR. YOSHIMURA:  Objection.
12  BY THE WITNESS:
13      A.   I didn't perform analysis of what -- I
14  analyzed this document.  I came to the conclusion,
15  my expert opinion, that a person I believe to be
16  Jessica Grailer logged into her Ecolab account
17  using an undisclosed device and exfiltrated these
18  files.
19      Q.   Is that your whole answer?
20      A.   That is my answer.
21      Q.   All right.  Page 2, column DM.  Managed
22  device.
23      A.   Yes.
24      Q.   As you pointed out before, rows 31

Page 172

1  through 50 in Exhibit 12, that value says "false."
2          What do you make of that?
3      A.   It says it's false.
4      Q.   I know, but what does that mean to you?
5      A.   I'm not sure.  But I'm just noting it
6  says "false."
7      Q.   All right.  Page 2, collum FV, the
8  source is organization column.
9      A.   Page 2, FV?
10      Q.   Yep.  Rows 31 through 50.
11      A.   Hold on.  FV.  Yes, I see that.
12      Q.   The value is always, "Microsoft Corps
13  MSN As Block?"
14      A.   Uh-huh.
15      Q.   What do you make of that?
16      A.   So I looked at the source IP that's --
17  well, the column is cut off.  It's after FX.  It
18  starts 2603.1036.  And my recollection is that IP
19  address is owned by Microsoft.  So it correlates
20  to their Office 365/s or service.
21      Q.   Okay.  And how could Grailer have
22  accessed or previewed the files that are
23  identified in rows 31 through 50 of Exhibit 12
24  from a Microsoft corporation IP address?

Page 173

1      A.   That's a good question.  So some of the
2  entries in here we see the IP addresses resolve to
3  Charter Communications, which, in my opinion, is
4  her home personal Internet account.  Some of the
5  IP addresses I looked up, they relate to the
6  Verizon business, the Zscaler.  Other IP addresses
7  relate to Microsoft Office 365.
8          So the report doesn't -- for example,
9  if Ms. Grailer had accessed it -- had accessed and
10  performed this activity from a starting IP
11  address, let's say her home IP address, and then
12  that got forwarded to the Microsoft Office 365
13  instance, and then the Microsoft instance is what
14  the IP address was recorded, that's any
15  explanation.
16      Q.   And on what basis are you saying that?
17      A.   My basis?
18      Q.   Yes.
19      A.   Well, the IP address resolves to
20  Microsoft Office 365.
21      Q.   But I guess what is -- so you're saying
22  that Grailer was able to access files on January
23  15th, 2023, without leaving any trace of the IP
24  address she was doing that from?

Laurence D. Lieb
January 23, 2024

Page 174

1          MR. YOSHIMURA:  Objection.
2     BY THE WITNESS:
3          A.     No.  No.  What I'm say is that the
4     audit log here recorded entries of -- that says
5     source IP address that resolved to Microsoft
6     Office 365.
7          Q.     I can see that.  But why -- in other
8     entries, the IP address was her home IP address,
9     right?
10         A.     That's exactly right.
11         Q.     And then in other entries I thought you
12    told me it was the hotspot she received from work,
13    right?
14         A.     Verizon, yes.
15         Q.     What is your explanation for why on
16    January 15th the IP address is a Microsoft
17    corporation IP address in Des Moines, Iowa?
18         A.     I don't know.
19         Q.     Okay.  Let's look at column GG on -- so
20    page 3 of Exhibit 12.  Still focusing on rows 31
21    through 50.
22         A.     Okay.
23         Q.     So column GG gives file paths and at
24    the end of the file paths, the file names, right?

Page 175

1          A.     It does.
2          Q.     Okay.  So the logs you reviewed do not
3     show any events where any of those files were
4     deleted, right?
5          A.     No.  And to answer further, because I'm
6     an independent expert, my recollection is that I
7     actually looked for these files on her laptop to
8     see which ones we still had.  Because from my
9     experience, and the other Ecolab cases and other
10    cases I found, it's not uncommon for employees to
11    not only exfiltrate files, but to take steps to
12    delete their former employer's only copies.
13                So my recollection is that some of
14    these files I could recover from her laptop but
15    other files I couldn't.
16         Q.     But are you opining that she deleted
17    the files that you couldn't find?
18         A.     My recollection of my analysis is that
19    some of the files -- I didn't include it in my
20    report.  At that point when I was writing my
21    report, I didn't think it was relevant.  But some
22    of the files I was able to recover and some of the
23    files I was not.
24                As I sit here, I don't have that

Page 176

1     analysis in front of me.  But I do recall running
2     that analysis.
3          Q.     Let's go back to my original question,
4     though, which is whether you could recover them or
5     not, the log does not record any instances of
6     Grailer deleting any of the files identified in
7     rows 31 through 50 column GG of Exhibit 12, right?
8          A.     It does not.
9          Q.     All right.  And when you said you
10    looked for those files, did you look for them at
11    the SharePoint URLs that are listed in rows 31
12    through 50 column GG of Exhibit 12?
13         A.     I recall looking for them on her laptop
14    which also has, obviously, synchronization of her
15    OneDrive account.  So I did not -- I was not
16    provided with original copy of the SharePoint
17    shared folders.  I was not provided with copies of
18    those and I did not look and analyze the actual
19    SharePoint folders because I was not provided with
20    copies of them.
21         Q.     Okay.
22         A.     But my analysis was looking at her
23    laptop to synchronize with her OneDrive account.
24         Q.     And I understand because you didn't

Page 177

1     have the information, you did not look for the
2     files at the file paths that are identified in
3     column GG, rows 31 through 50 of Exhibit 12,
4     right?
5          A.     I did not.
6          Q.     Okay.
7          MR. YOSHIMURA:  We've been on the
8     record for quite a while here.  Are we going
9     to be able to take a break pretty soon?
10         MR. SPLITEK:  We can take a break
11    whenever.  But I'm less than -- I'm five
12    minutes maybe from a more natural breaking
13    point.
14         MR. YOSHIMURA:  Let's get to that
15    breaking point then.
16         MR. SPLITEK:  All right.
17    BY MR. SPLITEK:
18         Q.     Still looking at column GG, rows 31
19    through 50 of Exhibit 12.  So the URLs in those
20    columns and rows, they go to a number of different
21    folders and sub folders in SharePoint, right?
22         A.     They do.
23         Q.     Did you do any analysis to determine
24    whether a user could access 20 specific files in

Laurence D. Lieb
January 23, 2024

Page 178

1    all those different folders and subfolders within
2    only a couple seconds?
3         A.    No.
4         Q.    And I just want to make sure that we're
5    clear.  If we turn to the last page of Exhibit 12,
6    rows 31 through 50 of Exhibit 12 looking at
7    columns GP and GT.
8         A.    Yes.
9         Q.    What do you make of the fact that
10   columns GP and GT are empty in rows 31 through 50
11   of Exhibit 12?
12        A.    I don't know why they're empty.
13        Q.    All right.
14              MR. SPLITEK:  As promised, I'm ready
15        for my break.
16              THE VIDEOGRAPHER:  The time is 1:09
17        p.m.  We are going off the record.
18                   (Whereupon, a break was taken,
19                   after which the following
20                   proceedings were had:)
21              THE VIDEOGRAPHER:  The time is 1:59
22        p.m.  We are back on the record.
23              MR. SPLITEK:  Before we begin, let me
24        note on the record, Bruce Pixley has been

Page 179

1         listening in via Zoom all day and we intend
2         to have him continue to do that for the rest
3         of the deposition.
4    BY MR. SPLITEK:
5         Q.    I will move on from Exhibit 12, but I
6    want to revisit one thing quick.  If you can go
7    back to Exhibit 12.
8         A.    Okay.
9         Q.    And take a look at columns BC and DE in
10   Exhibit 12.  That's pages 1 and 2.
11              Can you tell from the folder tabs shown
12   in columns BC and DE of Exhibit 12 whose calendar
13   events were hard deleted in the hard delete
14   events?
15        A.    I'm not sure I'm understanding your
16   question.  So you're talking about referring to
17   Exhibit 12, column BC to being with row 21, it
18   shows calendar Benjamin Irwin.
19        Q.    Yeah.  We can focus on -- so rows 24
20   through 30 --
21        A.    Okay.
22        Q.    -- of Exhibit 12 and column BC it says
23   "Calendar/Irwin Benjamin," right?
24        A.    I see that.

Page 180

1         Q.    And when you drop down to rows 56
2    through 60 in column BC, it says "Calendar/Patrick
3    M. Severson"?
4         A.    It does.
5         Q.    Okay.  And does that tell you anything
6    about whose calendar these events were on?
7         A.    No.  I mean, other than -- I don't want
8    to speculate, but my interpretation would be that
9    there was a calendar event with Jessica Grailer
10   and Benjamin Irwin.  But if we look at column BD
11   it lists Focus Time, Private Appointment, Pepsi
12   Knoxville Controller Installation Survey, Private
13   Appointment, Focus Time.
14              So my interpretation of BC and BD is
15   that these are the events that were in
16   Ms. Grailer's calendar with these individuals that
17   were deleted.
18        Q.    And do you know who would have
19   initiated the first deletion of the calendar
20   events?
21        A.    No.  But I know that it's -- and it's
22   not included in your Exhibit 12, but one of the
23   columns shows that it was under user account
24   JGrailer@Ecolab.com.  So it is my opinion that the

Page 181

1    activity was performed by Ms. Grailer, not
2    Benjamin Irwin or these other individuals.
3         Q.    And if one person -- hold on.
4              This is a hard delete event.  Is there
5    a distinction between a hard delete and a soft
6    delete?
7         A.    Not that I'm aware of or could opine on
8    that.
9         Q.    All right.  Do you know if when one
10   participant in a shared calendar invitation
11   deletes that calendar invitation it deletes in
12   both user accounts?
13        A.    I don't know.  I have not investigated
14   that.
15              MR. SPLITEK:  All right.  Let's take a
16        look at Exhibit 13.
17                   (Deposition Exhibit No. 13 was
18                   introduced to the witness.)
19   BY THE WITNESS:
20        A.    Okay.
21        Q.    Are you familiar with the materials in
22   Exhibit 13 that Microsoft makes available online?
23        A.    I'm not familiar with this particular
24   document, but I regularly refer to Microsoft's

Laurence D. Lieb
January 23, 2024

Page 182

1  website for explanations of information.
2      Q.    Do you know if the materials marked as
3  Exhibit 13 can be helpful to interpret any of the
4  log terminology we've just been looking at in
5  Exhibit 12 --
6              MR. YOSHIMURA:  Objection.
7  BY MR. SPLITEK:
8      Q.    -- and the earlier exhibits?
9      A.    I don't recall looking at this
10  particular Microsoft guide, for lack of a better
11  term, relating to audit log activities.
12              MR. SPLITEK:  All right.  Exhibit 14 I
13  will hand you.
14              (Deposition Exhibit No. 14 was
15              introduced to the witness.)
16  BY MR. SPLITEK:
17      Q.    Are you familiar with the materials in
18  Exhibit 14 that Microsoft makes available online?
19      A.    I am not.
20      Q.    Do you know if the materials marked as
21  Exhibit 14 can be helpful to understand the hard
22  delete events that we reviewed in Exhibit 12?
23              MR. YOSHIMURA:  Objection.
24

Page 183

1  BY THE WITNESS:
2      A.    I have not read this particular guide,
3  so I can't opine on it.
4              MR. SPLITEK:  All right.  I'll hand you
5  Exhibit 15.
6              (Deposition Exhibit No. 15 was
7              introduced to the witness.)
8  BY MR. SPLITEK:
9      Q.    Are you familiar with the materials in
10  Exhibit 15 that Microsoft makes available online?
11      A.    Again, I regularly refer to Microsoft's
12  guides online regarding what Microsoft states; for
13  example, what it means by first-stage recycle bin
14  and second-stage recycle bin.
15              This particular Exhibit 16 I don't have
16  any recollection of ever reading.
17  BY MR. SPLITEK:
18      Q.    Exhibit 15 you said you don't have a
19  recollection of reading?
20      A.    Not this particular website.
21              MR. SPLITEK:  I'm handing you Exhibit
22  16.
23
24

Page 184

1              (Deposition Exhibit No. 16 was
2              introduced to the witness.)
3  BY MR. SPLITEK:
4      Q.    Are you familiar with the company
5  called Elastic that makes the materials shown in
6  Exhibit 16 available online?
7      A.    I am.
8      Q.    And do you know whether Elastic
9  software was involved in producing the large
10  spreadsheet log that we marked as Exhibit 10?
11      A.    I am.
12      Q.    Are you familiar with the materials
13  that I've marked as Exhibit 16 here that Elastic
14  makes available?
15      A.    As I'm reading Exhibit 16, I have not
16  read this particular report or documentation from
17  Elastic.
18      Q.    And do you know whether or not the
19  materials I've marked as Exhibit 16 can be helpful
20  in understanding the event dot category field in
21  the log that we marked as Exhibit 10?
22              MR. YOSHIMURA:  Objection.
23  BY THE WITNESS:
24      A.    I have not read through this Elastic

Page 185

1  information in Exhibit 16 so I can't opine on it.
2              MR. SPLITEK:  I'll hand you Exhibit 17.
3              (Deposition Exhibit No. 17 was
4              introduced to the witness.)
5  BY MR. SPLITEK:
6      Q.    Are you familiar with the materials
7  marked as Exhibit 17 that Elastic makes available
8  online?
9      A.    I have not read this particular
10  document that is -- I can see from the bottom it
11  was pulled directly from Elastic's website.
12      Q.    Okay.  Am I right then that you're not
13  able to opine on whether the material that's
14  marked as Exhibit 17 can be helpful to understand
15  the event dot type field in the log we marked as
16  Exhibit 10?
17      A.    I have not read any of the content in
18  Exhibit 17 prior to today.
19      Q.    And in your report and today during
20  your deposition you've talked about Grailer using
21  an undisclosed computer, right?
22      A.    Yes.
23      Q.    All right.  Was that undisclosed
24  computer, as you call it, approved by Ecolab as a

Laurence D. Lieb
January 23, 2024

Page 186

1  device to access its systems?

2      A.    In my opinion, it must have been in the

3  past.

4      Q.    Did you ask Ecolab for a list of all

5  approved devices that accessed its systems on or

6  around January 15th, 2023?

7      A.    I did.

8      Q.    Did you receive that list?

9      A.    As of the date I asked for it, which

10  would have been in February, my recollection is

11  that they had not -- I ran into ground and I don't

12  believe they had any record of which device --

13  they could provide to me a record of which devices

14  had been approved in the past and which ones

15  hadn't.

16      Q.    Did you ask for a list of all devices

17  that accessed Ecolab's system on or around January

18  15th, 2023?

19      A.    Yes.

20      Q.    Did you receive that list?

21      A.    I was told -- excuse me.  I was told as

22  of the date of my involvement that the sum total

23  of information that I could be provided with from

24  Ecolab systems was encompassed by the Digital

Page 187

1  Guardian report and the OneDrive audit log and her

2  former work laptop and two former work phones.

3      Q.    And at that time you say the audit log

4  was the smaller one that we marked as Exhibit 9,

5  right?

6      A.    It was.

7      Q.    And who told you that?

8      A.    Jennifer Semmler.

9      Q.    And did Jennifer Semmler say that the

10  other information you asked for didn't exist?

11      A.    I had asked Jack Anderson of Ecolab IT

12  if he had any more information related to approved

13  devices.

14      Q.    And what did Jack Anderson tell you?

15      A.    They didn't have a record of that.

16      Q.    But I also asked did you -- if

17  you sought a list of all devices that accessed

18  Ecolab's system on or around January 15, 2023.

19  Did you seek that?

20      A.    On or around January 15th?

21      Q.    Yes.

22      A.    So as part of my analysis I analyzed

23  Jessica Grailer's former Ecolab work laptop to see

24  if I could find any reference to another computing

Page 188

1  device.  I did not find any on her work laptop.

2      I analyzed the Digital Guardian report

3  to see if I could find any reference to any other

4  -- what I'm referring to the undisclosed device.

5  I didn't find any reference in the Digital

6  Guardian report.

7      Q.    I understand all of that.

8      I'm asking, did you ask Ecolab for a

9  list of devices that accessed its system at any

10  time?

11      A.    Yes.

12      Q.    Not whether they were approved or

13  unapproved, just a list of devices that accessed

14  its systems, you asked for that?

15      A.    Yes.

16      Q.    And what were you told?

17      MR. YOSHIMURA:  Objection.

18  BY THE WITNESS:

19      A.    I was told as of the time I made the

20  inquiry that that information -- that all the

21  information that was available was what I

22  described; the Digital Guardian report, the user

23  audit log --

24      Q.    Okay.

Page 189

1      A.    -- and the devices I was provided with.

2      Q.    All right.  In your report you talk

3  about Grailer emptying her computer's recycle bin

4  on January 8th, 2023, right?

5      A.    I do.

6      Q.    All right.  Do you know what happened

7  to the files in Grailer's recycle bin after she

8  emptied it?

9      A.    Do I know what happened to the files?

10  Well, my forensic tool, OSForensics, was able to

11  carve, C-A-R-V-E, carve and recover some of the

12  deleted files.  And even though the recycle bin,

13  as of the date that the laptop was provided to me,

14  the recycle bin had been emptied by, I believe,

15  Ms. Grailer.

16      But my forensic tool was able to carve

17  and recover some deleted files from -- that had

18  been stored in the recycle bin.

19      Q.    Let me ask you a better question.

20      You mentioned the second-stage recycle

21  bin earlier, right?

22      A.    Yes.

23      Q.    Do you know whether the files that

24  Grailer emptied from her recycle bin on January

Laurence D. Lieb
January 23, 2024

Page 190

1  8th, 2023, then moved to the second-stage recycle
2  bin?
3       A.    Well, respectfully you're conflating
4  two items.  So first-stage recycle bin and
5  second-stage recycle bin is Microsoft terminology
6  related to deletion of files that exist in a
7  OneDrive account online.
8            What I was referring to in my report
9  being able to carve and recover files from the
10 Jessica Grailer laptop, I was referring to my
11 ability to carve and recover those files from the
12 local laptop hard drive.  So that is completely
13 unrelated to first-stage recycle bin and
14 second-stage recycle bin on OneDrive.  That's data
15 stored in OneDrive versus data stored on the
16 physical laptop.
17      Q.    Okay.  So to be clear then, when you
18 talk about Grailer emptying the recycle bin on her
19 laptop, you are not opining that any files stored
20 on OneDrive were thereby deleted, correct?
21      A.    Correct.
22      Q.    Do you know whether or not when Grailer
23 put files in her recycle bin on her desktop copies
24 of those files then went into a recycle bin in

Page 191

1  Grailer's OneDrive account?
2       A.    So I believe what you're asking me --
3  you may not be asking this question but maybe the
4  question you should be asking is, it is
5  possible -- so on the local laptop we'll see there
6  is a C, which is the local drive, user name then
7  OneDrive, and then folders and files.  So that's
8  what we'll call the OneDrive synchronization
9  folder.  So those files exist both on the local
10 laptop because they're synchronized down to the
11 laptop and they exist also in Microsoft's
12 OneDrive.  So they actually exist in two
13 locations.
14           And the question I think you're asking
15 is if one were to delete a file from, let's say,
16 the local files stored within that OneDrive
17 path -- we see that in some of the files in my
18 reports from the local laptop -- would that also
19 delete the version that's stored online.  And
20 that's a very specific question.
21           I think it can be.  But I would -- I'd
22 have to analyze the computer and test that to see
23 how Ecolab set up their synchronization.  It is
24 possible -- I know from experience it is possible

Page 192

1  to set it up such that if a file is deleted from
2  the local laptop hard drive within the OneDrive
3  folder, the next time it synchronizes online, it
4  will delete it from the online folder because --
5  well, the user -- most end users don't realize
6  that.
7            When they're seeing a OneDrive folder,
8  they think it's all online.  But it's really the
9  local version.
10           So is that what you're asking me is if
11 I deleted it from the OneDrive -- a document from
12 the OneDrive folder that's stored on the local
13 hard drive, would it cause the online copy in
14 Microsoft's Azure system to be deleted as well?
15      Q.    No.  But that was still helpful so
16 thank you.
17           You referred to some settings.  Those
18 are settings that Ecolab would have controlled,
19 synchronization settings?
20      A.    It is either Ecolab or -- it's
21 Microsoft.  It's how they set up synchronization.
22      Q.    And you don't know what the
23 synchronization settings were?
24      A.    Not as I sit here.  I believe they can

Page 193

1  be tweaked so they can make it such that even if a
2  file is deleted locally, it still exists online.
3  Or if it is deleted from the local OneDrive
4  folder, the next time it syncs it is deleted from
5  the online OneDrive but that's a Microsoft
6  setting, so ...
7            I don't believe I opined on anything
8  related to that in -- when I refer to this file
9  deletion in the recycle bin I was specifically --
10 I apologize if this was not clear in my report --
11 deletion of files from the local laptop hard drive
12 and then the fact that when I received the laptop,
13 the local laptop recycle bin was empty.
14      Q.    Thank you.  That is helpful.
15           The question I was asking earlier
16 though was -- I'll try to rephrase it.
17           When Grailer would put local files from
18 her laptop into her local recycle bin, do you know
19 whether or not there was also a recycle bin on
20 OneDrive that would be synchronized with her local
21 recycle bin?
22      A.    I don't believe so.  My understanding
23 of the way OneDrive synchronization works is
24 Microsoft will set up a OneDrive folder on the

Laurence D. Lieb
January 23, 2024

Page 194

1  local hard drive that will contain -- you know,
2  synchronize so that employees can access these
3  OneDrive folders when they're offline.
4        And I believe it is possible to extend
5  that.  I believe now Microsoft has expanded that
6  so that not only the OneDrive folder is
7  synchronized up and down, but also the desktop
8  folder and maybe my documents.  But that's
9  Microsoft doing that.  So it is -- yeah.
10        MR. SPLITEK:  I'm going to hand you
11     Exhibit 18.
12            (Deposition Exhibit No. 18 was
13              introduced to the witness.)
14  BY MR. SPLITEK:
15     Q.   Are you familiar with the materials in
16  Exhibit 18 that Microsoft makes available online?
17     A.   I have not read this particular entry
18  from Microsoft.
19     Q.   Okay.  Then am I right then that you
20  don't know whether or not Exhibit 18 contains
21  information relating to how the second-stage
22  recycle bin works?
23        MR. YOSHIMURA:  Objection.
24

Page 195

1  BY THE WITNESS:
2     A.   Well, I am aware of how Microsoft's
3  second-stage recycle bin works, according to
4  Microsoft.
5     Q.   How does it work?
6     A.   According to Microsoft's website
7  themselves and Microsoft, when a file is placed
8  on -- it's moved from the first-stage recycle bin
9  to the second-stage recycle bin, it can no longer
10  be recovered.  It's the equivalent of -- so the
11  first-stage recycle bin is the trash receptacle
12  next to my desk, and then the second-stage recycle
13  bin would be the dumpster behind the dumpster
14  outside of the building.
15     Q.   And are you saying that once it's in
16  the second-stage recycle bin, the file can never
17  be recovered again?
18     A.   That's what Microsoft says.
19     Q.   By anybody, including the system
20  administrator?
21     A.   According to Microsoft, it can no
22  longer be recovered.
23     Q.   Okay.  Once it's in -- as soon as it
24  enters the second-stage recycle bin, it's gone

Page 196

1  forever to everybody, right?
2     A.   According to Microsoft.
3        MR. SPLITEK:  I'm going to mark -- I'm
4     going to hand you Exhibit 19.
5            (Deposition Exhibit No. 19 was
6              introduced to the witness.)
7  BY MR. SPLITEK:
8     Q.   Exhibit 19, is this a copy of Exhibit G
9  to your report?
10     A.   It could be.  Now I'm really ruing the
11  fact that I didn't bring my reading glasses.
12     Q.   I also was not happy with your small
13  print Exhibit G.
14     A.   What I'm going to do is take a picture
15  of it.
16     Q.   That's okay with me.  I'm fine with
17  that.
18        MR. YOSHIMURA:  I think this is the
19     same as the Exhibit G that's in the packet
20     that you provided earlier that was printed.
21        MR. SPLITEK:  Is that bigger?
22        MR. YOSHIMURA:  It is not printed.
23        MR. SPLITEK:  I'm fine with him looking
24     at that.  I'm also fine if he wants to use

Page 197

1  his phone to magnify.  I don't have any
2  objection.  That's fine.
3        THE WITNESS:  I can't read this.
4  BY MR. SPLITEK:
5     Q.   Let's try to talk generally about
6  Exhibit G and if there is another -- there is also
7  Exhibit G within --
8        MR. YOSHIMURA:  Exhibit 3.
9        MR. SPLITEK:  In Deposition Exhibit 3,
10     you can look at that one too.  I'm just
11     trying to pull it out so there is one clean
12     record of it.
13        MR. YOSHIMURA:  Understood.  Here, I'll
14     trade you.
15        MR. SPLITEK:  We could not have more
16     copies of Exhibit G.
17        THE WITNESS:  Okay.  I'm recalling.
18  BY MR. SPLITEK:
19     Q.   We agree we are looking at Exhibit G to
20  your report?
21     A.   We are.
22     Q.   And that's what I've also marked as
23  Exhibit 19, right?
24     A.   It is.

Laurence D. Lieb
January 23, 2024

Page 198

1    Q.    Okay.  So in your report you say that
2  Grailer deleted all of the files listed in your
3  Exhibit G on January 8th, 2023, right?
4    A.    I believe so.
5    Q.    So I want to look at the first ten
6  rows --
7    A.    Okay.
8    Q.    -- of Exhibit G.
9    A.    Okay.
10    Q.    If you look at the file path which is
11  page 1 of Exhibit G --
12    A.    Okay.
13    Q.    -- in the file path do you see, again,
14  that INetCache/content.Outlook folder?
15    A.    I do.
16    Q.    Did you testify earlier that that's a
17  system folder that typically a user isn't
18  managing?
19    A.    Yes.
20    Q.    Okay.  So when files were deleted from
21  the INetCache folder, might that have been the
22  system automatically deleting files that were
23  cached?
24    A.    I don't recall finding evidence of

Page 199

1  automatic system deletion versus Window's system
2  deleting files.
3    Q.    And tell me again, what do you believe
4  the function is of the INetCache folder in
5  relation to the files that are shown in those
6  first rows in your Exhibit G?
7    A.    My understanding is it is a system
8  folder that records and stores evidence of human
9  interaction and temporary files.  So, for example,
10  someone opens up an e-mail attachment or opens up
11  an Internet using their Internet browser, Windows
12  Explorer will create a temporary copy, and that's
13  resulting in these.
14    Q.    So these were temporary copies of files
15  shown in the first ten rows of Exhibit G?
16    A.    It could be.
17    Q.    Did you check to see whether these
18  temporary copies of files related to files
19  connected to Grailer's work e-mail activity on
20  January 8th, 2023?
21    A.    I don't understand the question.
22    Q.    Do you know whether or not the files
23  listed in the first ten rows of your Exhibit G are
24  -- were just temporary copies of files that were

Page 200

1  attached to e-mails that Grailer sent or received
2  on January 8th, 2023?
3    A.    So it is my opinion and the evidence is
4  consistent with these files being deleted as a
5  direct result of actions Jessica Grailer took.
6    Q.    That's not my question.
7        My question is:  Do you know whether or
8  not the files listed in the first ten rows of
9  Exhibit G were temporary copies of files that were
10  attached to e-mails that Grailer sent or received
11  on January 8th, 2023?
12    A.    It is my opinion the evidence is
13  consistent with the fact that Jessica Grailer
14  deleted these files and moved them to the recycle
15  bin and then emptied her recycle bin.
16    Q.    Well, we're going to try this a
17  different way here.
18        This is your opportunity to tell me if
19  you have a reason to believe that the files listed
20  in the first ten rows of Exhibit G were not
21  temporary copies of files that were attached to
22  e-mails that Grailer sent or received on January
23  8th, 2023.
24        MR. YOSHIMURA:  Objection to form.

Page 201

1  BY THE WITNESS:
2    A.    So, in my opinion, the files listed in
3  the first ten rows were deleted and placed in the
4  recycle bin as a result of Jessica Grailer
5  deleting those files.
6    Q.    Okay.  And you didn't really address
7  whether they were temporary copies of files that
8  were attached to e-mails that Grailer sent or
9  received on January 8th, 2023, that's okay with
10  me.
11        Do you have anything --
12    A.    I have no evidence that Windows deletes
13  -- would have deleted these files on its own.  I
14  found no evidence of that.
15    Q.    Did you ever look to check and see if
16  the files listed in the first ten rows of your
17  Exhibit G were, in fact, attached to e-mails that
18  Grailer sent or received on January 8th, 2023?
19    A.    No.
20    Q.    Then there is a lot of files in your
21  Exhibit G that begin with a "$R" prefix.
22    A.    Yes.
23    Q.    And I want to, for the court reporter,
24  this is a dollar sign and then a capital R to make

Laurence D. Lieb
January 23, 2024

Page 202

1  sure that is clear.
2          So they have long file names but the
3  prefix always begins with $R, right?
4      A.    It does.
5      Q.    So when a user deletes a file, the file
6  is moved from the original folder to the user's
7  recycle bin, right?
8      A.    That is correct.
9      Q.    And when the file is moved to the
10  recycle bin, it's given a new file name that
11  starts with a $R prefix, right?
12      A.    That's exactly right.
13      Q.    So the $R prefix files in your Exhibit
14  G are files that were sitting in Grailer's recycle
15  bin when she emptied it, right?
16      A.    Correct.
17      Q.    Did you check to see how long those
18  files had been accumulating in her recycle bin?
19      A.    Let me see if I can I understand that
20  question.  If you're asking me if I analyzed when
21  each file was deleted --
22      Q.    That's exactly what I'm asking you.
23      A.    I don't recall doing that.  What I
24  recall doing and describing in my report is that I

Page 203

1  used the OSForensics software, the industry
2  standard tool that I'm certified in, to carve and
3  recover files from the laptop.
4          I was able to carve and recover the
5  files that I described in my report and, again,
6  importantly in my opinion, the recycle bin as the
7  laptop that was provided to me, it was emptied by
8  a person I believe to be Jessica Grailer.
9      Q.    Did you do any analysis to determine
10  how many of the $R prefix files in your Exhibit G
11  were already in the recycle bin before January
12  8th, 2023?
13      A.    I don't recall performing a
14  file-by-file analysis to determine what date each
15  of the files was placed in the recycle bin.  My
16  recollection is that the last modified date of --
17  from the master file table entry is the date --
18  equals a date that a file was placed in the
19  recycle bin.  But I didn't feel I needed to
20  perform that analysis.
21          I just know that what I identified and
22  described in my report can be independently
23  verified and replicated by a qualified peer.
24      Q.    And you can look in the USN change

Page 204

1  journal to identify specific files that Grailer
2  put in her recycle bin on January 8th, 2023,
3  right?
4      A.    I have not done that in this case.
5      Q.    I asked if you could do it.
6      A.    Possibly.  I have not done it, so ...
7      Q.    Okay.  But I guess then bottom line,
8  you don't know how many of the $R prefix files in
9  your Exhibit G were already in Grailer's recycle
10  bin before January 8th, 2023, right?
11      A.    I don't know.  I didn't perform that
12  analysis.
13      Q.    Then there's a lot of files in your
14  Exhibit G that begin with a $I prefix, right?
15          I'll make sure for the court reporter
16  it's clear, it's dollar sign and then the capital
17  I.
18          So I want to make sure we understand
19  what a $I prefix file is.  I wish these had names
20  that were more pleasant to say.
21      A.    So when a user of Windows computer
22  places a file in the recycle bin, you're correct
23  that Windows renames that deleted file with this
24  $R and whatever, A, B, C, D, E.

Page 205

1          At the same time the Microsoft Windows
2  operating system will create a paired file that's
3  $I, the same string, A, B, C, D whatever.  The $I
4  file is a system artifact that, amongst other
5  information, contains the original path from which
6  the file was -- or originally existed on the
7  laptop before it was deleted and the file name.
8          So for example, the $I might show
9  C:/user/JGrailer/desktop/Nalcodocuments and
10  whatever report dot PDF.
11          So analysis of the $I file can reveal
12  not only the name of -- the original name of the
13  file that's been changed to $R but also the
14  location from which the file was moved to -- you
15  know, before it was moved to the recycle bin.
16      Q.    All right.  And just for an example
17  here, if we can somehow all see it, on page 1 of
18  your Exhibit G, we went through this first ten
19  rows where the file path goes to the INetCache
20  folder.  But just look at the next two rows as an
21  example.
22      A.    Okay.
23      Q.    The first row is an $R file, and then
24  the rest of the file name is 047B1E, right?

Laurence D. Lieb
January 23, 2024

Page 206

1    A.    Yes.
2    Q.    Then the next row down is a $I file,
3 and the rest of the file name is identical, again,
4 047B1E, right?
5    A.    It is.
6    Q.    Okay.  So the $I file, did you refer to
7 that as a system artifact?
8    A.    It's a system artifact that has the
9 original -- so if a user -- if you ever go in your
10 recycle bin and selected a file that you deleted
11 and say I want to restore this file, well, Windows
12 knows where to restore it to based upon that $I
13 file.  So when you restore it, it will go back to
14 the original location within your desktop or your
15 downloads.  It doesn't just go to a random
16 location.  It goes to the location from which it
17 was originated from, and that's the $I.
18    Q.    Okay.  And $I prefix files, are they
19 sometimes called recycle bin information files?
20    A.    I have not heard them referred to that,
21 but that sounds accurate.
22    Q.    Sounds better than $I.
23    A.    Yes.
24    Q.    Okay.  Let's stick with $I, though,

Page 207

1 since you hadn't heard of the other one.
2         So Windows automatically creates the $I
3 prefix files in the recycle bin, right?
4    A.    Yes.  And in some cases -- I don't know
5 if it is the case here because I have not looked
6 at all of these and I don't have my glasses on,
7 but in some cases, my forensic tools have only
8 been able to recover the $I file, not the $R, the
9 actual deleted file.
10        In those cases -- again, I don't know
11 if it's the case here -- I've been able to opine
12 that a file did exist on the computer based
13 upon -- even though it's no longer accessible, it
14 was probably overwritten after a file is deleted,
15 so sometimes I get the $I and the $R file, then I
16 can restore the actual $R which is the actual
17 file.
18        Sometimes I'm only able to restore the
19 $I file, but then I can opine on what file was
20 deleted and where it existed before it was moved
21 to the recycle bin.
22    Q.    And typically the user wouldn't see the
23 $I prefix files, right?
24    A.    I don't think they're seeing $I or $R.

Page 208

1 Those are -- only our forensic tools are seeing
2 those.
3    Q.    Okay.  Those are not visible to a user
4 like Grailer?
5    A.    No.
6    Q.    When the recycle bin is emptied, the $I
7 prefix files can be emptied -- could be deleted,
8 right?
9    A.    Yes.  But, again, so our forensic tools
10 can carve and recover files that have not been
11 overwritten through continued usage and are still
12 available to be recovered.
13        And so in this case, the OSForensics
14 tool, one of its features is that it carves and
15 recovers deleted files.  So I performed that
16 analysis, which is standard on all of my cases.
17    Q.    But when a user opens the recycle bin,
18 they don't see the $I prefix files in there?
19    A.    No.  It's a hidden system file.
20    Q.    Okay.  And they didn't put the $I
21 prefix files in the recycle bin either, right?
22    A.    No.  They didn't put them in there.
23 The $I files are a system file that's created by
24 the Windows operating system when a file is moved

Page 209

1 to the recycle bin.
2    Q.    And I guess the question then is why,
3 in your report, are you accusing Grailer of
4 deleting these system files that a user generally
5 wouldn't even know about?
6         MR. YOSHIMURA:  Objection.
7 BY THE WITNESS:
8    A.    Well, these files were all carved and
9 recovered by my forensic tool, and so these are --
10 so they are files, the $I files.
11        I understand what distinction you're
12 making is that it's a system file that Ms. Grailer
13 would not have been able to see.  But it's still a
14 -- the point I was making is it's still a file
15 that my forensic tool was able to carve and
16 recover.
17        And as I said, I don't know if it's the
18 case here, if we only see a $I and not a paired
19 $R, then it will be the case; and oftentimes I'm
20 only able to carve and recover the $I file, which
21 informs me that there was an actual deleted file
22 that got overwritten and was not able to be
23 recovered.  I've had that on many cases.
24    Q.    Let me make sure I'm clear then.

Laurence D. Lieb
January 23, 2024

Page 210

1    In your Exhibit G, were you able to
2  recover the $I prefix files listed in Exhibit G?
3    A.    Yes.
4    Q.    So those were not permanently deleted;
5  is that right?
6    A.    That's exactly right.  All the files
7  listed were able to be carved and recovered by my
8  forensic tool.
9    Q.    Okay.  Are there any files listed in
10 your Exhibit G that you were not able to recover?
11   A.    Again, I don't recall seeing any files
12 where only one can see the $I version and not the
13 paired $I A, B, C, D, E.  There should be a paired
14 $R A, B, C, D, E; the $R A, B, C, D, E being the
15 actual PDF file or Word file.
16         But as I'm sitting here, it is
17 possible.  So if you see one of these that's only
18 the $I and there's no paired $R, then, in my
19 opinion, that would be an example of my forensic
20 tool being able to recover the system file but the
21 actual file was overwritten.
22         But as I sit here, I don't recall
23 seeing anything like that.  I didn't look.
24   Q.    Okay.  So to the best of your

Page 211

1  knowledge, none of the files listed in your
2  Exhibit G were permanently deleted?
3    A.    No, because -- yeah, because what I
4  describe as permanent deletion is deleted beyond
5  recovery, meaning overwritten.
6         Again, sometimes I'm able to recover
7  the $I designation that can show me that a file
8  did exist even though the file wasn't able to be
9  recovered, but I can opine with 100 percent that a
10 file did exist on a computer but it was no longer
11 able to be recovered.
12   Q.    But to the best of your knowledge, none
13 of the files listed in your Exhibit G was deleted
14 beyond recovery?
15   A.    Again, if one of these in here we only
16 see the $I but not the paired $R file, then I
17 would describe those files as permanently gone.
18         But as I sit here, I don't recall doing
19 that analysis to see if there was only a $I and
20 not -- which is the system file saying there was a
21 file that existed at this path on my documents.
22 So I don't know.  It is too small for me to see if
23 there's -- the pairs are there or not.
24   Q.    All right.

Page 212

1    A.    I didn't think it was relevant.
2    Q.    So when Grailer connected and
3  disconnected her USB thumb drive to and from her
4  laptop, that caused multiple timestamps to update
5  in Windows; am I right?
6    A.    Yes.
7    Q.    Not just one timestamp but multiple
8  timestamps in different places in Windows would
9  update, right?
10   A.    Right.  The act of connecting a USB
11 drive to a Windows operating system will create
12 timestamps in a variety of locations on a Windows
13 laptop.
14   Q.    And one of those locations is in what's
15 called the mount -- try again -- one of those
16 locations is in what's called the MountPoints2 sub
17 key of the Windows registry; is that right?
18   A.    It could be.  I know it's in the
19 USBSTOR file.  It's in -- it's recorded in --
20 Windows records activity in a lot of places.
21   Q.    Yeah.  And let me pause real quick to
22 tell the court reporter, if it's okay with you
23 two.  MountPoints2, it's capital M-O-U-N-T,
24 capital P-O-I-N-T-S and then the number 2.

Page 213

1         Do you think I got that right?
2    A.    I'm not familiar with that particular
3  one.  But I know event logs, Windows event logs
4  that end in dot EVTX can and will record activity
5  of USB drive interactions, the USBSTOR file.
6  There is various locations.
7         I'm blanking on the other ones.
8  Windows captures this information in a variety of
9  locations.
10   Q.    Okay.  Let's just focus on when she
11 connects her USB thumb drive to the computer.  So
12 I think you said you're not sure whether or not a
13 timestamp is updated in the MountPoints2 sub key
14 of the registry, right?
15   A.    I would have to test that.  I don't
16 know that, as I'm sitting here.
17   Q.    Okay.  But there is at least one
18 timestamp and maybe more in the USBSTOR sub key
19 that updates; is that right?
20   A.    I believe so.
21   Q.    Let me pause to try to spell USBSTOR --
22 Mr. Lieb, do you want to try it?
23   A.    It's U-S-B-S-T-O-R, no E at the end.
24   Q.    All right.  And all in caps?

Laurence D. Lieb
January 23, 2024

Page 214

1     A.     All caps.
2     Q.     U-S-B-S-T-O-R.
3     A.     And various event logs.
4     Q.     Yes.  When Grailer would connect her
5  USB thumb drive to the laptop, it would create an
6  entry in the Windows event logs, right?
7     A.     That's why it's very difficult for a
8  layperson to try and cover their tracks on a
9  Windows computer because most people aren't aware
10 that evidence of activity appears and is recorded
11 in 20 different locations.
12    Q.     Because there are event logs that show
13 every time you connect and disconnect a USB
14 device?
15    A.     Plug and play logs, registry, yes.
16    Q.     Yes.  Okay.
17    A.     A variety of places.
18    Q.     And then there's also -- we mentioned
19 the USBSTOR sub key.  There's also something
20 called a USB sub key, right?
21    A.     Could be.  I'm not familiar with that
22 one.  You could be right.
23    Q.     Okay.  And I want to -- --
24    A.     Are we done with this exhibit?

Page 215

1     Q.     Yes, we are.  Don't throw it away but
2  we're re done with it for now.
3            And I'll tell you how I'm spelling
4  things.  So USBSTOR, again, is all caps
5  U-S-B-S-T-O-R and then USB is just all caps U-S-B.
6            So we covered already that there is
7  something called the USBSTOR sub key in the
8  registry, right?  We agree with that?
9     A.     Yes.
10    Q.     Do you know whether there is also
11 something called USB sub key in the registry?
12    A.     I'm not familiar with that reference,
13 but when I do a USB device analysis I do it
14 regularly on every case.
15           So it's in the Microsoft -- sorry,
16 Magnet Forensics Axiom tool, which I used in this
17 case, it just has a sub folder that says devices,
18 connected devices and it will list USB drives.
19           It also has devices in another location
20 where it will have references to USB device
21 interactivity.  So it actually -- I don't know why
22 Axiom records it in two different locations, like
23 devices and also USB devices.  But it will ...
24    Q.     And this information is also reported

Page 216

1  out by OSForensics, right?
2     A.     It is.
3     Q.     And let me pause since we're on the
4  topic of terminology to make sure we have a couple
5  things clear.
6            You used Axiom software to extract
7  information from the image of Grailer's laptop,
8  right?
9     A.     I did.
10    Q.     And the developer of Axiom is Magnet
11 Forensics, right?
12    A.     Correct.
13    Q.     So when you extracted information using
14 Axiom from the image of Grailer's laptop, you then
15 got -- would you call it a case or a database?
16 What is your preferred term?
17    A.     It's a case.  I was asked to produce a
18 copy of that and I did.
19    Q.     That's what Mr. Pixley calls it too; a
20 case.
21    A.     Yeah, Magnet Forensics refers to it as
22 a case file.
23    Q.     All right.  Yeah, a case or a case
24 file.  Can we call it a case right now?

Page 217

1     A.     Yes.
2     Q.     All right.  So you used Axiom to
3  extract image -- you used Axiom to extract
4  information from the image of Grailer's laptop?
5     A.     I did.
6     Q.     And then you got an Axiom case with the
7  extracted information?
8     A.     That's correct.
9     Q.     In a much more readable format than it
10 existed in the image of her laptop, right?
11    A.     That's exactly right.
12    Q.     All right.  And then does OSForensics
13 serve a similar purpose?
14    A.     Yes, it does.
15    Q.     And OSForensics, by the way, is
16 capital, O, capital, S, capital, F Forensics,
17 right?
18    A.     That's right.
19    Q.     Okay.  So you also used OSForensics, is
20 it fair to say, it's a competing software tool?
21    A.     It is a competing software.
22    Q.     Okay.  You also used OSForensics to
23 extract information from the image of Grailer's
24 laptop, right?

Laurence D. Lieb
January 23, 2024

Page 218

1    A.    I did.
2    Q.    And then you got -- would that be
3  called an OSForensics case?
4    A.    There is a case folder, yes.
5    Q.    All right.  So can we refer to those as
6  your Axiom case and your OSForensics case?
7    A.    Yes, we can.
8    Q.    And I think we got the OS -- no, we got
9  the Axiom case but not the OSForensics case, if
10  I'm not mistaken.
11    A.    Correct.
12    Q.    All right.  And both Axiom and
13  OSForensics extract and report timestamp
14  information from multiple sources in Windows,
15  right?
16    A.    The reason I personally used two tools
17  on the same evidence is that almost every single
18  case, the two different tools, they're highly
19  respected, they're used by US law enforcement and
20  US military, will extract the same and report on
21  the same evidence and in one tool it will extract
22  and report on evidence -- or Axiom will extract
23  and identify evidence that OSForensics does not,
24  and vice versa.  OSForensics will extract.

Page 219

1            So my best practice is not just run one
2  tool.  I like to -- I always create two different
3  cases and the two different tools, see where the
4  overlap is, and then look to see what is one tool
5  reporting that the other is not, and then dig into
6  that; go, okay, Axiom identified this information,
7  I'm not showing up in the OSForensics.  I'm going
8  to look into OSForensics and see why it's not
9  there.  Sometimes I'll reach out to Passmark or --
10  who's the owner or manufacturer of OSForensics,
11  and say, hey, you missed this.  They'll update it
12  for the next -- and vice versa.
13            Yeah, I can't explain it why.  But some
14  experts I've encountered say, oh, no, I can only
15  use one tool.  And I can prove that's not a good
16  idea.
17    Q.    And I want to go back to the USBSTOR
18  sub key which you're familiar with.  Let's just
19  assume for a moment that there is also something
20  called a USB sub key.  Would you have any idea
21  what the difference between those is?
22    A.    I'm not familiar what the distinction
23  is.
24    Q.    Okay.  Each time a USB thumb drive is

Page 220

1  connected to the computer, it is mounted and
2  assigned a drive letter like drive D; is that
3  right?
4            MR. YOSHIMURA:  Objection.
5  BY THE WITNESS:
6    A.    It can be.  In some instances, so if a
7  drive is purchased, a raw drive is purchased out
8  of the box and it has never been formatted,
9  formatting means creating like -- what is the best
10  way to describe a format?
11            So literally all storage devices in the
12  Windows context are file cabinets.  In the Windows
13  context, all USB storage device and hard drives,
14  they reserve the first part of the first file
15  cabinet for an index like a Dewey Decimal card
16  catalog -- when they used to have card catalog
17  systems.
18            And so those card catalog systems in
19  the first part of the first cabinet drawer keep
20  track of when files are created and where they're
21  stored in the file cabinets, if a file is deleted.
22            So if a file is deleted, in quotation
23  marks, what Windows is doing is just going to the
24  card catalog system and then checking a box.  That

Page 221

1  file still exists in the file cabinet so I can
2  delete all the files on a USB drive, and if I just
3  never touched it, I can recover them all.
4            So I'm not destroying and overwriting
5  those deleted files in quotation marks.  I'm just
6  going into the card catalog system and saying, you
7  know, if you need to use that space again for
8  future files, I can do that.
9    Q.    And I think -- if you don't know the
10  answer to these questions, that's fine, but I want
11  to make sure that I have all of the information
12  that I can get on the record here.
13            I think you did say you are not
14  familiar with the MountPoints2 sub key; is that
15  right?
16    A.    I've been doing the forensic analysis
17  for close to 20 years so I'm -- I know I've
18  encountered locations where all the different
19  locations in a Windows operating system, be it in
20  the registry or other system files where USB data
21  related to USB data can reside.
22    Q.    Okay.  Do you know whether or not the
23  MountPoints2 sub key hierarchy in Grailer's laptop
24  contained a sub key for Grailer's USB thumb drive?

Laurence D. Lieb
January 23, 2024

Page 222

1    A.    I don't know.  I don't know.  As I sit
2    here, I can't recall what you're specifically
3    asking for.
4    Q.    And do you know whether when Grailer's
5    thumb drive was inserted into the computer the
6    last written timestamp for that sub key in the
7    MountPoints2 sub key would update?
8    A.    I don't recall.
9          MR. SPLITEK:  Okay.  I'm going to hand
10         you Exhibits 20 and 21 as a pair.
11               (Deposition Exhibit Nos. 20 and
12                21 were introduced to the
13                witness.)
14   BY MR. SPLITEK:
15   Q.    And you'll understand why they're
16   paired when you see them.  Exhibit 20 is a
17   screenshot taken from your Axiom case and
18   Exhibit 21 is a zoomed-in enlargement of the text
19   in the right-hand column of Exhibit 20.
20   A.    Okay.  I see.
21   Q.    All right.
22   A.    Exhibit 21 is actually -- it says
23   "evidence source."  It's highlighted in blue.  The
24   information that's being described is actually

Page 223

1    coming from what is known as the NTUSER.DAT file.
2    Q.    Okay.  And what does that mean to you?
3    A.    The NTUSER.DAT file is a Windows
4    operating system file that records various aspects
5    of human interaction within a Windows computer.
6    Q.    And if you look under the evidence
7    source -- we're in Exhibit 21 right now -- under
8    the evidence source there is a location.  Does
9    that mean anything to you?
10   A.    So software, I believe that -- so
11   there's -- the Windows registry has multiple, what
12   they call or refer to as hives.  There's a
13   software hive, there's a system hive, there's a
14   security hive.
15         So I assume this is referring to the
16   software registry hive.
17   Q.    So there's a timestamp on Exhibit 21.
18   A.    Okay.
19   Q.    Do you have any idea what that
20   timestamp is telling us in Exhibit 21?
21   A.    Well, it says, "last written time,
22   December 20th, 2022, 6:26 a.m."
23         But let me see what it is deciding is
24   the last written time.  It could be referring to

Page 224

1    the mount -- the file above it that is starting
2    BC602.  I'm not actually sure.  As I look at this,
3    I'm not sure whether -- what specifically it is
4    saying was last written.
5    Q.    Do you recall ever looking at the
6    timestamp of the evidence referenced in Exhibit
7    21?
8    A.    As I sit here, no.  But I do recall
9    bookmarking.  Actually I think the version of the
10   Axiom case I turned over actually had all of my
11   bookmarks and tags in it.  So the information that
12   I analyzed and tagged was all in the Axiom case.
13   Q.    Can you go back to Exhibit 8.  Keep
14   Exhibit 21 around but go to Exhibit 8.  It is your
15   February 2023 declaration.
16   A.    Okay.  I've got it.
17   Q.    Page 8 --
18   A.    I've got -- 8 starts with Exhibit C.
19   Q.    Yeah, Exhibit 8, if you keep turning,
20   it's your February 2023 declaration.
21   A.    Okay.
22   Q.    And if you go to page 8 of your
23   February 2023 declaration --
24   A.    Okay.

Page 225

1    Q.    -- and then if you look at footnote 5
2    on page 8 of your February 2023 declaration --
3    A.    Okay.
4    Q.    -- if compare your footnote 5 there on
5    8 of your declaration with Exhibit 21, are you, in
6    fact, citing the same evidence in your declaration
7    in February that is now shown in Exhibit 21?
8    A.    It looks like -- so I got paragraph 26,
9    "Forensic analysis of the laptop reveal that
10   Jessica Grailer plugged in the Emtec external USB
11   drive, serial number 789127BD 070B4A71ADB22353 to
12   the laptop on December 20th, 2022, at 6:26 a.m.,"
13   and it says 32 seconds, "and unplugging the USB
14   drive on December 20th, 2022 at 4:55 p.m."  And I
15   believe that is footnote 5.
16   Q.    It is footnote 5.  That's what I want
17   you to be looking at.
18   A.    Okay.
19   Q.    Look at footnote 5.
20   A.    Okay.
21   Q.    And particularly look at the end of
22   footnote 5.
23   A.    Okay.
24   Q.    Software, Microsoft Windows current

Laurence D. Lieb
January 23, 2024

Page 226

1  version explorer MountPoints2, and then the same
2  alphanumeric code that we see --
3        A.    Okay.
4        Q.    -- in Exhibit 21 next to both the word
5  "path" and the word "location," right?
6        A.    I see that.
7        Q.    So in footnote 5 of your February 2023
8  declaration, you cited the same evidence that is
9  shown here in Exhibit 21, correct?
10       A.    Yes.
11       Q.    When you cited that evidence in your
12 February declaration, what were you -- what
13 proposition were you citing it for?
14       A.    I believe it was in the context of
15 Jessica Grailer's interaction on December 20th
16 with files related to her new position at Chem
17 Tree.
18       Q.    Well, that's not correct because in
19 paragraph 26 of your February 2023 declaration,
20 you are talking about her plugging in her Emtec
21 external Emtec USB drive into the laptop.
22       A.    Okay.
23       Q.    And then you drop a footnote and you
24 cite the evidence that is now shown in Exhibit 21,

Page 227

1  right?
2             MR. YOSHIMURA:  Objection.
3  BY THE WITNESS:
4        A.    So I see that on -- I don't have -- I
5  don't have this February declaration memorized.
6  But I also see around that time frame that in the
7  December 20th time frame that she was accessing
8  files from the Emtec drive related to her --
9        Q.    I understand that.  But I want you to
10 focus on what this footnote --
11       A.    Yeah, it says MountPoint2, yes.
12       Q.    Yes, the footnote 5.
13       A.    Okay.
14       Q.    And the footnote you have appended it
15 to paragraph 26 of your February declaration --
16       A.    Okay.
17       Q.    -- which is about Grailer plugging in
18 and unplugging the USB drive, correct?
19       A.    Correct.
20       Q.    And then you cite Exhibit 21 which, in
21 fact, gives a December 20th, 2022 timestamp,
22 right?
23       A.    Yes.
24       Q.    So were you siting this evidence shown

Page 228

1  in Exhibit 21 for a timestamp of when she
2  connected her thumb drive to the computer?
3             MR. YOSHIMURA:  Objection.
4  BY THE WITNESS:
5        A.    I don't recall.
6        Q.    Okay.  Do you know whether or not
7  Grailer could have connected her thumb drive to
8  the computer again after December 20 of 2022
9  without updating the timestamp that is shown in
10 Exhibit 21?
11       A.    I have not tested that, but my forensic
12 analysis did reveal evidence of Grailer later
13 connecting that same USB -- that Emtec drive to
14 her former work laptop on January 8th.
15       Q.    But we see in Exhibit 21, which comes
16 from your Axiom case, that the timestamps shown in
17 Exhibit 21 did not update after December 20th,
18 2022, right?
19       A.    So this information is consistent with
20 what I'm sitting here in paragraph 26 and there is
21 evidence that can be independently verified of
22 her --
23       Q.    That's not my question.
24             What we're seeing in Exhibit 21 is that

Page 229

1  the timestamp shown in Exhibit 21 did not update
2  again after December 20th, 2022, correct?
3             MR. YOSHIMURA:  Objection, form.  And
4        if you can limit crosstalk, Matt, please.
5        Thank you.
6  BY THE WITNESS:
7        A.    So I stand by what -- on paragraph 26,
8  page 8 of Exhibit 6.
9        Q.    I know he doesn't want crosstalk, but
10 I'm sorry, you're just not answering the question.
11            We're going to do this again the other
12 way, which is here is -- after I stop talking --
13 this is your opportunity to tell me if you think
14 that the timestamp shown in Exhibit 21 ever
15 updated again after December 20th, 2022.
16            MR. YOSHIMURA:  Objection; form.
17 BY THE WITNESS:
18       A.    I could perform that analysis.  I don't
19 recall performing that analysis.  I do recall
20 performing analysis that showed -- and it could be
21 independently verified by any qualified peer, that
22 this Emtec drive was also connected to the laptop
23 on January 8th.
24       Q.    You said that when Grailer connected

Laurence D. Lieb
January 23, 2024

Page 230

1  and disconnected her thumb drive from her laptop,
2  Windows would create event log entries relating to
3  these connection and disconnection events, right?
4      A.   It could have.
5      Q.   It could have or it did?
6      A.   I don't recall, as I sit her.  I don't
7  have the Axiom database from my OSForensics case
8  in front of me.
9           MR. SPLITEK:  Let me hand you a copy of
10     Exhibit 22.
11           (Deposition Exhibit No. 22 was
12           introduced to the witness.)
13  BY MR. SPLITEK:
14     Q.   So I will tell you Exhibit 22 are
15  screenshots taken from your Axiom case --
16     A.   Okay.
17     Q.   -- and do you see that what has been
18  brought up here are the Windows event logs for
19  storage device events, right?
20     A.   Yes.
21     Q.   So do you see in Exhibit 22 there are
22  connection and disconnection events for Grailer's
23  USB thumb drive running from March 16th of 2022,
24  through December 20th of 2022?

Page 231

1      A.   I see in Exhibit 22 under Windows event
2  logs storage device events you have something
3  highlighted in blue that says -- well, there is a
4  line above it, says "connected USB disc 2.0
5  connected."  It has a USB vendor.  It doesn't
6  record to Emtec.
7           But I believe -- if I'm looking at it,
8  it's the same serial number.  So, in my opinion,
9  it's the Emtec drive.  It shows being connected
10  6:26 a.m. and then later disconnected 4:55 p.m.,
11  which is consistent with the language in page 8,
12  paragraph 26 of my February 2023 affidavit.
13     Q.   And when is the -- as shown in Exhibit
14  22, when is the last Windows event log for
15  Grailer's thumb drive being connected or
16  disconnected?
17     A.   I can't see the entire -- I don't know
18  if it is showing the entire database.  Again, if I
19  had the Axiom case database in front of me and the
20  OSForensics case in front of me, I could answer
21  your questions.
22     Q.   Right now let's just focus on reading
23  what is in front of you in Exhibit 22.
24           So in Exhibit 22, when is the last

Page 232

1  event log entry that you see for Grailer's thumb
2  drive?
3           MR. YOSHIMURA:  Objection.
4  BY THE WITNESS:
5      A.   For the Emtec?
6      Q.   That is correct?
7      A.   December 20th, at least from what is
8  visible here.
9      Q.   Do you believe that there are
10  additional event log entries after December 20th,
11  2022 that I have failed to include in Exhibit 22?
12     A.   I don't know.  Again, I don't have the
13  Axiom -- this is a snippet of the Axiom data case
14  file.
15     Q.   So when Grailer connected and
16  disconnected her USB thumb drive to and from the
17  computer, that created event log entries for the
18  connections and disconnections, right?
19     A.   It did.
20     Q.   It did.  Did you check to see whether
21  there were any event log entries for Grailer
22  connecting or disconnecting her USB thumb drive
23  after December 20th, 2022?
24     A.   That's what I'm looking at because I do

Page 233

1  reference in footnote the evidence of the
2  January 8th connectivity.  I am just trying to
3  figure out --
4      Q.   I'll tell you right now, you don't cite
5  the event logs in your report.
6      A.   Okay.
7      Q.   Why don't you site the event logs in
8  your report?
9      A.   Because I cited the evidence of the --
10  what I did find of Grailer connecting that Emtec
11  USB drive and her iPhone 6 to the work laptop on
12  January 8th.
13     Q.   How could Grailer have connected her
14  thumb drive to the computer after December 20th,
15  2022, without causing Windows to create an event
16  log entry documenting that connection?
17     A.   I don't know, but if I have --
18  wherever -- whatever I reference, I'm not sure why
19  you're not bringing up the evidence where I do
20  identify the January 8th activity.
21     Q.   We'll get to it.
22           But my question right now is, how
23  could -- do you have any -- we'll back up and do
24  it the way that seems to work.

Laurence D. Lieb
January 23, 2024

Page 234

1    This is your opportunity.  If you have
2    any explanation for how Grailer could have
3    connected her thumb drive to the computer after
4    December 20th, 2022, without causing Windows to
5    create an event log entry documenting that
6    connection, tell me right now.
7        MR. YOSHIMURA:  Objection to form.
8    BY THE WITNESS:
9        A.    So it is my opinion, the evidence is
10   consistent with the fact that a person I assume to
11   be Jessica Grailer connected the Emtec drive to
12   her former work laptop on January 8th, and used it
13   to exfiltrate a significant number of Ecolab
14   files.
15       Q.    Do you have anything else to say about
16   how Grailer could have possibly connected her
17   thumb drive to the computer after December 20th,
18   2022, without causing Windows to create an event
19   log entry documenting the connection?
20       A.    Her connection of the --
21       MR. YOSHIMURA:  Objection.
22   BY THE WITNESS:
23       A.    -- connection of the Emtec drive to her
24   laptop caused the evidence artifact that I

Page 235

1    described in one of my reports, one or more of my
2    reports.
3        Q.    Before today did you know that the
4    event logs don't contain any entries on January
5    8th, 2023, showing Grailer connecting or
6    disconnecting her thumb drive?
7        A.    I analyzed all the evidence on the
8    laptop.  I went through each of the categories in
9    the Axiom database.  I also used OSForensics to
10   analyze the same laptop --
11       Q.    So you did know?
12       A.    -- to come to the conclusion that I
13   described in my report which is that a person I
14   assume to be Jessica Grailer connected the Emtec
15   drive to her work laptop on January 8th that's
16   independently verifiable and replicatable by any
17   qualified peer and the fact that she used that --
18   it is my opinion that she used that drive to
19   exfiltrate the files that I described in my
20   reports.
21       Q.    So you did review all of the evidence.
22   You did know that there were no event log entries
23   on January 8th, 2023 for her thumb drive?
24       MR. YOSHIMURA:  Objection to form.

Page 236

1    BY THE WITNESS:
2        A.    I analyzed each category of evidence
3    that in the Axiom database and my OSForensics
4    database and formed the opinions, the basis for my
5    opinions that I describe in my expert reports.
6        Q.    You said earlier when Grailer connected
7    and disconnected her USB thumb drive that would
8    cause updates to the USBSTOR sub key in the
9    Windows registry, right?
10       A.    I said a human action of plugging in a
11   USB drive to a Windows computer can leave evidence
12   of activities in multiple locations on a Windows
13   computer.
14       Q.    Is one of those locations the USBSTOR
15   sub key?
16       A.    It can.
17       Q.    Is it or can it be?
18       MR. YOSHIMURA:  Objection to form.
19   BY THE WITNESS:
20       A.    So, again, I'd like to see my specific
21   -- so I can be specific in my responses, my expert
22   report where I describe the activities on January
23   8 because the evidence that I cite in my footnote
24   can be independently verified and replicated by

Page 237

1    any qualified peer.
2        Q.    Do you know whether or not within the
3    USBSTOR sub key hierarchy there is a specific sub
4    key that has a timestamp for the last time
5    Grailer's USB thumb drive was inserted into the
6    computer?
7        A.    I do recall that Magnet Forensic Axiom
8    actually pulls out first insertion, last
9    insertion, and a variety of timestamps.
10       Q.    Including from the USBSTOR sub key?
11       A.    It could be.  Again, you're asking me a
12   very specific question.  I don't have my report in
13   front of me.  I would like to have that report in
14   front of me so I can answer your question
15   specifically as to how I formed that opinion for
16   January 8th, which is my opinion.
17       Q.    Do you know whether or not in the
18   USBSTOR sub hierarchy there is also another
19   specific sub key that has a timestamp for the last
20   time Grailer's thumb drive was removed from the
21   computer?
22       MR. YOSHIMURA:  Objection.
23   BY THE WITNESS:
24       A.    It could be.  Again, I don't have the

Laurence D. Lieb
January 23, 2024

Page 238

1  Axiom or OSForensics database in front of me.  If
2  I did, I could bring that up on the screen and
3  show you exactly where I see the evidence of her
4  activities on January 8th, which can be
5  independently verified by any qualified peer.
6        Q.    Do you know whether or not when Grailer
7  connected and disconnected her USB thumb drive the
8  last insertion and last removal timestamps would
9  automatically update in the USBSTOR sub key?
10              MR. YOSHIMURA:  Objection.
11  BY THE WITNESS:
12        A.    I don't understand the question.  Say
13  it again.
14        Q.    Do you know whether or not when Grailer
15  connected and disconnected her USB thumb drive
16  there were last insertion and last removal
17  timestamps that would update automatically in the
18  USBSTOR sub key?
19        A.    I'd have to test that.
20              MR. YOSHIMURA:  Objection.
21  BY MR. SPLITEK:
22              MR. SPLITEK:  I'm going to hand you
23        Exhibits 23 and 24.
24

Page 239

1              (Deposition Exhibit Nos. 23 and
2                  24 were introduced to the
3                  witness.)
4  BY MR. SPLITEK:
5        Q.    Exhibit 23 is a screenshot of
6  information from your Axiom case, and then
7  Exhibit 24 -- I'm sorry, here is Exhibit 24 --
8  Exhibit 24 is a zoomed-in enlargement of the
9  right-hand column of Exhibit 23 because I think we
10  can all see it is not very legible.
11        A.    Okay.
12        Q.    So first, in the middle column of
13  Exhibit 23, there are yellow and purple, can I
14  call them, tags --
15        A.    Yes.
16        Q.    -- next to several rows?
17              Did you put those there?
18        A.    Unless Bruce Pixley added additional
19  tags, I believe they're my tags.
20        Q.    Okay.  And what does yellow mean, do
21  you know?
22        A.    Usually it's of interest.
23        Q.    All right.  And what does purple mean?
24        A.    I don't recall, as I sit here.

Page 240

1        Q.    Okay.  So if you look at the -- let's
2  go to Exhibit 24, please.
3        A.    Okay.
4        Q.    Under evidence information in the
5  middle of the page, do you see file paths after
6  location?
7        A.    I do.
8        Q.    And do you see that most of those file
9  paths have USBSTOR in the folder path?
10        A.    They do.
11        Q.    Okay.  Including the file paths that
12  end in 0066, 0067, 0064, and 0065, right?
13        A.    Yeah, I see the writer references, yes.
14        Q.    Okay.  Having reviewed that, can you
15  tell me whether or not in Exhibit 24 Axiom is
16  reporting information from the USBSTOR registry
17  sub key?
18        A.    Yes, it appears to be.
19        Q.    Okay.  And Axiom reports a last
20  insertion date?
21        A.    Yes.
22        Q.    And what date does it report on Exhibit
23  24?
24        A.    Exhibit 24 it says "last insertion date

Page 241

1  of December 20th, 2022."
2        Q.    Okay.  And can you tell from the serial
3  number on Exhibit 24 that what it is reporting is
4  the last insertion date for Grailer's Emtec USB
5  thumb drive that you discuss in your report?
6        A.    Yes, I believe that is the Emtec drive.
7        Q.    All right.  And what is the last
8  removal date that Axiom reports in Exhibit 24?
9        A.    December 20th, 2022.
10        Q.    And you obviously reviewed this
11  information because you flagged it as "of
12  interest" in your Axiom case, right?
13        A.    I did.
14        Q.    Okay.  So you Axiom is reporting that
15  last insertion date and last removal date both on
16  December 20th of 2022 in Exhibit 24?
17        A.    It is.
18        Q.    Do you know how to manually check
19  whether those timestamps are being reported
20  accurately?
21        A.    Well, yes.
22        Q.    How?
23        A.    What I do personally is I actually open
24  up the source file and look at the entry for the

Laurence D. Lieb
January 23, 2024

Page 242

1   date and time value and then I will swipe it, and
2   then usually those date and timestamps are
3   recorded in seconds or milliseconds from January
4   1, 1970 so I have another tool that will decode
5   that to give me a time and date stamp.  That's how
6   I do it.
7        Q.    And if we look at these hyperlinks in
8   the middle of the page on Exhibit 24 under
9   evidence information --
10       A.    Okay.
11       Q.    -- do you know what you can do by
12  clicking on those hyperlinks?
13       A.    Yes.  If one were to click on those, it
14  would open up the registry viewer view of Axiom.
15       Q.    And do you know if it allows you to
16  manually access and verify the underlying evidence
17  relating to these timestamps that are being
18  reported at the top of Exhibit 24?
19       A.    It does.
20       Q.    It does.  Do you know which of the
21  hyperlinks will take you to the underlying
22  evidence for the last insertion date/time that
23  Axiom was reporting as December 20th, 2022, in
24  Exhibit 24?

Page 243

1        A.    As I sit here, I don't know which of
2   these blue hyperlinks devices would contain that
3   specific value.
4        Q.    Okay.  Do you know if it might be the
5   hyperlink ending in 0066?
6             MR. YOSHIMURA:  Objection.
7   BY THE WITNESS:
8        A.    I don't know.
9        Q.    Do you know which hyperlink to click on
10  to manually find the underlying timestamps that
11  Axiom is reporting is the last removal date/time?
12       A.    I don't have it memorized.
13       Q.    Do you know if it's the hyperlink
14  ending in 0067?
15            MR. YOSHIMURA:  Objection.
16  BY THE WITNESS:
17       A.    I don't know, as I sit here.
18       Q.    Did you manually click on those
19  hyperlinks and verify the timestamps that are
20  shown here in Exhibit 24?
21       A.    I don't recall if I did or didn't.
22       Q.    All right.  How could Grailer have
23  connected her USB thumb drive to her computer
24  after December 20th of 2022, without causing an

Page 244

1   update to the last insertion or last removal
2   timestamp that Axiom is reporting here in Exhibit
3   24?
4        A.    Again, I'm not sure why you're not
5   referring to my expert report where I actually
6   reference the evidence on the laptop that shows
7   the evidence of activity relating to the Emtec
8   drive on January 8th.  I'm not sure why you're
9   hiding that.
10       Q.    Well, I want you to -- we will get to
11  what you want to talk about.  But I need answers
12  to my questions.  And so we're going to do this
13  the other way, again.
14            This is your opportunity to tell me.
15  So tell me now if you have an explanation.  This
16  is your opportunity to tell me if you have any
17  explanation for how Grailer could connect her USB
18  thumb drive to her computer after December 20th of
19  2022, without causing updates to the last
20  insertion and last removal timestamps that are
21  reported in Exhibit 24.
22            MR. YOSHIMURA:  Objection to form.
23  BY THE WITNESS:
24       A.    That question makes no sense to me.

Page 245

1   But I do recognize this exhibit as coming from the
2   Axiom case that I generated myself, and I also
3   know that there's evidence on the laptop of
4   activity on January 8th that for some reason
5   you're hiding.
6        Q.    Do you have anything else that you want
7   to offer about how she could connect her thumb
8   drive after December 20th without causing updates
9   to timestamps in Exhibit 24?
10       A.    That question doesn't make any sense to
11  me.  But I will state that wherever it is, in one
12  of my declarations, I provide independently
13  verifiable evidence of Grailer connecting the
14  Emtec drive to her former work laptop on
15  January 8th concurrent with her activities to --
16  of exfiltration, in my opinion.
17       Q.    The last insertion and last removal
18  timestamps, do you know what form those timestamps
19  are stored in?
20       A.    I'm not sure what you mean by "form."
21       Q.    What do they look like?
22       A.    From my experience, timestamps in
23  Windows operating systems are stored in -- it's
24  either seconds or milliseconds since January

Laurence D. Lieb
January 23, 2024

Page 246

1  1, 1970.  So generally they start with 1644578,
2  whatever.  It's seconds or milliseconds since
3  January 1, 1970.  That's the form it's actually
4  stored in.
5        Q.    Is it stored in -- as an 8-bit hex
6  value?
7            MR. YOSHIMURA:  Objection; leading.
8  BY THE WITNESS:
9        A.    An 8-bit hex value.  So -- I mean, it's
10  ultimately stored in zeros and ones on the hard
11  drive.
12           THE VIDEOGRAPHER:  I'm sorry, we need
13      to go off the record.
14           MR. SPLITEK:  We need to go to another
15      volume?
16           THE VIDEOGRAPHER:  Yeah.  The time is
17      3:22 p.m. and we are going off the record.
18               (Whereupon, a discussion
19               was had off the record.)
20           THE VIDEOGRAPHER:  The time is 3:36
21      p.m. and we are back on the record.
22  BY MR. SPLITEK:
23           MR. SPLITEK:  I'm going to hand you
24      first Exhibit 25 and then Exhibit 26.

Page 247

1               (Deposition Exhibit Nos. 25 and
2               26 were introduced to the
3               witness.)
4  BY MR. SPLITEK:
5        Q.    Exhibit 25 is another screenshot taken
6  from your Axiom case.
7        A.    Yes.
8        Q.    And Exhibit 26 is a zoomed-in
9  enlargement of the right-hand column --
10        A.    I see that.
11        Q.    -- of Exhibit 25.
12        A.    Yes.
13        Q.    All right.  In Exhibit 26, have we now
14  gotten to the timestamp that you site in your
15  report in support of your claim that Grailer
16  connected her thumb drive to the computer at
17  9:39 p.m.?
18        A.    Yes.
19        Q.    Okay.  And I want to be specific here.
20        A.    I want to be specific too.
21        Q.    In my rebuttal to Mr. Pixley's report,
22  I noted that on January 8th my forensic analysis
23  of the Windows operating system showed that the
24  laptop had been rebooted and restarted because

Page 248

1  Mr. Pixley, in his rebuttal to my report, said,
2  how is it possible that the USB drive and the
3  Emtec USB drive and the iPhone 6S could be plugged
4  in at the exact same time, and I provided the
5  evidence of that, which I have not seen Mr. Pixley
6  rebut, which was that the forensic analysis of the
7  Grailer laptop showed that the Windows system was
8  restarted, and that if these USB devises, the USB
9  Emtec drive and the iPhone were connected
10  concurrently when the laptop was rebooted, it
11  would be consistent with the evidence we're seeing
12  here.
13        Q.    And I'm sorry, would the connection
14  time be the time of the reboot?  I'm confused.
15  When did the reboot happen?  The timestamp here on
16  Exhibit 26 is 9:39:51 p.m.
17            So when was the reboot then that you're
18  talking about?
19        A.    I don't have my rebuttal to
20  Mr. Pixley's report, but it's -- that date and
21  time is listed in there.
22        Q.    But I guess just to -- I don't think we
23  need your rebuttal for that explanation to make
24  sense.

Page 249

1            Would the reboot be at 9:39:51 p.m.,
2  would it be before 9:39:59 or sometime after?
3        A.    The system restart is at the time and
4  date that's described in my response to
5  Mr. Pixley's report.
6        Q.    But that's not -- you brought this up.
7  I wasn't going to ask you about this.
8            But are you saying a system reboot
9  earlier in the day on January 8th, 2023, could
10  cause all of the timestamps to be identical later
11  in the day?
12        A.    Mr. -- no.  Mr. Pixley's rebuttal to my
13  report, he criticized my findings saying how is it
14  possible that someone could plug in a USB drive,
15  as I describe, and an iPhone 6S within
16  microseconds of each other.  I don't have his
17  report in front of me, but that's basically my
18  recollection of his language.
19            And in response to that I did analysis
20  and produced a subsequent report that showed that
21  the reasonable explanation was -- was that a
22  Windows systems had been restarted.  That's what
23  the evidence shows and did result, in my opinion,
24  with the evidence that we're seeing here.

Laurence D. Lieb
January 23, 2024

Page 250

1    Q.    So let's just look at Exhibit 2, your
2    report, paragraph 17.
3    A.    I have two Exhibit 3s.  This must be
4    yours.
5         I'm looking for Exhibit 2.  Got it.
6    Q.    Okay.  So in your Exhibit 2 in
7    paragraph 17 --
8    A.    Okay.
9    Q.    -- you say that Grailer last connected
10   her Emtec thumb drive at 9:39:51 p.m. on January
11   8th, 2023, right?
12   A.    That is what it says.
13   Q.    Okay.  And do you believe that at
14   9:39:51 p.m. on January 8th, 2023, Grailer
15   connected her thumb drive to her laptop?
16   A.    That's what the Windows system entry
17   had recorded.
18   Q.    Okay.  And then you were talking about
19   a different timestamp as well for the iPhone,
20   right?
21         Okay.  So now let's go to Exhibit 8.
22   This is your February declaration.
23   A.    Okay.
24   Q.    In paragraph --

Page 251

1    A.    Hold on.
2    Q.    Sorry.
3    A.    I got it.
4    Q.    Actually let's look at paragraph 20.
5    In paragraph 20 of your February declaration, you
6    said that Grailer last attached her iPhone to her
7    laptop at that exact same time, 9:39:51 p.m. on
8    January 8th, 2023, right?
9    A.    That is what the evidence shows.
10   Q.    Okay.  So you're saying that she
11   simultaneously connected both her USB drive and
12   her iPhone to the laptop at 9:39:51 p.m. on
13   January 8th, 2023?
14   A.    What I'm saying is that the forensic
15   analysis revealed Jessica Grailer last attached
16   her iPhone 6S, serial number 9&30A71D7&1&0000 to
17   the laptop on January 8th, 2023 at 9:31:51 p.m.
18   And I cite the Windows system hive, the Enum,
19   which is E-N-U-M, slash, USB registry entry.
20   Q.    So the time that you give for when she
21   last connected her USB thumb drive is 9:39:51 p.m.
22   on January 8th, 2023, right?
23   A.    I have not encountered any evidence
24   that changes my opinion that are in my reports and

Page 252

1    these date and timestamps are wholly consistent
2    with my opinion that Jessica Grailer exfiltrated
3    the files I detailed on January 8th using either
4    the Emtec drive or the iPhone 6S which were
5    connected to the laptop on the evening of January
6    8th.
7    Q.    And they were both connected at the
8    same second, according to the timestamps you've
9    given us, right?
10   A.    And the timestamps -- sorry, go ahead.
11   Q.    And you contend those timestamps are
12   accurate?
13   A.    I have no evidence -- I found no
14   evidence to show that these timestamps are not
15   accurate.
16   Q.    So I guess if you're contending,
17   though, that she actually simultaneously connected
18   both devices to her computer at 9:39:51 p.m. on
19   January 8th, 2023, what are you trying to explain?
20         Your opinion is that she connected them
21   both to the computer at that time.  Isn't that
22   your explanation?
23   A.    The evidence that can be independently
24   verified by any qualified peer shows that both the

Page 253

1    iPhone 6S and the Emtec drive were connected to
2    the Jessica Grailer laptop on January 8th, at
3    9:39 p.m.
4    Q.    And 51 seconds?
5    A.    And 51 seconds.
6    Q.    Okay.  In Exhibit 26 -- Exhibit 26 is
7    showing us the timestamp that you site in support
8    of your claim that Grailer connected her iPhone to
9    her computer at 9:39:51 p.m. on January 8th, 2023,
10   right?
11   A.    It is.
12   Q.    Okay.  Do you believe that Grailer
13   first installed her thumb drive on the computer at
14   9:39:51 p.m. on January 8th, 2023?
15   A.    I don't understand that question.
16        MR. SPLITEK:  Can you read it back to
17   him.
18        (Whereupon, the record
19         was read as requested.)
20   BY THE WITNESS:
21   A.    I don't understand the question because
22   software programs are installed on a computer, not
23   USB drives.
24   Q.    All right.  So look at Exhibit 26.  Do

Laurence D. Lieb
January 23, 2024

Page 254

1   you see first install date/time?
2       A.   I do.
3       Q.   And do you see it is the identical
4   January 8th, 2023, 9:39:51 p.m.?
5       A.   I do.
6       Q.   What is that telling us?
7       A.   In my opinion, the evidence is
8   consistent with the fact that a person I assume to
9   be Jessica Grailer connected the -- and had
10  connected the Emtec drive and her iPhone 6S to her
11  work laptop the evening of January 8th, which is
12  consistent with the evidence of interacting with
13  and exfiltrating the files I described in my
14  report.
15      Q.   And according to Exhibit 26, when is
16  the last time Grailer removed her thumb drive from
17  the computer?
18      A.   The registry value says last removal
19  date and time January 8th, 2023 9:39:51 p.m.
20      Q.   Do you contend that timestamp
21  accurately reflects when she last removed the
22  thumb drive from the computer?
23      A.   It's my opinion that the person I
24  assume to be Jessica Grailer had this Emtec drive

Page 255

1   connected to her work laptop on the evening of
2   January 8th at 9:39 p.m., which is consistent with
3   the activity of accessing and, in my opinion,
4   exfiltrating the files described in my export
5   report.
6       Q.   So Exhibit 26 says that she both
7   inserted the thumb drive into the computer at
8   9:39:51 and also removed the thumb drive from the
9   computer at 9:39:51.
10           Do you believe that both of those are
11  accurate?
12      A.   It is my opinion that Jessica Grailer
13  connected this Emtec drive to her former work
14  laptop on the evening of January 8th, 2023, and
15  her iPhone 6S and used one or both of the devices
16  to exfiltrate the files that are described in my
17  expert report.
18      Q.   And then she did that after 9:39:51
19  p.m., correct?
20      A.   It's my opinion that Jessica Grailer
21  used this Emtec drive and/or the iPhone 6S which
22  were connected to the laptop on the evening of
23  January 8th, 2023, to exfiltrate the files
24  addressed in my report.

Page 256

1       Q.   Not my question.
2            So the timestamp there, 9:39:51 p.m. on
3   January 8th, 2023, do you see that?
4       A.   I do.
5       Q.   Did the exfiltration that you allege
6   occur before or after that specific time?
7       A.   I believe the evidence shows that
8   Jessica Grailer exfiltrated the files that I
9   described in my expert report on the evening of
10  January 8th, 2023, using the Emtec USB drive
11  and/or the iPhone 6S that was connected to her
12  laptop that evening.
13      Q.   So if you look at Exhibit 26, the only
14  timestamp that is given is 9:39:51 p.m. on January
15  8th, 2023, right?
16      A.   Yes.
17      Q.   Do you understand so far?
18      A.   I see those timestamps.
19      Q.   And you allege that Grailer exfiltrated
20  files to her USB thumb drive, right?
21      A.   Or the iPhone 6S, as the evidence shows
22  that both devices were connected to her laptop on
23  the evening of January 8th concurrent and
24  consistent with the evidence of the file

Page 257

1   exfiltration.
2       Q.   So my question to you is:  Do you claim
3   that that file exfiltration happened before or
4   after you say that Grailer connected her USB thumb
5   drive to the computer at 9:39:51 on January 8th,
6   2023?
7       A.   It is my opinion that Jessica Grailer
8   connected the Emtec drive and her iPhone 6S to her
9   Ecolab laptop on January 8th, 2023, and used one
10  or both of those devices to exfiltrate the files
11  described in my expert report.
12      Q.   Okay, I understand that.  I guess I
13  have a different question, though, which is:  Do
14  you claim that the exfiltration you just referred
15  to happened before or after 9:39:51 p.m. on
16  January 8th, 2023?
17      A.   So I'm reading paragraph 18, page 5.
18      Q.   Of what?
19      A.   Of Exhibit 2.
20           [As read]:  Forensic analysis.  The
21  Ecolab computer revealed Jessica Grailer accessed
22  and exfiltrated multiple files on January 2023 --
23  January 8th, 2023, including the 259 files
24  described in Exhibit E based on -- should be my

Laurence D. Lieb
January 23, 2024

Page 258

1    forensic analysis.
2             [As read]:  It is my opinion that the
3    259 files were copied by Jessica Grailer to the
4    Emtec drive on January 8th, 2023.
5             I found no evidence to change my
6    opinion.
7        Q.   All right.  So you just directed me to
8    paragraph 18 of your report in Exhibit 2, right?
9        A.   Yes.
10       Q.   Okay.  And you talked about the
11   exfiltration that you say happened in that
12   paragraph, right?
13       A.   Yes.
14       Q.   So I have a related question for you.
15            The exfiltration that you're talking
16   about in paragraph 18 of your report, is it your
17   opinion that that exfiltration happened before or
18   after 9:39:51 p.m. on January 8th, 2023?
19       A.   I don't know.  I'd have to look at the
20   access dates and timestamps on the files that I
21   described as her being exfiltrated.
22       Q.   So you don't know?
23       A.   I do know.  I know that the files that
24   were -- that identified as being exfiltrated all

Page 259

1    have date and timestamps that are consistent with
2    my opinion that Jessica Grailer connected an Emtec
3    USB drive to her former work laptop on the evening
4    of January 8th, 2023, and exfiltrated the files
5    that I described.
6        Q.   How could Grailer have exfiltrated
7    files to her thumb drive before connecting her
8    thumb drive?
9        A.   I don't see anywhere in my report where
10   I claimed that.  I am not claiming that.
11       Q.   Okay.  So you don't claim that she
12   exfiltrated files before you say she connected her
13   USB thumb drive at 9:39:51 on January 8th, 2023,
14   correct?
15       A.   It is any opinion that the evidence
16   shows that the Emtec USB drive was connected to
17   Jessica Grailer's Ecolab laptop on the evening of
18   January 28, 2023, which is consistent with the
19   dates and timestamps that I see on the files that
20   I describe as her having exfiltrated.
21       Q.   And you don't claim, of course, that
22   she somehow exfiltrated files to her thumb drive
23   before connecting it?
24       A.   If you're asking me if files can be

Page 260

1    copied to a USB drive that is not connected to a
2    laptop, is that what you're asking.
3        Q.   That is, yes.
4        A.   That's impossible.
5        Q.   All right.
6             And you would agree with me that in
7    paragraph 17 of your report, the only time of
8    connection that you identify is 9:39:51 p.m. on
9    January 8th, 2023, correct?
10       A.   Yes.  It's my opinion that the system
11   hive of the laptop under the Enum/USB registry
12   entry contains evidence of Jessica Grailer having
13   had this Emtec drive connected to her laptop on
14   January 8th 2023.
15       Q.   Do you know if the timestamps that
16   Axiom is pulling out here on Exhibit 26 are coming
17   from what I referred to before as the USB sub key?
18       A.   Well, I'm looking at the -- what they
19   say is the source is the system hive, and it's
20   saying -- it shows the location as control set 1
21   Enum/USB, Enum/USB.  That's what I cite.  That's
22   exactly what I cite in my expert report.
23       Q.   And you can click on the hyperlinks
24   shown in Exhibit 26 to verify the timestamps that

Page 261

1    are being recorded in Exhibit 26, right?
2        A.   One can, yes.
3        Q.   Did you?
4        A.   Yes.
5        Q.   You did.  And what did you find?  Did
6    they match the timestamps reported in Exhibit 26?
7        A.   That is my recollection.
8             MR. SPLITEK:  I'm going to hand you
9        Exhibit 27.
10            (Deposition Exhibit No. 27 was
11            introduced to the witness.)
12            THE WITNESS:  Okay.  Well, give me the
13       blown-up version.
14            MR. SPLITEK:  Yep.  And I'm also going
15       to hand you Exhibit 28 --
16            (Deposition Exhibit No. 28 was
17            introduced to the witness.)
18            MR. SPLITEK:  -- which is an enlarged
19       version of the right-hand column of
20       Exhibit 27.
21            THE WITNESS:  Okay.
22   BY MR. SPLITEK:
23       Q.   So if we go back to Exhibit 26, you can
24   click on the hyperlink ending in 0066, right?

Laurence D. Lieb
January 23, 2024

Page 262

1     A.     00 -- yes.
2     Q.     Okay.  And that will take you to the
3  underlying timestamp that is being reported above
4  at the top of Exhibit 26, right?
5     A.     I'm not -- I have not clicked on this
6  particular item, but -- so I see that Windows
7  decoding it as 12:20, 2022.
8     Q.     That's right.  But I thought you said
9  you did click on the hyperlink shown in Exhibit 26
10 to manually access the underlying timestamps.
11    A.     Yeah, I recall confirming these dates
12 and that they are accurate and can be
13 independently verified by any qualified peer.
14    Q.     So the timestamp that Axiom is pulling
15 from the sub key ending in 0066, it is one of the
16 timestamps that comes in on January 8th, 2023, at
17 9:39:51 p.m., right?
18    A.     So I didn't create this Exhibit 28.
19 But if I had the Magnet Forensics Axiom case
20 database in front of me, I could pull up what I
21 bookmarked here as this particular evidence you're
22 showing as Exhibit 26 and I could show you where
23 the timestamp is deriving from.
24    Q.     But that's just a factual question and

Page 263

1  our expert too can click on the hyperlink.
2         What I'm telling you is that when you
3  navigate from the hyperlink for the sub key ending
4  0066 and you decode the value, Axiom reports
5  December 20th, 2022, is the timestamp, not January
6  8th.
7         MR. YOSHIMURA:  Objection to form,
8         foundation.
9  BY MR. SPLITEK:
10    Q.     Assuming that's true, do you have any
11 explanation for why the timestamp that Axiom is
12 reporting in Exhibit 28 would not have been
13 updated after December 20th of 2022?
14         MR. YOSHIMURA:  Objection; form,
15         foundation.
16 BY THE WITNESS:
17    A.     Yeah, I didn't generate Exhibit 28.  It
18 is a window within -- appears to have been derived
19 from an Axiom case file.
20         It is my opinion that -- and the
21 evidence is consistent with the fact that Jessica
22 Grailer connected this Emtec USB drive to her work
23 laptop on January 8th and used it to exfiltrate
24 the files described in my report.

Page 264

1     Q.     So in Exhibit 26, that last insertion
2  timestamp of January 28th, 2023, 9:39:51 p.m., I
3  think what you're telling me is you don't know
4  when you go in to manually access the underlying
5  timestamp whether it turns out to match the
6  January 8th, 2023, 9:39:51 p.m. timestamps or not,
7  right?
8     A.     No, I didn't say that.
9         MR. YOSHIMURA:  Objection.
10 BY MR. SPLITEK:
11    Q.     So you do know?
12    A.     I said that the evidence reported here
13 by Axiom and in my expert report is consistent
14 with the fact that Jessica Grailer connected this
15 Emtec drive to her laptop on the evening of
16 January 8th, and, in my opinion, used it to
17 exfiltrate the files described in my report.
18    Q.     And if you look at the last removal
19 timestamp shown on Exhibit 26, do you know whether
20 or not you can manually validate that by
21 navigating through the hyperlink for the sub key
22 ending in 0067?
23         MR. YOSHIMURA:  Objection.
24

Page 265

1  BY THE WITNESS:
2     A.     I'm not sure I understand the question.
3     Q.     So just like Axiom in Exhibit 26, it
4  reports the same timestamps for all the events,
5  right?
6     A.     Okay.
7     Q.     Well, it does?
8     A.     It does.  I see that.
9     Q.     So the last one, because Axiom reports
10 that Grailer first installed, last inserted and
11 last removed her USB all at the same second,
12 right?
13    A.     Okay.
14    Q.     The last timestamps for last removal of
15 January 8th, 2023, 9:39:51 p.m., do you know
16 whether or not the underlying timestamp for that
17 report is stored at the sub key ending in 0067,
18 which you can see a hyperlink for in Exhibit 26?
19         MR. YOSHIMURA:  Objection.
20 BY THE WITNESS:
21    A.     As I sit here, I don't know which of
22 these particular hyperlink entries correlate with
23 the entries described above.
24         MR. SPLITEK:  I'm going to hand you

Laurence D. Lieb
January 23, 2024

Page 266

```
1    Exhibit 29.
2              (Deposition Exhibit No. 29 was
3              introduced to the witness.)
4         MR. SPLITEK:  And I'm going to hand you
5    Exhibit 30.
6              (Deposition Exhibit No. 30 was
7              introduced to the witness.)
8    BY MR. SPLITEK:
9         Q.    Exhibit 29 is another screenshot from
10   your Axiom case and Exhibit 30 is an enlargement
11   of the right-hand column of Exhibit 29.
12             I will represent to you that when you
13   click on the hyperlink for the sub key ending in
14   0067 in your Axiom case and decode the timestamp,
15   the value, again, comes back as December 20th,
16   2022.
17             Assuming that's true, do you have any
18   explanation for why that happens?
19        MR. YOSHIMURA:  Objection; foundation.
20   BY THE WITNESS:
21        A.    So I didn't create Exhibit 30 and I'll
22   note that in my footnote to Exhibit 2, footnote
23   No. 2, it lists the source as system control set
24   001/Enum/USB and has a vendor ID and product ID
```

Page 267

```
1    related to this device, and then a serial number.
2              This particular exhibit has a different
3    location; it ends in 0067.  So you're citing here
4    a different location from what I'm citing.
5         Q.    Do you know whether or not that
6    timestamp corresponds -- let me be specific here.
7              Do you know whether or not the
8    timestamp shown in Exhibit 30 corresponds to the
9    last removal date/time that is reported in Exhibit
10   26?
11        MR. YOSHIMURA:  Objection.
12   BY THE WITNESS:
13        A.    I didn't create this timestamp, but I
14   will say that I've found no evidence that the
15   timestamps in Exhibit 26, which correlate with my
16   expert report, page 5, paragraph 17, are
17   incorrect.
18        Q.    And you also used your OSForensics
19   software to double-check the timestamps that you
20   found in Axiom, right?
21        A.    I used OSForensics tool to process and
22   make a case out of the laptop, but I don't believe
23   -- I could be wrong -- I don't believe I reference
24   OS -- evidence from OSForensics here.  I'm looking
```

Page 268

```
1    here, this -- at paragraph 17 and my recollection
2    is that is coming from my analysis that I
3    performed using the Axiom database.
4         Q.    Did you -- I understand what you did
5    and didn't cite in the report.
6              But did you use OSForensics to review
7    any of the information it provided about when
8    Grailer connected and disconnected her USB thumb
9    drive?
10        A.    I don't recall.
11        MR. SPLITEK:  I'm going to hand you
12   Exhibit 31.
13             (Deposition Exhibit No. 31 was
14              introduced to the witness.)
15   BY MR. SPLITEK:
16        Q.    So you did not provide us a copy of
17   your OSForensics case, right?
18        A.    I don't recall if I did or didn't.  It
19   is possible.  I just don't recall.
20        Q.    I will represent to you that Bruce
21   Pixley used OSForensics himself to extract
22   information from the image of Grailer's laptop.
23        A.    Okay.
24        Q.    And you did the same thing, right?
```

Page 269

```
1         A.    I did process the forensic image of
2    Grailer's laptop using OSForensics.
3         Q.    All right.  So here in Exhibit 31, it
4    shows what OSForensics reports -- if you go to
5    first the "user activity" section and then if you
6    look at the next column under USB near the bottom,
7    it's the "US devices" section.
8              Do you see that?
9         MR. YOSHIMURA:  Objection --
10   BY MR. SPLITEK:
11        Q.    Sorry.  "USB devices" section.
12        MR. YOSHIMURA:  Objection; foundation.
13   BY MR. SPLITEK:
14        Q.    Well, I'm just asking about looking at
15   the document here.
16             So in the left-hand column, "user
17   activity" is highlighted and then the second
18   column near the bottom under USB, what's highlight
19   is "USB devices."
20             Do you see that?
21        A.    I do.
22        Q.    Okay.  Do you remember reviewing USB
23   devices information like this in OSForensics?
24        A.    I don't recall.
```

Laurence D. Lieb
January 23, 2024

Page 270

1    Q.    Okay.  So in Exhibit 31, we can find
2    entries, again, for Grailer's thumb drive, right?
3         MR. YOSHIMURA:  Objection.
4    BY THE WITNESS:
5         A.    Sorry.  I don't understand the
6    question.  This is hard to read.
7         Q.    Well, I made it big in an effort to --
8         A.    Yeah, sorry for not bringing glasses.
9         Q.    About halfway down the page there are
10   three entries.  One says, VID_6557 PID_4200, and
11   then the next two are USB disc 2.0 and USB disc
12   2.0.
13        Do you sees though entries?
14        MR. YOSHIMURA:  Objection.
15   BY THE WITNESS:
16        A.    I believe so.  USB disc 2.0?
17        Q.    That's right.
18        A.    Okay.
19        MR. YOSHIMURA:  Matt, just for the
20        record, I have to state an objection to this
21        to the extent that unlike the other
22        screenshots that you showed us, this is not
23        based on processing that has been done by
24        both parties.  We cannot independently

Page 271

1    confirm this on our end after this deposition
2    and we object to its usage.
3         MR. SPLITEK:  Are you going to give us
4    his OSForensics case then?
5         MR. YOSHIMURA:  I don't believe that
6         that has anything to do with the objection I
7         just raised.  And if you and I want to meet
8         and confer about that, we can.
9              I don't think that needs to be
10        answered on the record in this deposition.
11        MR. SPLITEK:  All right.
12   BY MR. SPLITEK:
13        Q.    But in any event, you provided the
14   image of Grailer's laptop, right?
15        A.    I did.
16        Q.    And another independent expert is able
17   to use OSForensics to extract information from it,
18   right?
19        A.    I used OSForensics to extract
20   information from the Grailer laptop, which I
21   describe in my most recent expert report.
22        Q.    But if two people both use OSForensics
23   from the same image, the information that
24   OSForensics extracts shouldn't be different,

Page 272

1    right?
2         A.    I don't know if it is -- which version
3    did he use?
4         Q.    It could be a more recent version than
5    yours.  That would be likely.
6         MR. YOSHIMURA:  Objection.
7    BY MR. SPLITEK:
8         Q.    Do you see in the serial number column?
9         A.    Okay.
10        Q.    Do you see entries there, serial number
11   ending in 070 -- I'm sorry, beginning in 070?
12        A.    I'm having a difficult time reading
13   this; it is so small.  I see date last connected.
14   Oh, gosh, I can't read it.
15        Q.    All right.
16        A.    I really can't.
17        Q.    Do you have any reason to dispute that
18   when somebody uses OSForensics to extract the USB
19   device's information from the image of Grailer's
20   laptop they are told that Grailer's USB thumb
21   drive was last connected on December 20th, 2022?
22        A.    I don't understand the question.
23        So the Axiom database shows evidence of
24   this Emtec drive being connected on December 20th,

Page 273

1    2022.  I address that in my report.  The Axiom
2    database shows evidence of Grailer also connecting
3    the same Emtec drive to the Ecolab laptop on
4    January 8th, 2023.  I address that in my report.
5         Q.    I guess what I'm telling you is, I'm
6    representing to you that when someone uses
7    OSForensics to extract the information shown in
8    Exhibit 31, they are told that Grailer's USB thumb
9    drive was last connected on December 20th, 2022.
10        And all I'm asking is just sitting here
11   today, do you have any reason to dispute that that
12   is, in fact, what OSForensics reports?
13        MR. YOSHIMURA:  Objection.
14   BY THE WITNESS:
15        A.    I have not generated this particular
16   exhibit.  I will state that I have no reason or I
17   found no evidence to -- that the evidence reported
18   in Exhibit 26 on January 8th is incorrect.
19        Q.    All right.
20        MR. SPLITEK:  I'm going to hand you
21        Exhibit 32.
22             (Deposition Exhibit No. 32 was
23             introduced to the witness.)
24        MR. YOSHIMURA:  For the record, we'll

Laurence D. Lieb
January 23, 2024

Page 274

1    make the same objection.  Exhibit 32 appears
2    to be derived from another source, the same
3    source as Exhibit 31.
4    BY MR. SPLITEK:
5        Q.   So I will represent to you that the
6    information shown in Exhibit 32 was extracted from
7    the image of Grailer's laptop that you provided
8    using OSForensics software, and that as depicted
9    in Exhibit 32, this is now the USB history
10   information that OSForensics reports.
11       A.   Okay.
12       Q.   If you look at just what's on the face.
13   I'm not asking you to agree that OSForensics is
14   right, but if you look at the face of Exhibit 32,
15   when is the -- when are the last connection and
16   disconnection events that you see for Grailer's
17   USB thumb drive?
18           MR. YOSHIMURA:  Objection.
19   BY THE WITNESS:
20       A.   According to this report, it says
21   December 20th, 2022, and this is reporting it from
22   the diagnostic event log, which is different from
23   the source I quote in paragraph 17 of my report.
24       Q.   And do you have any explanation for how

Page 275

1    Grailer could have connected her thumb drive to
2    the laptop after December 20th, 2022, without
3    causing another entry in that log?
4            MR. YOSHIMURA:  Objection.
5    BY THE WITNESS:
6        A.   I don't need to.  I found forensic
7    analysis of the laptop showed that Grailer
8    connected the Emtec drive to her laptop -- to the
9    Ecolab laptop on the evening of January 8th, 2023.
10       Q.   By the way, on Exhibit 32, who was
11   connecting USB devices on February 8th?
12           MR. YOSHIMURA:  Objection.
13   BY THE WITNESS:
14       A.   That was me as part of doing the
15   forensic imaging of the device.
16       Q.   You had the computer running before you
17   imaged it?
18       A.   Yes, because it was BitLocker
19   encrypted.  My recollection is that the serial
20   number was not visible, so I had to perform a live
21   forensic image.
22       Q.   Okay.  And that did cause some changes
23   in the laptop, right?
24       A.   Specifically it caused the entries

Page 276

1    we're seeing here on February 8th.
2        Q.   It also caused USN change journal
3    entries, right?
4        A.   I'm not aware of any.
5        Q.   Did you check?
6        A.   No.
7        Q.   And the USN change journal has a
8    maximum size, right?
9        A.   I don't know.
10       Q.   Do you know if when a USN change
11   journal has a maximum size, new entries in the
12   change journal will cause old entries to purge
13   out?
14       A.   I do not.
15       Q.   All right.  So you don't know whether
16   when you were running the computer you were
17   causing old change journal entries to purge out?
18           MR. YOSHIMURA:  Objection.
19   BY THE WITNESS:
20       A.   I found no evidence of that.  And I did
21   find evidence of US [sic] journals consistent with
22   the January 8th exfiltration of files that I
23   reported on.
24           MR. SPLITEK:  I'm going to hand you

Page 277

1        Exhibit 33.
2               (Deposition Exhibit No. 33 was
3               introduced to the witness.)
4            MR. YOSHIMURA:  Same objection.
5    BY MR. SPLITEK:
6        Q.   I will represent to you that, once
7    again, Exhibit 33 depicts information that
8    OSForensics software extracted from the image of
9    Grailer's laptop that you provided, and
10   specifically as depicted in Exhibit 33, we are
11   looking at the event logs for storage device
12   usage --
13       A.   Okay.
14       Q.   -- as you can see in the second column.
15       A.   Okay.
16       Q.   If you just look at the face of Exhibit
17   33, when here is OSForensics telling you that
18   Grailer's thumb drive was last connected?
19           MR. YOSHIMURA:  Objection.
20   BY THE WITNESS:
21       A.   This is near impossible to read.  I
22   see -- I really can't read this, quite honestly.
23   I see entries.  I don't know.  This is difficult
24   to read.

Laurence D. Lieb
January 23, 2024

Page 278

1    I see an entry on January 28th.  I see
2  an entry on February 8th.  I can't read -- the
3  text is too small.
4    Q.    Well, let me just ask a general
5  question.
6          Do you have any explanation as to how
7  Grailer could have connected her USB thumb drive
8  to the laptop after December 20th, 2022, without
9  causing an additional entry in the storage device
10 usage event logs that OSForensics reports?
11         MR. YOSHIMURA:  Objection.
12 BY THE WITNESS:
13   A.    I don't really understand the question.
14         I will state that I did find through
15 forensic analysis that Jessica Grailer connected
16 her Emtec drive to her Ecolab laptop on January
17 8th, 2023, as reported by my -- as described in my
18 report and as shown in your Exhibit 26.
19   Q.    And in Exhibit 26, do you have any
20 explanation as to why Axiom reported identical
21 timestamps for the last connected daytime, install
22 daytime, first install daytime, last insertion
23 daytime and last removal daytime?
24         MR. YOSHIMURA:  Objection; asked and

Page 279

1  answered.
2  BY THE WITNESS:
3    A.    I do not.
4    Q.    What did you say?
5    A.    I do not.
6    Q.    Thank you.
7          Tell me if you agree or disagree with
8  this statement.  Axiom retrieves timestamps for
9  USB devices from the device registry.  Is that
10 true so far?
11         MR. YOSHIMURA:  Objection.
12 BY THE WITNESS:
13   A.    Yes.
14   Q.    And due to the behavior of registry
15 keys, those timestamps may not always accurately
16 reflect the true time when a user performed a
17 certain action.
18         Do you agree or disagree with that?
19         MR. YOSHIMURA:  Objection.
20 BY THE WITNESS:
21   A.    Could you repeat that?
22   Q.    Yes.
23         Due to the behavior of registry keys,
24 those timestamps may not always accurately reflect

Page 280

1  the true time when a user performed a certain
2  action?
3    A.    I don't really understand what that
4  means, but I will state that my forensic analysis
5  of the Grailer laptop using Axiom revealed
6  evidence of Grailer connecting the Emtec drive to
7  her work laptop on January 8th, 2023, as described
8  in my report.
9    Q.    All right.  Tell me if you --
10   A.    I found no evidence and I've been shown
11 no evidence that is incorrect.
12   Q.    Tell me if you agree or disagree with
13 this next statement.  Timestamp data for a
14 registry key may update when any of the data
15 within that key changes.
16         MR. YOSHIMURA:  Objection to form.
17 BY THE WITNESS:
18   A.    I don't know.  I'd have to -- it sounds
19 like you're asking a hypothetical that would
20 require testing.
21   Q.    All right.  You don't know.  Okay.
22         Tell me what you think about the next
23 statement.  If multiple timestamps are recovered
24 from the same registry key, they may all

Page 281

1  inaccurately display the same timestamp; for
2  example, the one that was most recently recorded
3  for that key.
4          MR. YOSHIMURA:  Objection; form.
5  BY THE WITNESS:
6    A.    I don't even understand what that
7  means.
8    Q.    Okay.  Tell me what you think about
9  this next statement.  Typically an examiner needs
10 to collect details from multiple locations to
11 analyze USB activity on a Windows PC.
12         MR. YOSHIMURA:  Objection; form.
13 BY THE WITNESS:
14   A.    I analyzed Grailer's laptop using two
15 different forensic tools and I was able to
16 identify the evidence described in Exhibit 26 of
17 Grailer connecting the Emtec drive to the laptop
18 on January 8th, 2023, which is consistent with the
19 timestamps we see on the files that I'm describing
20 as having been exfiltrated.
21   Q.    All right.  So let's say that Grailer
22 connected her thumb drive to her laptop at 9:39:51
23 p.m. on January 8th, 2023, which is what you're
24 claiming, right?

Laurence D. Lieb
January 23, 2024

Page 282

1    A.    That's what the evidence shows.
2    Q.    Would you expect that connection to
3  cause changes to USB sub keys that had nothing to
4  do with the thumb drive?
5    A.    I don't understand the question.
6    Q.    So if -- there are lots of sub keys in
7  the registry, right?
8    A.    Okay.
9    Q.    Do you agree with that?
10    A.    The registry has many, many, many, many
11  entries; hundreds, if not thousands of entries.
12    Q.    And many sub keys that are completely
13  unrelated to Grailer's thumb drive, right?
14    A.    The Windows registry has a system hive,
15  a software hive, a security hive, it has
16  NTUSER.NET file.  Those registry hives and
17  NTUSER.NET file contain evidence of human
18  interaction and usage of a Windows machine,
19  including what I found here in Exhibit 26, which
20  is evidence of Grailer connecting and using this
21  Emtec drive with her work laptop on January 8th,
22  2023.
23    Q.    And so when Grailer connected her USB
24  thumb drive to her computer, would you expect that

Page 283

1  connection to cause updates to sub keys that were
2  completely unrelated to her thumb drive?
3    A.    I don't really understand that
4  question.  I honestly don't.
5    Q.    Did you ever check to see how many sub
6  keys in the registry were updated at the identical
7  time of 9:39:51 p.m. on January 8th, 2023?
8    A.    Did I -- sorry.  Repeat the question.
9    Q.    Yeah.
10          Did you ever check to see how many sub
11  keys in the registry in Grailer's -- in the image
12  of Grailer's laptop were updated all at the
13  identical time of 9:39:51 p.m. on January 8th,
14  2023?
15          Mr. YOSHIMURA:  Objection.
16  BY THE WITNESS:
17    A.    I don't really understand that
18  question.
19          I did perform analysis of the Grailer
20  laptop and found the evidence that you have
21  displayed here in Exhibit 26.
22    Q.    Did you ever check to see how many sub
23  keys with no relationship to Grailer's thumb drive
24  were all changed at the identical time of 9:39:51

Page 284

1  p.m. on January 8th, 2023?
2    A.    No, I didn't need to.  And I found
3  literally no evidence -- I was presented with no
4  evidence that this Emtec drive was not connected
5  to the laptop on January 8th, 2023.
6    Q.    Do you have an opinion about how many
7  times Grailer connected and disconnected her thumb
8  drive from her laptop on January 8th, 2023?
9    A.    I do not.
10    Q.    Do you have an opinion about when
11  Grailer last removed her thumb drive from her
12  laptop?
13    A.    Yes.
14    Q.    What time?
15    A.    It was on January 8th, 2023, according
16  to Axiom.
17    Q.    No.  Do you have an opinion about what
18  time Grailer last removed her thumb drive from the
19  laptop?
20    A.    Well, the forensic artifact here is
21  reporting 9:39:51 p.m. on January 8th, 2023.
22    Q.    Okay.  And that's what you're relying
23  on?
24    A.    It is my opinion and I have not been

Page 285

1  shown any evidence to the contrary that Grailer
2  connected this Emtec drive to her work laptop on
3  January 8th, 2023, and used it to exfiltrate the
4  files described in my report.
5    Q.    Just to be clear, I was asking about
6  your opinion about when she last removed the thumb
7  drive from the computer.
8          MR. YOSHIMURA:  Objection.
9  BY MR. SPLITEK:
10    Q.    You're still pointing to the timestamp
11  in Exhibit 26, though; am I right?
12    A.    That's the evidence that the Axiom tool
13  reports.
14    Q.    Okay.  So to support your claim that
15  Grailer exfiltrated the files that you listed in
16  your Exhibit E, you cite the USN change journal in
17  the image of her laptop, right?
18    A.    I did.
19    Q.    Okay.  And you cite the entire change
20  journal; not to any specific entries there, right?
21    A.    No.  I believe in my original report I
22  actually had the USN journal entries related to
23  the files I described as being exfiltrated.
24    Q.    Well, we're going to look at -- let's

Laurence D. Lieb
January 23, 2024

Page 286

1  go to Exhibit 2, paragraph 18, footnote 3.
2      A.    Okay.
3      Q.    That's the entire USN change journal
4  that you're citing on page 5 of Exhibit 2, right?
5      A.    So paragraph 18 says, Forensic analysis
6  of the --
7      Q.    And I want to focus you on footnote 3
8  at the bottom of page 5.
9            Are you or are you not citing the
10 entire USN change journal in footnote 3 of page 5
11 of Exhibit 2?
12     A.    I don't know if you're describing as
13 the entire USN.  It says in my footnote, too, it
14 ends $USNJRNL, I believe, it's a colon, $J.
15     Q.    And that's the USN change journal,
16 right?
17     A.    It could be the entire journal.  I
18 don't know.
19     Q.    Well, it's your footnote.  I mean, is
20 it one entry in the journal or is it the whole
21 journal?
22           MR. YOSHIMURA:  Objection.
23 BY THE WITNESS:
24     A.    I took this from the Axiom forensic

Page 287

1  database.  That's why I'm citing it so that any
2  independent expert could verify that and find the
3  same evidence at the same location on the laptop.
4      Q.    And you would agree with me that the
5  USN change journal does not track files being
6  copied to external storage media, right?
7      A.    No.  I disagree.
8      Q.    What is it -- how does it track files
9  being copied to external storage media?
10     A.    So USN journal files, as I describe in
11 my report, record human interaction with files.
12     Q.    And the -- is there a reason field in
13 each change journal entry?
14           MR. YOSHIMURA:  Objection.
15 BY THE WITNESS:
16     A.    I don't know what that means.
17     Q.    Okay.  What -- when there's an entry in
18 a USN change journal, what information is recorded
19 in the entry?
20     A.    Well, we'd have to look at each of the
21 USN journal entries that I provided.  I believe it
22 was in my original declaration.
23     Q.    But are you saying that in the USN
24 change journal, entries will say this file was

Page 288

1  copied to external storage media?
2      A.    What I'm something is that I referenced
3  the USN journal entries related to the files I
4  described as having been exfiltrated, and I
5  included all of them in my expert report.
6            I was later asked to provide copies of
7  those files to be produced.  Those files all had
8  the date -- last access date and timestamp
9  consistent with my opinion that those files were
10 exfiltrated via this Emtec USB drive.
11     Q.    But I guess what I'm asking is, are you
12 claiming that if someone goes into the USN change
13 journal, they will see a report in there that says
14 this file was copied to an external storage media
15 at this time?
16     A.    What I found through the analysis of
17 the USN journal, which is a -- records human
18 interaction with files, it shows the files I
19 described as being exfiltrated were interacted
20 with concurrent with the date and time of those
21 files being exfiltrated.
22           And then when I was later asked to
23 produce those, the date last accessed, modified,
24 created metadata dates lined up perfectly with my

Page 289

1  opinion and the USN journal files.  All of it is
2  consistent.
3      Q.    So if you go into one of these USN
4  change journal entries that you're relying on,
5  what kind of information would it provide to you?
6      A.    Human interaction with those files; not
7  a system, not automated.  Human interaction.
8      Q.    And does it tell you what kind of
9  interaction?
10     A.    Well, there is many different types of
11 USN journal entries.  We would have to look at the
12 specific ones that I report on and that are
13 available in the Axiom database.
14     Q.    And are any of those entries about
15 copying to external storage media?
16     A.    I don't recall.
17     Q.    Do you know how many entries exist in
18 the USN change journal in the image of Grailer's
19 laptop?
20     A.    I do not.
21     Q.    Could you approximate it?
22     A.    As I sit here, no.
23     Q.    More than 100,000?
24     A.    As I sit here, I do not know.

Laurence D. Lieb
January 23, 2024

Page 290

1    Q.    Do you know when the USN change
2    journal's earliest entry is from?
3    A.    I don't recall.
4    Q.    Do you know how many of the USN change
5    journal entries are from February 8th, 2023 when
6    you had the laptop?
7    A.    I don't know how many, as I sit here.
8    Q.    All right.  I want to -- here's what I,
9    you know, I don't fully understand is the
10   chronology.
11        So in my mind, if somebody is copying
12   files to a USB thumb drive, they have to connect
13   it at some specific time.
14   A.    Right.
15   Q.    And then there is a period of time
16   after the connection where the copying to the
17   thumb drive would have to happen, right?
18   A.    That's right.
19   Q.    And then at the end they also remove
20   the thumb drive.
21   A.    I agree.
22   Q.    Could you provide that rough chronology
23   to me right now?
24   A.    Yeah.  So my forensic analysis showed

Page 291

1    that a person I believe to be Jessica Grailer
2    connected Emtec USB drive to her former work
3    laptop on January 8th 2023.  The forensic analysis
4    of the USN journal files showed her interacting
5    with those same files, as I describe as being
6    exfiltrated.
7         The actual metadata of those files that
8    got produced, hopefully you have those exhibits,
9    are all consistent with them being accessed en
10   masse currently on the evening of January 28th,
11   2023.
12        So the timeline is self-evident in the
13   metadata of the files that were produced as having
14   been exfiltrated, as consistent with the entry we
15   see here in Exhibit 26, and it is consistent with
16   the activity we see in the USN journal.  It is all
17   consistent.
18   Q.    Well, I'm probably not a very smart
19   guy, but it's not all self-evident to me.  So I
20   want to break it down.
21        The three stages we identified were in
22   the chronology.  There's three points in this
23   chronology I want to focus on.  One was the user
24   connects the thumb drive to the computer.

Page 292

1    A.    Okay.
2    Q.    And the next is a period of time where
3    there is copying to the thumb drive, right?
4    A.    Yes.
5    Q.    And then the final point is the thumb
6    drive is removed from the computer, right?
7    A.    Yes.
8    Q.    All right.  So let's just focus on the
9    beginning of have chronology --
10   A.    Okay.
11   Q.    -- which is the event where the user
12   connects the thumb drive to the computer.
13   A.    Okay.
14   Q.    What is the specific time on January
15   8th, 2023, that you claim that chronology began?
16   A.    So the evidence, as shown in your
17   Exhibit 26, shows that the Emtec drive was
18   connected to the laptop on January 28th, 2023, at
19   9:39 p.m., which, in my opinion, is why that
20   activity doesn't show up in the Digital Guardian
21   report.
22        And if we look at the -- I don't have
23   the Axiom database in front of me but if we did,
24   maybe Mr. Pixley can bring it up on screen because

Page 293

1    I tagged all those files that as I describe, we
2    can see the last access dates and times are
3    consistent with or after the connectivity of the
4    USB drive.
5         So it is any opinion and the evidence
6    is consistent with the fact that Ms. Grailer used
7    this Emtec driver to exfiltrate the files I
8    described in my expert report on the evening of
9    January 28th.
10   Q.    Okay.  And just to be clear then, that
11   chronology I referred to in my last question, in
12   your view it began at the 9:39 p.m. timestamp that
13   we saw in Exhibit 26, correct?
14   A.    Yes.
15   Q.    Okay.  Are you certain that the USN
16   change journal on Grailer's laptop contains
17   entries relating to all of files in your Exhibit
18   E?
19        MR. YOSHIMURA:  Objection.
20   BY THE WITNESS:
21   A.    I don't understand the question.
22   Q.    Well, so you cite the USN change
23   journal --
24   A.    Yes.

Laurence D. Lieb
January 23, 2024

Page 294

1    Q.    -- in support of your claim that
2  Grailer exfiltrated all of the files listed in
3  Exhibit E to your report, right?
4    A.    Yes.
5    Q.    Okay.  And it wouldn't make sense for
6  you to cite the USN change journal as evidence
7  that files were copied if the USN change journal
8  had no entries about those files, right?
9         MR. YOSHIMURA:  Objection.
10 BY THE WITNESS:
11   A.    I don't really understand that
12 question.  But I believe it would be informative
13 to have a copy -- maybe you have that and you're
14 about to provide it to me.  My rebuttal to
15 Mr. Pixley because I believe I addressed that
16 exact subject in my rebuttal to his report.
17   Q.    About how much time did you spend
18 analyzing the USN change journal to determine that
19 Grailer copied the files listed in your Exhibit E?
20   A.    I don't recall.
21   Q.    Did you perform that analysis before
22 executing your February 2023 declaration?
23   A.    If I describe -- I believe so.  I
24 believe that the original declaration where I

Page 295

1  describe the file exfiltration was based upon my
2  evidence of human interaction that I discovered
3  through the identification of the USN journal
4  entries, which are a direct result, in my opinion,
5  of actions Jessica Grailer took.
6         At a later date I was asked to -- I
7  believe Fisher Phillips said we got to produce the
8  true and exact copies of the files that I'm
9  describing as her having been exfiltrated, and my
10 recollection is that the metadata dates of all of
11 those files that are produced are completely
12 consistent with my opinion.
13   Q.    Which dates in the production that we
14 received should be showing up then as January 8th,
15 2023, in the metadata?
16   A.    Which what?
17   Q.    You're saying that the metadata was
18 consistent.  Are you telling me that some date in
19 the metadata for the production?
20   A.    Yeah.  It would be the last access
21 dates.
22   Q.    The last access dates in the documents
23 that were -- that you gathered to provide to us
24 were all January 8th, 2023?

Page 296

1    A.    The evening of, yes.  You should have
2  that -- if you have a relativity database, you can
3  confirm that.
4    Q.    Okay.  Did you do any analysis to rule
5  out the possibility that programs running in the
6  background on Grailer's computer caused USN change
7  journal entries relating to files that are listed
8  in your Exhibit E?
9    A.    No.  I'm not aware of any instances
10 where automatic software -- what did you say?  A
11 Windows operating system -- so nonhuman activity
12 would cause the evidence I saw in the USN user
13 journals to be changed or recorded.
14   Q.    When Grailer's laptop started up,
15 Windows would automatically start up different
16 kernel and file system drivers, right?
17   A.    Say that again.
18   Q.    Do you know whether when Grailer's
19 laptop started up Windows would automatically
20 start up different kernel and file system drivers?
21   A.    What's the last word you're saying?
22   Q.    Kernel and file system drivers.
23   A.    Oh, kernel and file system drivers.
24         I don't know.

Page 297

1    Q.    Do you know how many additional
2  programs were also set up to start up
3  automatically when Grailer's laptop started?
4    A.    I don't recall doing that analysis.
5    Q.    Okay.  Do you agree that programs
6  running in the background in the computer can
7  interact with files without the user's
8  intervention?
9    A.    I am aware of antivirus programs which
10 are running in the background will -- periodically
11 will be -- con be configured periodically to scan
12 files on a computer just -- and be set up to run
13 in an automatic fashion.  But I'm not aware of
14 that occurring here.
15   Q.    Do you agree that USN change journal
16 entries will result when a program running in the
17 background interacts with a file?
18   A.    I'm not aware of any evidence or
19 instance of that occurring.
20   Q.    Did you check the Windows event logs to
21 determine whether Grailer logged into the computer
22 in close proximity to any of the USN journal
23 entries relating to files in your Exhibit E?
24   A.    I don't recall.

Laurence D. Lieb
January 23, 2024

Page 298

1    Q.    When I say "your Exhibit E," I mean
2  Exhibit E to your report.
3    A.    Okay.
4    Q.    Are we on the same page?
5    A.    I didn't really understand the
6  question.  What was the question?
7    Q.    Yeah.
8          So I thought the question went well and
9  then I tripped up by making sure we were
10  talking -- Exhibit E to your report from
11  November --
12   A.    Okay.
13   Q.    -- identifies the files that you claim
14  Grailer exfiltrated, right?
15   A.    Can I pull that up?
16   Q.    Sure, yeah.  That's fine.
17         MR. SPLITEK:  Let's mark a new one.
18  Exhibit 35 I'm handing to you.
19              (Deposition Exhibit No. 35 was
20               introduced to the witness.)
21  BY MR. SPLITEK:
22   Q.    Do you agree that Exhibit 5 is a copy
23  of Exhibit E to your report?
24         MR. YOSHIMURA:  Exhibit 35.

Page 299

1  BY MR. SPLITEK:
2    Q.    Exhibit 35 is a copy of Exhibit E in
3  your report, right?
4    A.    If appears to be.
5    Q.    Did you check the Windows event logs to
6  determine whether Grailer logged into the computer
7  in close proximity to any of the USN journal
8  entries relating to files in your Exhibit E?
9    A.    Did I specifically analyze Windows
10  event log to -- I don't understand that question.
11   Q.    All right.  Did you check the OneDrive
12  synchronization log to determine whether a
13  OneDrive program was synchronizing files at the
14  time of any of the USN journal entries relating to
15  files in your Exhibit E?
16   A.    I don't recall.
17   Q.    Do you agree that when OneDrive
18  synchronizes files, that will result in USN change
19  journal entries for the synchronized files?
20   A.    I'm not aware of that occurring.
21   Q.    Did you check to see if any of the
22  files listed in your Exhibit E were being written
23  to in regular increments on the computer?
24   A.    No.  I'm only aware of evidence of USN

Page 300

1  journal files being created as a direct result of
2  human activity.
3    Q.    Did you do any analysis to determine
4  whether USN change journal entries for files in
5  your Exhibit E related to temporary files that
6  were being created and deleted on January 8th of
7  the 2023?
8    A.    I don't recall identifying any of these
9  as temporary files.
10   Q.    All right.  Did you check to see
11  whether any files in your Exhibit E were temporary
12  files located in temporary folders?
13   A.    I don't recall any of these being
14  temporary files or located in temporary folders.
15   Q.    Do you recall looking to find out if
16  they were or weren't?
17   A.    I wouldn't have reported on a file
18  being exfiltrated if that file originated from a
19  temporary file.
20   Q.    Did you do any analysis to determine
21  whether the USN change journal entries for files
22  in your Exhibit E related to a program called End
23  Point Sensor that was running in the background?
24   A.    I did not.

Page 301

1          MR. YOSHIMURA:  Objection.
2  BY MR. SPLITEK:
3    Q.    Did you do any analysis to determine
4  whether any USN change journal entries for files
5  in your Exhibit E were related to the Digital
6  Guardian agent running in the background?
7    A.    No.  And I'm not aware of Digital
8  Guardian agent having any effect on user journal
9  files because, again, my understanding and
10  experience with user journal files is they're
11  created as a direct result of human activity.
12   Q.    Did you do any analysis to identify the
13  folder pads for all the files in your Exhibit E?
14   A.    Oh, yes.
15   Q.    Did you do any analysis to determine
16  whether the files in your Exhibit E had folder
17  locations such that a user could have plausibly
18  selected them for copying at the times that you
19  believe they were copied?
20   A.    I don't recall that specifically, but I
21  do recall identifying these files as -- and
22  evidence that was consistent with Grailer
23  exfiltrating these specific files on January 8th
24  2023.

Laurence D. Lieb
January 23, 2024

Page 302

1    Q.    And do you agree with me, though, that
2 although it is easy to simultaneously select and
3 copy multiple files that are stored together in
4 the same folder, it's not so easy to
5 simultaneously select and copy files that are
6 spread out in different folders in different
7 locations?
8    A.    I think you're asking a hypothetical.
9 But I know I can -- in Windows Explorer I can hit
10 -- while the control key is held down, I can
11 simultaneously select multiple files in different
12 folders.
13    Q.    But it would take you more than a
14 second or two to do that, I assume?
15         MR. YOSHIMURA:  Objection.
16 BY THE WITNESS:
17    A.    I really don't understand the question.
18    Q.    Did you do any analysis to determine
19 whether USN change journal entries for files in
20 your Exhibit E were related to thumbnails of files
21 previewing in a folder?
22    A.    No.
23    Q.    Did you check to see whether any of the
24 files in Exhibit E are just files that Grailer

Page 303

1 sent or received by e-mail on January 8th, 2023?
2    A.    No.
3    Q.    And if Grailer sent or received files
4 by e-mail, there would be USN change journal
5 entries relating to those files, right?
6    A.    I don't know that.
7    Q.    Okay.  But you did have access to all
8 the e-mails Grailer sent or received on January
9 8th, 2023, right?
10    A.    I had access to all the e-mails Grailer
11 received using her laptop.
12    Q.    Okay.  But you didn't check to see
13 whether in your Exhibit E you might be accusing
14 her of exfiltrating files that she just sent or
15 received in her work e-mail?
16         MR. YOSHIMURA:  Objection.
17 BY THE WITNESS:
18    A.    I found no evidence of Grailer
19 e-mailing the files that I identified in Exhibit
20 E, your Exhibit 35, as result -- a direct result
21 of her sending an e-mail to another Ecolab
22 employee or herself via an e-mail attachment.
23 Because if I had, I would not have identified that
24 file as a file I believe she exfiltrated.

Page 304

1    Q.    Can you go back to Exhibit 36, which is
2 Exhibit F to your report?
3    A.    Exhibit 36.
4    Q.    I want you to turn to page 2 of
5 Exhibit 36 --
6    A.    Okay.
7    Q.    -- which, again, is your Exhibit F.
8    A.    Okay.
9    Q.    At the bottom of the page do you see
10 the shortcut to a file with a name that begins
11 with .849C9?
12    A.    I do.
13    Q.    Do you know what that file is?
14    A.    I do not.
15    Q.    And if you turn to page 3 in your
16 Exhibit F, do you see that -- the shortcut to the
17 same file appearing there again?
18    A.    I do.  It's in black because the other
19 files are in green.
20    Q.    Do you know why the same shortcut to
21 that same file keeps showing up in different
22 folders in your Exhibit F?
23    A.    No.  I'm not familiar with what that
24 file is.

Page 305

1    Q.    Did you do any analysis to determine
2 whether the MFT modified dates depicted in your
3 Exhibit F can be connected with OneDrive folder
4 synchronization activities?
5    A.    So I'm looking at the folder path of
6 the files, for example, on page -- the first page
7 it says J. Grailer Ecolab and it's not under the
8 OneDrive folder.  So it's under the folder path
9 JGrailer Ecolab owns Michael Idium Clinton
10 actually.  So it's not under the OneDrive folder.
11    Q.    And that's why you're saying then you
12 didn't do any analysis to see whether the MFT
13 modified dates could be connected with OneDrive
14 folder synchronization activities?
15         MR. YOSHIMURA:  Objection.
16 BY THE WITNESS:
17    A.    I found no evidence of this artifact
18 being -- or the fact that these multiple files
19 were -- in folders were concurrently accessed at
20 the same time.
21    Q.    Did you do any analysis to determine
22 whether the MFT modified dates in your Exhibit F
23 could be connected to Grailer's activities putting
24 together an e-mail that she sent to her supervisor

Laurence D. Lieb
January 23, 2024

Page 306

1  on January 8th, 2023?
2          MR. YOSHIMURA:  Objection.
3  BY THE WITNESS:
4      A.    I found no evidence that any of these
5  dates and time changes were a result of e-mail
6  activity by Jessica Grailer.
7      Q.    Did you do an analysis to figure that
8  out one way or the other?
9          MR. YOSHIMURA:  Objection.
10 BY THE WITNESS:
11     A.    I analyzed the e-mail that she sent
12 because that's specifically looking for any sort
13 of evidence of her e-mailing files to herself and
14 found none.
15     Q.    About how much time did you spend
16 analyzing the files in folders shown in your
17 Exhibit F to determine whether Grailer copied them
18 to her thumb drive?
19     A.    If you're asking me -- so I'm not sure
20 I understand the question.
21     Q.    Well, when did you do the analysis?
22 Did you do this before your February 2023
23 declaration to determine that the files and
24 folders shown in your Exhibit F were copied to

Page 307

1  Grailer's thumb drive?
2      A.    So my Exhibit F, your Exhibit 36, my
3  recollection is that I generated this in response
4  to writing a rebuttal to Mr. Pixley's rebuttal to
5  me.
6      Q.    So you performed that analysis then
7  before your second declaration; is that correct?
8      A.    Yes, I believe so.  If you're referring
9  to the most -- the last declaration, is that what
10 you're referring to?
11         So I believe this is -- well, I don't
12 have them all in front of me, so ...
13     Q.    Your supplemental declaration in
14 response to Mr. Pixley was at the end of March
15 2023.
16     A.    Okay.  You could be right.  I don't
17 recall the date.
18     Q.    Okay.  But the analysis that you
19 performed to conclude that Grailer exfiltrated the
20 files in folders shown in your Exhibit F, which we
21 have marked as Exhibit 36, you believe you
22 performed that analysis before executing that
23 March 2023 declaration, right?
24     A.    My recollection is that I performed

Page 308

1  this analysis and created this exhibit in response
2  to -- in response to my rebuttal to Mr. Pixley's
3  report.
4      Q.    What is the master file table?
5      A.    Master file table is a Windows system
6  artifact that records when files are created,
7  accessed, modified, or modified on a computer that
8  is running the Windows operating system.
9      Q.    All right.  Is the master file table
10 designed to record when files are copied to
11 external storage media?
12     A.    So the Digital Guardian tool is
13 designed to track and record when files are
14 recorded to external USB media.  The Windows
15 registry and operating system is not designed to
16 record directly in a discrete location files being
17 copied to an external USB drive.
18     Q.    Okay.  An MFT modified date must tell
19 us the date and time when something was modified,
20 right?
21     A.    My understanding is it is the last date
22 that the entry in the master file table was
23 modified.
24     Q.    Okay.  So the thing that was modified

Page 309

1  was the entry in the master file table?
2      A.    Correct, which can be different from
3  the last modified date of an actual file.
4      Q.    Got it.  All right.
5          And does -- in your view, does a change
6  to an MFT modify date relating to a file always
7  mean that a user has accessed that file?
8      A.    I don't know how to answer that
9  question.
10     Q.    You list in your -- the exhibits to
11 your report a lot of cases in which you've
12 testified, right?
13     A.    I do.
14     Q.    Okay.  How many cases were you
15 testified -- were you testifying about
16 interpreting outputs from maintenance forensics
17 Axiom software?
18     A.    I would say the majority of them.
19     Q.    Could you tell me the last five?
20     A.    I'd have to have the list of my
21 testimony experience in front of me from my CV to
22 jog my recollection of what the case was about and
23 jog my recollection of what the forensic analysis
24 I performed.  They're not all the same.

Laurence D. Lieb
January 23, 2024

Page 310

1    Q.    And when did you first receive any
2  certification from Magnet Forensics?
3    A.    Oh, gosh.  Maybe 10 years ago.
4  Originally the tool was called Internet Evidence
5  Finder and then that eventually evolved into --
6  they're calling it Axiom now, but it may be more
7  than ten years.
8    Q.    Okay.  And those certifications were
9  provided by the vendor, Magnet Forensics; is that
10  right?
11    A.    Yes.
12    Q.    When did you first get any
13  certification from OSForensics?
14    A.    Oh, gosh.  I believe Passmark started
15  offering training and certification for their
16  OSForensics tool several years ago, and so I've
17  passed -- I've been certified on the tool in the
18  past and then I recently, again, trained and
19  recertified in this tool, whatever the date shown
20  in -- as part of one of the exhibits to my CV.
21    Q.    Okay.  And that certification was also
22  provided by the vendor OSForensics, correct?
23    A.    The vendor is Passmark,
24  P-A-S-S-M-A-R-K.

Page 311

1    Q.    Thank you.
2          So Passmark is the developer of
3  OSForensics; is that right?
4    A.    It is.
5    Q.    Okay.  Just like Magnet Forensics is
6  the developer of Axiom?
7    A.    Correct.
8    Q.    Thank you for that clarification.
9          MR. SPLITEK:  Let me give you
10  Exhibit 38.
11            (Deposition Exhibit No. 38 was
12              introduced to the witness.)
13  BY MR. SPLITEK:
14    Q.    Do you recognize Exhibit 38?
15    A.    I do not.  Can I look?
16    Q.    Yes.  Take your time.
17    A.    My recollection -- and please correct
18  me if I'm wrong -- is that this report was
19  generated by a special master at the direction of
20  the Judge, but I could be wrong.
21    Q.    Have you reviewed the report marked as
22  Exhibit 38 before?
23    A.    I believe so, yes.  If this is the
24  special master report that was brought in, then,

Page 312

1  yes, I did review that report.
2    Q.    And I think the term --
3    A.    What is confusing me is --
4    Q.    The term would be more along the lines
5  of a neutral expert.
6    A.    Okay.
7    Q.    I understand what you mean and you're
8  not off base to use that terminology either.
9    A.    Okay.
10    Q.    So, I mean, did you have an
11  understanding before today that Digital Forensics
12  looked for files on Grailer's iPhone and didn't
13  find them?
14    A.    Yes.  Oh, yes.  Yes, yes.  I'm familiar
15  with this report.
16    Q.    Did you -- do you take any issue with
17  Digital Forensics methods or findings?
18    A.    No.
19    Q.    I thought earlier in the deposition,
20  maybe within the past hour or so, you might have
21  said that Grailer exfiltrated files to her USB
22  thumb drive and/or her iPhone.  I'm not trying to
23  mischaracterize what you said.  Did I get that
24  right?

Page 313

1    A.    Yes.  It's both devices.  The forensic
2  evidence shows that both devices were connected to
3  the former work laptop on the evening of
4  January 8th.  And I know how to copy -- I can copy
5  files to my iPhone once my iPhone is connected to
6  my laptop.
7          So it's possible it was the iPhone --
8  it's possible the files were copied to the
9  iPhone 6S but -- because -- due to the fact that
10  the iPhone 6S was factory reset before it was
11  returned to me by a person that I assume to be
12  Jessica Grailer, I cannot confirm any evidence of
13  activities that occurred on the iPhone 6S.
14    Q.    So you know how to copy Excel
15  spreadsheets and PDFs from a laptop to an iPhone?
16    A.    So when a user plugs in an iPhone to a
17  Windows computer -- I have it configured so that
18  Windows Explorer pops up and you'll see a DCIM
19  folder, which is a digital camera, and it is
20  possible to drop and drag files to that.
21          But I might have different tools and
22  applications installed on my Windows PC that
23  allows me to do that.
24    Q.    Could an ordinary iPhone user move

Laurence D. Lieb
January 23, 2024

Page 314

1    Excel spreadsheets and PDFs in bulk to an iPhone?
2        A.    I can.
3        Q.    But could an ordinary iPhone user?
4        A.    I don't know if you're saying I'm not
5    ordinary.  It's possible.
6        Q.    I'm calling you extraordinary.  Take a
7    compliment.  I'll tell you, I'm not a witness
8    here.  I would have no idea how to bring an Excel
9    spreadsheet or a bunch of Adobe documents into an
10   iPhone.
11             But you tell me.  Could a typical
12   iPhone user do that?
13       A.    So if you plug your iPhone into your
14   laptop, you'll see that Windows will say, hey, do
15   you want to connect this device.  You have to hit
16   trust device on it.  And it can bring up a Windows
17   -- it can bring up a Windows Explorer entry and
18   you'll see your iPhone there.
19             And if you click on it, you will see a
20   folder, it will be DCIM, which is digital camera.
21   That is your photographs of -- where your
22   photographs are stored on that phone.  You can
23   drop and drag and copy them off and interact with
24   them.

Page 315

1             It is possible to copy files to that
2    location from your Windows computer.
3        Q.    Not just photos, but also Excel
4    spreadsheets?
5        A.    Anything.
6        Q.    So do you have an opinion, sitting here
7    today, about whether the exfiltration that you
8    claim occurred was to the USB thumb drive or to
9    the iPhone?
10       A.    Because the iPhone 6S was factory reset
11   before it was returned by a person I assume to be
12   Jessica Grailer before it was given to me, that
13   destroyed all evidence, like literally that's just
14   taking all of the documents out of a file cabinet
15   that is the an iPhone, shredding them and burning
16   them.
17             So no one can state what files existed
18   on that iPhone 6S anymore, or what activities were
19   on there.  It is very unfortunate.
20             The Emtec drive, I've been informed,
21   notwithstanding the fact that the evidence shows
22   that this Emtec drive contained Nalco files,
23   that's without question, it's connected to the
24   laptop on January 8th, 2023, in the evening, I've

Page 316

1    been informed that Ms. Grailer can no longer find
2    that, that USB drive.
3             So that would be -- so that's why in my
4    last report my recommendation would be to perform
5    a forensic analysis of this undisclosed computer.
6    Her new Chem Tree work computer, in particular,
7    would be my strong recommendation.  That's what I
8    would do if I was working for Chem Tree because I
9    would want to rule out whether that Emtec drive
10   had ever been connected to the new Chem Tree work
11   computer.
12             If there's no evidence of that, I
13   believe that's very important and relevant to this
14   dispute resolution.  That's my opinion.
15             MR. SPLITEK:  Let's go off the record
16   for a moment here.
17             THE VIDEOGRAPHER:  The time is 5:01
18   p.m. We are going off the record.
19                  (Whereupon, a break was taken,
20                   after which the following
21                   proceedings were had:)
22             THE VIDEOGRAPHER:  The time is 5:15
23   p.m. and we are back on the record.
24             MR. SPLITEK:  Mr. Lieb, I have no

Page 317

1    further questions for you today.
2             Mr. Yoshimura has an opportunity
3    to ask you questions if he would like, and if
4    he does, I may ask you questions on redirect.
5    But I will turn it over to Mr. Yoshimura.
6             MR. YOSHIMURA:  Thank you, Mr. Splitek.
7    We actually have no questions for Mr. Lieb at
8    this time.
9             MR. SPLITEK:  That's shocking.  Then
10   the deposition is over.  You can go.
11            THE WITNESS:  Fabulous.
12            THE VIDEOGRAPHER:  The time is
13   5:15 p.m.  This concludes the deposition for
14   today.
15            Would anybody like a video order
16   and transcript order?
17            MR. SPLITEK:  Yeah, I want both video
18   and the transcript.
19            MR. YOSHIMURA:  I'll take a transcript
20   for now.  We'll read and sign.
21            WITNESS EXCUSED AT 5:15 P.M.
22
23
24

Laurence D. Lieb
January 23, 2024

Page 318

```
 1              IN THE UNITED STATES DISTRICT COURT
                 WESTERN DISTRICT OF WISCONSIN
 2

 3   ECOLAB, INC., and NALCO       )
     COMPANY, LLC,                 )
 4              Plaintiffs,        )
                                   )
 5      -vs-                       )   No. 3-cv-102-wmc
                                   )
 6   JESSICA GRAILER,              )
              Defendant.           )
 7

 8           I, LAURENCE D. LIEB, being first duly
     sworn, on oath, say that I am the deponent in the
 9   aforesaid deposition, that I have read the
     foregoing transcript of my deposition taken
10   January 23, 2024, consisting of Pages 1 through
     320 inclusive, taken at the aforesaid time and
11   place and that the foregoing is a true and correct
     transcript of my testimony so given.
12                   Corrections have been submitted
                     No corrections have been
13                   submitted
14

15           LAURENCE D. LIEB, Deponent
16

     SUBSCRIBED AND SWORN TO
17   before me this      day
     of          C.E., 2024.
18
19      Notary Public
20
21
22
23
24
```

Page 319

```
 1              REPORTER'S CERTIFICATE

 2           I, Noreen E. Resendez, Registered

 3   Professional Reporter and Notary Public in and for

 4   the County of DuPage, State of Illinois, do hereby

 5   certify that on the January 23, 2024, the

 6   deposition of the witness, LAURENCE D. LIEB, was

 7   called by the Defendant, was taken before me,

 8   reported stenographically and was thereafter

 9   reduced to typewriting through computer-aided

10   transcription.

11           The said witness, LAURENCE D. LIEB, was

12   first duly sworn to tell the truth, the whole

13   truth, and nothing but the truth, and was then

14   examined upon oral interrogatories.

15           I further certify that the foregoing is

16   a true, accurate and complete record of the

17   questions asked of and answers made by the said

18   witness, at the time and place hereinabove

19   referred to.

20           The signature of the witness was not

21   waived by agreement.

22           Pursuant to Rule 30(e) of the Federal

23   Rules of Civil Procedure for the United States

24   District Courts, if deponent fails to read and
```

Page 320

```
 1   sign this deposition transcript within 30 days or

 2   make other arrangements for reading and signing

 3   thereof, this deposition transcript may be used as

 4   fully as though signed, and the instant

 5   certificate will then evidence such failure to

 6   read and sign this deposition transcript as the

 7   reason for signature being waived.

 8           The undersigned is not interested in

 9   the within case, nor of kin or counsel to any of

10   the parties.

11           Witness my official signature and seal

12   as Notary Public, in and for DuPage County,

13   Illinois, on this 29th day of January, C.E., 2024.

14
15
16
17
             /s/ Noreen E. Resendez, CSR, RPR, CRR
18           Notary Public
             License No. 084-004182
19
20
21
22
23
24
```